UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-1**

LOWENSTEIN SANDLER LLP
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)
Jeffrey Cohen, Esq. *(Admitted Pro Hac Vice)*
Michael Kaplan, Esq.
Nicole Fulfree, Esq.
Michael Papandrea, Esq.
Email: jcohen@lowenstein.com
Email: mkaplan@lowenstein.com
Email: nfulfree@lowenstein.com
Email: mpapandrea@lowenstein.com

*Co-counsel to the MSGI Liquidation Trustee*

| | |
|---|---|
| In re | Chapter 11 |
| MODELL'S SPORTING GOODS, INC., *et al.*, | Case No.: 20-14179 (VFP) |
| Liquidating Debtors.[1] | |
| MSGI LIQUIDATION TRUST, by and through its Liquidation Trustee, Steven Balasiano, | |
| Plaintiff, | |
| v. | |
| MITCHELL B. MODELL, individually, ERIC SPIEL, individually, HENRY MODELL AND CO., INC., M&M SERVICE CENTER, LLC, M&M OF BRUCKNER, M&M OF JAMAICA, LLC, M&M FLUSHING, LLC, and M&M MT. KISCO, LLC, | Adv. Case No. _____ |
| Defendants. | |

---

[1] The substantively consolidated Debtors in this chapter 11 case and the last four digits of each Debtor's federal tax identification number, as applicable, are as follows: Modell's Sporting Goods, Inc. (9418), Modell's II, Inc. (9422), Modell's NY II, Inc. (9434), Modell's NJ II, Inc. (9438), Modell's PA II, Inc. (9426), Modell's Maryland II, Inc. (9437), Modell's VA II, Inc. (9428), Modell's DE II, Inc. (9423), Modell's DC II, Inc. (9417), Modell's CT II, Inc. (7556), MSG Licensing, Inc. (8971), Modell's NH, Inc. (4219), Modell's Massachusetts, Inc. (6965) and Modell's Online, Inc. (2893) (collectively, the "Debtor"). The mailing address of the Debtors, solely for purposes of notices and communications, is MSGI Liquidation Trust, Attn: Steven Balasiano, Liquidation Trustee, c/o MHR Advisory Group, LLC, 6701 Bay Parkway, 3rd Floor, Brooklyn, New York 11204.

**COMPLAINT**

The MSGI LIQUIDATION TRUST, established pursuant to the Court's *Findings of Fact,
Conclusions of Law, and Order (I) Approving the Disclosure Statement on a Final Basis and (II)
Confirming the First Amended Joint Plan of Liquidation of Modell's Sporting Goods, Inc. and its
Subsidiary Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [Main Case ECF No. 827],
by and through its liquidation trustee, Steven Balasiano (the "Liquidation Trustee"), alleges the
following against Defendants, MITCHELL B. MODELL ("Mitchell"), ERIC SPIEL ("Spiel," and
together with Mitchell, the "Officer Defendants"), HENRY MODELL & COMPANY, INC.
("HMC"), M&M SERVICE CENTER, LLC ("Service Center"), M&M OF BRUCKNER, LLC
("Bruckner"), M&M OF JAMAICA, LLC ("Jamaica"), M&M FLUSHING, LLC ("Flushing"),
and M&M MT. KISCO, LLC ("Mt. Kisco," and together with Service Center, Bruckner, Jamaica,
and Flushing, the "M&M PropCos"), and states:

## I.  PRELIMINARY STATEMENT

1.     Prior to filing for protection under Chapter 11 of the Bankruptcy Code, the Debtor
operated a chain of retail sporting goods stores in the mid-Atlantic and New England regions.
Mitchell is the former Chief Executive Officer ("CEO") and director of the Debtor, and Spiel is
the former Chief Financial Officer ("CFO") of the Debtor.  HMC and the M&M PropCos are
primarily real estate-owning entities that were closely affiliated with the Debtor prior to its
bankruptcy, and which share common ownership and management with the Debtor.

2.     This is an action for damages brought against: i) the Officer Defendants for breach
of their fiduciary duties owed to the Debtor and its creditors while the Debtor was insolvent; ii)
Mitchell for the payment of unlawful dividends and the avoidance and recovery of fraudulent
transfers; iii) HMC and the M&M PropCos for aiding and abetting the Officer Defendants' breach

of their fiduciary duties to the Debtor and its creditors while the Debtor was insolvent, and iv) HMC for the avoidance and recovery of preferential transfers and breach of contract.

3.     As set forth herein, the Debtor has been insolvent since at least 2017, but, rather than abide their fiduciary duties to the Debtor and its creditors, the Officer Defendants caused the Debtor to continue operating for another three years in order to: i) reduce, to the extent possible, approximately $160M of potential liability of HMC – an affiliated Modell family-owned entity (of which the Officer Defendants were, likewise, the CEO and CFO, and for which Mitchell served as chairman of the board of directors in addition to being a 50% owner), which served as guarantor for the leases of dozens of the Debtor's stores, and ii) continue making rent payments to, and thus servicing $35M worth of mortgage debt owed by, the M&M PropCos – five Modell family-owned entities (of which Mitchell was the managing member and 50% owner), which were the landlords for four Modell's Sporting Goods stores and the Debtor's main distribution center.

4.     During that period, Mitchell also: i) engaged in self-dealing by causing the Debtor to accept inadequate consideration to terminate a below-market, long-term lease on the aforementioned distribution center (which allowed Mitchell to sell the distribution center to a third party at a tremendous personal profit, but created only problems for the insolvent Debtor), ii) continued receiving millions per year in compensation from the Debtor, comprised of a seven-figure salary and the payment of exorbitant personal expenses, and iii) caused the Debtor to pay millions in unlawful dividends (with 50% of all dividends going to Mitchell).

5.     Mitchell breached his duties as an officer and director of the Debtor by, among other things, prioritizing the preservation of his own personal and familial wealth over his duties to the Debtor and its creditors; failing to act in the best interests of the Debtor and its creditors at a time when the Debtor was insolvent; improperly exercising control over the Debtor on behalf

00680888.DOCX 30                                          3

and for the benefit of HMC and the M&M PropCos, and to the detriment of the Debtor; ignoring repeated advice of professionals hired by the Debtor to immediately close dozens of unprofitable and underperforming stores; failing to timely engage a real estate consultant to even explore the possibility of closing unprofitable or underperforming stores; failing to hire independent directors or recuse himself from business decisions that raised insurmountable conflicts of interest; causing the Debtor to accept inadequate compensation for the termination of a long-term, below-market lease on its distribution center at a time when the Debtor was financially unable to fund the capital expenditure required to lease and build out a new distribution center; and causing the Debtor to pay unlawful dividends.

6.      Spiel breached his duties as an officer of the Debtor by, among other things, failing to act in the best interests of the Debtor and its creditors at a time when the Debtor was insolvent;

7.      HMC and the M&M PropCos exercised control over the Debtor through their common management and thereby aided and abetted the Officer Defendants' breach of their fiduciary duties to the Debtor for the benefit of HMC and the M&M PropCos and to the Debtor's detriment.

8.      As a direct and proximate result of the actions or omissions of the Defendants, the Debtor was made to: i) continue operating while insolvent solely for the benefit of Mitchell, HMC, the M&M PropCos, and the Modell family, without a plan or hope of returning the Debtor to profitability, and ii) incur hundreds of millions of dollars in damages in the form of lost assets, lost corporate opportunities, and unnecessary proliferation of creditor claims.

## II.     PARTIES, JURISDICTION, AND VENUE

9.      On March 11, 2020 (the "Petition Date"), the Debtor filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code.

10.     Plaintiff is the Liquidation Trustee appointed pursuant to the *Findings of Fact, Conclusions of Law, and Order (I) Approving the Disclosure Statement on a Final Basis and (II) Confirming the First Amended Joint Plan of Liquidation of Modell's Sporting Goods, Inc. and its Subsidiary Debtors Pursuant to Chapter 11 of the Bankruptcy Code*, which was entered by the Court on November 13, 2020. [Main Case ECF No. 827].

11.     Prior to the Petition Date, the Debtor was a Delaware corporation with its principal place of business at 498 Seventh Avenue, 20th Floor, New York, New York 10018.

12.     Defendant Mitchell B. Modell served as a member of the Debtor's board of directors from the date of Debtor's incorporation through the Petition Date, and as its CEO from 2001 until the Petition Date.

13.     Defendant Eric Spiel served as the CFO of the Debtor from 2009 until March of 2019.

14.     Defendant Henry Modell & Company, Inc. is a New York corporation which, at all times relevant hereto, had its principal place of business in the Debtor's headquarters at 498 Seventh Avenue, 20th Floor, New York, New York 10018. At all times relevant hereto, Mitchell was the chairman of the board of directors, CEO, and owner of 50% of the common stock of HMC. At all times relevant hereto, Spiel was the CFO of HMC.

15.     Defendant M&M Service Center, LLC is a New York limited liability company which, at all times relevant hereto, had its principal place of business in the Debtor's headquarters

at 498 Seventh Avenue, 20ᵗʰ Floor, New York, New York 10018. At all times relevant hereto, Mitchell was the managing member and owner of a 50% interest in Service Center.

16.    Defendant M&M of Bruckner, LLC is a New York limited liability company which, at all times relevant hereto, had its principal place of business in the Debtor's headquarters at 498 Seventh Avenue, 20ᵗʰ Floor, New York, New York 10018. At all times relevant hereto, Mitchell was the managing member and owner of a 50% interest in Bruckner.

17.    Defendant M&M of Jamaica, LLC is a New York limited liability company which, at all times relevant hereto, had its principal place of business in the Debtor's headquarters at 498 Seventh Avenue, 20ᵗʰ Floor, New York, New York 10018. At all times relevant hereto, Mitchell was the managing member and owner of a 50% interest in Jamaica.

18.    Defendant M&M Flushing, LLC is a New York limited liability company which, at all times relevant hereto, had its principal place of business in the Debtor's headquarters at 498 Seventh Avenue, 20ᵗʰ Floor, New York, New York 10018. At all times relevant hereto, Mitchell was the managing member and owner of a 50% interest in Flushing.

19.    Defendant M&M Mt. Kisco, LLC is a New York limited liability company which, at all times relevant hereto, had its principal place of business in the Debtor's headquarters at 498 Seventh Avenue, 20ᵗʰ Floor, New York, New York 10018. At all times relevant hereto, Mitchell was the managing member and owner of a 50% interest in Mt. Kisco.

20.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1334; 28 U.S.C. §§ 157(a), (b)(2)(A), (H), and (O); and Federal Rule of Bankruptcy Procedure 7001, and the Liquidation Trustee consents to the entry of final orders and judgment by the Bankruptcy Court. Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1409(a), as this proceeding arises in a case under Title 11 which is pending in this Court.

## III.   FACTS SUPPORTING CLAIMS

### A. *Background and Overview of Claims*

21.   Prior to the Petition Date, the Debtor was the owner and operator of more than 150 Modell's Sporting Goods stores – a value-oriented retailer of apparel, footwear, and sporting goods.

22.   The retail business formerly operated by the Debtor was started in Manhattan in 1889 by Mitchell's great-grandfather, Morris Modell, under the banner of Henry Modell & Company, Inc.

23.   Throughout its 130-year history, HMC has always been privately owned by members of the Modell family, and, in 1986, ownership of the common stock of HMC was passed on to and thereafter shared equally between Mitchell and his brother, Michael S. Modell ("Michael").

24.   In the same year, the Debtor was created by Mitchell and Michael as part of a strategy to dramatically expand the retail business, and, like HMC, ownership of the Debtor was shared equally between Mitchell and Michael until Michael's untimely death in 2001. Following the creation of the Debtor, the M&M PropCos were also created as special purpose real estate-owning entities, and ownership of the M&M PropCos was also shared equally between Mitchell and Michael.

25.   Following Michael's passing, his ownership interests in the Debtor, HMC, and the M&M PropCos passed into the Trust Under the Will of Michael S. Modell, Paragraph Sixth (the "Trust") for the benefit of Michael's widow, Abby Modell ("Abby"), and Mitchell became the CEO of the Debtor (a role he maintained until the Petition Date) as well as the CEO of HMC and the managing member of the M&M PropCos.

26.     The Debtor's creation and expansion was funded by HMC, but the Debtor ultimately became the larger entity and the center of retail operations, while HMC became primarily a real estate holding company and store of Modell family wealth, as were the M&M PropCos (each a single purpose real estate holding entity).

27.     The Debtor's operations eventually expanded throughout the New England and Mid-Atlantic regions, with stores in New York, New Jersey, Pennsylvania, New Hampshire, Massachusetts, Maryland, Virginia, Washington, D.C., and Connecticut.

28.     Although HMC and the M&M PropCos were nominally separate from the Debtor, the contours of the Debtor-HMC-M&M PropCos relationship were convoluted, and, through at least 2017, the Debtor and HMC had "always been run as one business with consolidated financial reporting." Indeed, by 2017, HMC owned only 7 of the 158 Modell's Sporting Goods stores operated by the Debtor, and HMC lacked the ability to handle its own payroll or overhead services, let alone operate HMC-owned stores itself. Instead, HMC was operated by the Debtor's employees from the Debtor's headquarters, and the handful of HMC-owned stores were entirely dependent on the Debtor's continued operation, as they were staffed by the Debtor's employees and furnished with inventory by the Debtor pursuant to a complex Services Agreement between HMC and the Debtor. Similarly, the M&M PropCos had no independent offices, and the Debtor's employees operated the M&M PropCos, which were landlords to the Debtor and HMC but had no employees of their own.

29.    HMC, for its part, served as the deep pocket backing the Debtor – vendors and landlords were provided with consolidated financials that included HMC's extensive real estate assets, and HMC guaranteed the leases of dozens of the Debtor's stores. Moreover, HMC and the Debtor even had identical senior executives, with Mitchell and Spiel simultaneously serving as the CEO and CFO, respectively, and Douglas Epstein serving as the general counsel (the "GC"), of each. As did the M&M PropCos, with Mitchell serving as the managing member of each as well as the CEO of the Debtor. And the lines between the companies were unclear. For instance, Spiel's CFO employment agreement was with HMC, but he also served as the CFO of the Debtor, which was the entity that actually paid his salary (as well as Mitchell's and the GC's), with only a small portion of his salary reimbursed to the Debtor by HMC in connection with his role as HMC's CFO. Additionally, Mitchell was simultaneously the chairman of the board of HMC and, at nearly all relevant times, the sole director of the Debtor.

30.    By 2017, however, ███████████████████████████████████████████

███████████████████████ nearly all of the family's retail stores were owned and operated by the Debtor, which was in a state of existential peril. And despite the Debtor being the entity tasked with operating and managing all of HMC's and the M&M PropCos' real estate holdings, it owned none of the real estate.

31.    For the last decade of Mitchell's tenure as CEO of the Debtor, he operated almost entirely without the supervision, direction, or oversight of a board of directors (with the exception of two brief periods during the Debtor's final decade in operation, Mitchell was its sole director and CEO), and with the active cooperation and support of Spiel, who was the CFO until just one year prior to the Petition Date. Moreover, rather than having a board of directors, the Debtor had a "board of advisors" to whom it paid hundreds of thousands of dollars annually, but the advisors

had no authority over Mitchell and were regularly called upon to advise Mitchell regarding *his* interests, instead of those of the Debtor.

32.     As a result, years of unchecked mismanagement by the Officer Defendants left the Debtor in dire straits.

33.     During Mitchell's tenure as CEO, the Debtor nearly doubled its store count, while its financial performance declined year by year. Indeed, by 2014, the Debtor required the services of a restructuring consultant to evaluate and advise the struggling business. But the Officer Defendants then ignored the advice they were provided, as well as the advice of a second restructuring consultant, which the Officer Defendants retained in 2017 and again in early 2019.

34.     Had the Officer Defendants followed the advice they caused the Debtor to pay for on three separate occasions, the Debtor would have undergone a dramatic restructuring, or a bankruptcy, by 2017 or 2019. ███████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

35.     ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████



36.   Moreover, beyond willfully disregarding the sound advice of the Debtor's restructuring consultants, Mitchell negligently or willfully disregarded the grim reality of the Debtor's financial position and caused the Debtor to pay out over $12.3M in unlawful dividends to himself and to the Trust between 2014 and 2018.

37.   In February of 2019, Spiel fled the sinking ship, just as the Debtor was in the process of *re*-hiring the restructuring consultant that recommended a Chapter 11 in 2017.

38.   In March of 2019, the Debtor's recent *re*-hiring of its *second* restructuring consultant leaked to the press, and the *Wall Street Journal* ran an article breaking the news to the world (and to the Debtor's vendors and landlords). The Debtor's already tightening liquidity situation instantly became worse. Mitchell went into damage control mode with vendors and creditors, assuring all that he would do everything he possibly could to ensure the survival of the Debtor's business, and convincing vendors to continue shipping goods and non-affiliated landlords to grant forgiveness and deferrals of rent, despite making no such requests of the M&M PropCos. Incredibly, Mitchell even appeared on a *Fox News* program, during which he affirmed that the matter of the Debtor's survival was not just business to him, declaring that the Debtor's business was "in his veins, his blood, his DNA, it's who I am!" But the reality was that, for several years,

the survival of the Debtor's business was far from Mitchell's priority, as were his duties to the Debtor and its creditors. Indeed, even members of Mitchell's family questioned his motives and operation of the Debtor's business.

39.     For example, Abby and Mitchell served as co-trustees of the Trust from its inception in 2001 through April of 2019, but their relationship was acrimonious and litigious. By 2011, Abby was suing Mitchell for paying himself an exorbitant salary from the Debtor upon his promotion to CEO following her husband's death, causing the Debtor to make improper payments to fund his lavish personal lifestyle, and allowing other Modell family members to draw salaries from the Debtor despite providing no services to the Debtor. And Abby also brought suit to have Mitchell removed as a co-trustee of the Trust. A global settlement between Abby and Mitchell resulted in, among other things, i) a substantial payment from Mitchell to Abby, ii) Mitchell becoming the sole shareholder of the Debtor in April of 2019, and iii) Mitchell's resignation as a co-trustee of the Trust.

40.     Furthermore, numerous internal communications, analyses, and presentations evidence Mitchell and Spiel's true motivation during the period of March 2017 through the Petition Date. █████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████

41.     As a result of Mitchell placing his own interests, and those of HMC and the M&M PropCos, above those of the Debtor and its creditors, and Spiel's active support and participation

in same, Defendants caused the Debtor to amass nearly $200M in additional liability and creditor claims while they: i) extinguished approximately $80M worth of HMC's guarantee liability, ii) caused the Debtor and HMC to pay nearly $15M in additional rent payments to or for the benefit of the M&M PropCos, iii) caused the Debtor to pay in excess of $12M in unlawful dividends to Mitchell and the Trust between 2014 and 2018; iv) caused the Debtor to terminate a long-term, below-market rate lease of its distribution center (owned by Service Center) so that Mitchell could sell the center at a tremendous personal profit, and v) caused the Debtor to pay Mitchell millions in additional compensation, including a seven-figure salary and the improper payment of Mitchell's personal expenses by the Debtor, all while the Debtor was already insolvent and the Officer Defendants were in breach of their fiduciary duties to the Debtor and its creditors.

42.     Indeed, as of early 2017, the Debtor's books reflected liabilities totaling $175M, which, ███████████████████████████████████████, mushroomed into unpaid creditor claims in excess of $350M as of the Petition Date, while Mitchell, HMC, and the M&M PropCos avoided bankruptcy ████████████████████████████████████████████

## B. The Writing on the Wall

43.     During Mitchell's nearly twenty-year term as CEO and Spiel's decade as CFO, the Debtor slipped into insolvency and ultimately made a long-overdue filing for Chapter 11 protection in March of 2020.

44.     By at least 2014, however, the Debtor was insolvent, and the causes of the Debtor's insolvency were well known to Defendants by that time.

45.     To be sure, in late 2014, under the moniker, "Project Silver Octopus," the Officer Defendants caused the Debtor to engage a restructuring consultant to evaluate the status of the

business. The report generated by the consultant declared, in no uncertain terms, the dire state of the Debtor's business.

46.     Based on data supplied to it by Spiel, the consultant prepared a report (the "First Restructuring Report"), which identified numerous issues with the business, such as more than a decade of: poor sales performance, escalating corporate costs, increased occupancy costs as a percentage of sales, tightening liquidity, and downward trending EBITDA, all of which, the consultant noted, were "well documented and not news to the Senior Management team or Board of Advisors."

47.     Based on the performance trend of the Debtor, the consultant recommended that an "overall restructuring" of the Debtor's business needed to be commenced "immediately."

48.     Indeed, the consultant reported that, over the preceding 14 years, the number of stores operated by the Debtor nearly doubled, from 86 in 2000 to 154 by the end of 2013, but, over the same period, profitability per store declined by 50% and average store sales declined by 20%.

49.     Moreover, over the same 14-year period, the Debtor's selling, general, and administrative expenses ("SG&A") and occupancy costs increased dramatically, both in absolute terms and as a percentage of sales.

50.     To wit, SG&A costs increased by nearly 150% in absolute terms, and by nearly 25% as a percentage of sales, while occupancy costs increased by nearly 300% in absolute terms, and by nearly 200% as a percentage of sales.

51.     All of which, the consultant reported, resulted in the Debtor's operating income suffering a significant decline from the period of 2000 through the end of 2013 – from in excess of $20M in 2000 to less than $3M in 2013.

52.    To be sure, by the end of 2013, one out of every five of the Debtor's 154 stores were unprofitable (28 stores), and another 10 stores contributed annual profits of less than $100,000.

53.    The consultant predicted that the Debtor's downward trend would only continue unless drastic measures were taken to either: i) rein in skyrocketing costs by approximately $15M *and* close unprofitable stores or ii) sell the Debtor to a strategic or financial buyer.

54.    For instance, the consultant pointed out that the costs associated with the Debtor's home office had nearly doubled (an increase of nearly $20M) over the period analyzed (and the headcount in the office increased from approximately 130 to nearly 240), and the Debtor might achieve a significant cost reduction by reducing the home office headcount in conjunction with the closing of the Debtor's 28 unprofitable stores.

55.    But merely closing unprofitable stores and reducing home office expenses would not be enough, the consultant warned. Expenses associated with the operation of the Debtor's stores and distribution center, and working capital requirements, would also need to be reduced in order to achieve a targeted EBITDA of 3% of sales, or approximately $16.5M.

56.    The suggested restructuring would not, however, be without its own costs, such as severance for employees, negotiated lease termination payments for unprofitable stores, and professional fees associated with the recommended out-of-court restructuring, including, for example, hiring a real estate expert to negotiate early lease terminations.

57.    To finance the proposed restructuring, the consultant suggested that Mitchell and the Trust might explore the sale or refinancing of some of the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ real estate holdings of HMC or the ▮▮▮▮▮▮▮▮▮▮▮ real estate holdings of the M&M PropCos (which were jointly owned by Mitchell and the Trust).

58.    Based upon the consultant's analysis, the conclusion set forth in the First
Restructuring Report was a recommendation that the Debtor *immediately and concurrently*: i)
engage an investment banker to evaluate strategic alternatives related to a potential sale and ii)
engage in a process to "right size" the business to achieve historical EBITDA performance levels.

59.    Despite causing the Debtor to pay $125,000 for the consultant's analysis and report,
the Officer Defendants ignored the recommendations in the report and declined to engage an
investment banker, begin the process of right-sizing the Debtor's business by hiring a real estate
expert to negotiate the termination of the leases of unprofitable stores, or rein in the extremely high
overhead costs of the home office.

60.    Indeed, rather than follow the consultant's advice to right-size or sell the business,
the Officer Defendants caused the Debtor to continue its expansion through 2016, at which point
it was operating 158 stores and suffered a net income loss of over $11M – a loss nearly 10 times
worse than the losses in fiscal year 2014 and over $12M in the negative year-over-year.

*C. Hope is Not a Course of Action*

61.    Following the disastrous results of 2016, in February of 2017, Mitchell directed
Spiel to analyze the potential impacts of either a bankruptcy filing or a reduction in store count in
an effort to achieve profitability.

62.    Spiel then re-circulated the First Restructuring Report, pointing out that, "We paid
$125k for the attached so worth another read as the options and costs are very relative to the
discussions we are having."

63.    To be sure, because the Officer Defendants failed to implement the advice set forth
in the First Restructuring Report, the same issues faced by the Debtor persisted and the Debtor's
financial results continued to decline as predicted.

64.     Nonetheless, Spiel prepared a new report by the end of February 2017. The resulting analysis – set forth in a forty-page presentation dubbed "Project Hope" – reflects the considerations in the Officer Defendants' minds when evaluating whether to cause the Debtor to file for bankruptcy protection, which were primarily i) Mitchell's risk of personal liability, ii) the likelihood that Mitchell would be able to maintain majority control of the Debtor and his position as CEO, iii) the impact on Mitchell's business and personal reputation, iv) the impact on Mitchell's ability to obtain trade and personal credit post-filing, v) the professional and social impact on Mitchell's sons, vi) the risk of a substantive consolidation of HMC with the Debtor, vii) the implications of HMC's joint liability for the then-$18M dollars' worth of unfunded pension liability of the Debtor, and viii) the cash flow impact on Mitchell and the Trust if the Debtor and HMC were to suddenly stop paying rent to the M&M PropCos (which were using cash flow from rent payments to service approximately $35M worth of mortgage debt on their respective holdings).

65.     Notably absent from the foregoing Project Hope considerations are any discussion of or concern for the Debtor, the Debtor's creditors, or the Officer Defendants' fiduciary duties to both.

66.     To the contrary, the presentation reflects the Officer Defendants' blatant disregard for their duties to the Debtor and its creditors.

67.     For example, the presentation explicitly states that, based on 2016 store performance, the Debtor had as many as 54 stores (of its 158) which each generated less than $100,000 per year in profit – 37 of which were unprofitable and 17 of which generated between $0 and $100,000 in profit per year – and *would* be "target[ed] to close." However, Spiel's presentation also pointed out that the leases for 11 of those 54 stores were guaranteed by HMC,

00680888.DOCX 30                                    17

and those stores *would not* be closed for that reason, despite the fact that they would collectively contribute only losses of nearly $2.6M over the course of the next two years.

68.     And Spiel's Project Hope analysis only served to reinforce the earlier findings of the dire state of the Debtor's business announced in the First Restructuring Report in connection with Project Silver Octopus, and to show that the Debtor's financial condition had only deteriorated – as predicted – in the intervening time.

69.     By way of example, the two reports showed that the number of unprofitable stores had increased from 28 to 37, and the number of stores generating less than $100,000 per year in profits had increased from 10 to 17.

70.     Furthermore, the Project Hope presentation showed that, even after eliminating most of the poorly performing stores, the Debtor's profitability per store in 2017 would be lower than it was in the disastrous 2016, and would continue to decrease each year going forward due to new, higher minimum wage rates and increases in rent, common area maintenance, and real estate taxes owed in connection with existing leases.

71.     Nonetheless, the Officer Defendants made presentations to banks in mid-March 2017 in which they projected the Debtor's "return to profitability in 2017."

72.



73.



74.

75.

76.

77.



78.

79.

80.



81.

82.

83.

84.    Indeed, even discussions amongst the Debtor's board of advisors began characterizing the Debtor's business as a "threat" to the preservation of Mitchell's wealth rather than an asset. For instance, the presentation for the "CEO session" of the May 2017 meeting of the Debtor's board of advisors (the "May 2017 Presentation") expressly states that, **"[a]fter**

**further evaluation of the business and discussion with Mitchell we have identified
Preservation of Wealth**, namely the family's substantial real estate investments, **as his primary
goal** (and likely that of the other Shareholder [sic]," and **"[w]e have identified several threats to
the preservation of wealth that need to be addressed** and or mitigated and are the focus of our
discussion today **including**: 1. Trustee Litigation [with Abby Modell], 2. Credit Facility Extension
[with JP Morgan], 3. **Henry Modell & Company (HMC) Lease Guarantees**, 4. **Retail Business
Performance**, 5. Potential Vendor Response to FY 16 Audited Financial Statements, [and] 6. FY
18 Liquidity."

85.     Thus, rather than calling upon the board of advisors to advise them in the execution
of their fiduciary duties and the best interests of the Debtor, the Officer Defendants called upon
the Debtor's board of advisors to advise them on how best to position Mitchell given the impending
financial collapse of the Debtor.

86.     To be sure, by that point, Defendants were of the belief that Mitchell's equity in the
Debtor's business was valueless, and the May 2017 Presentation reflects Defendants' belief that
Abby also "understand[s] the Equity of the Retail business, excluding the real estate income, is
worth \$0, other than to a strategic purchaser [sic]."

87.     Yet, despite the insolvency of the Debtor and Defendants' belief that Mitchell's
equity in the Debtor was valueless, Defendants caused the Debtor to continue its operations so as
to avoid subjecting HMC to liability on its lease guarantees and to prevent the M&M PropCos
from suffering a cash flow crunch.

88.     In fact, the board of advisors discussed in detail HMC's guarantees of 37 of the
Debtor's leases. The May 2017 Presentation, prepared by Spiel at Mitchell's direction, highlighted
that an immediate bankruptcy of the Debtor would trigger up to \$139M in lease liability for HMC

under a "worse case [sic]" scenario (which would turn out to be a low estimate), carefully detailed the rent, common area maintenance, and taxes owed through the end-of-term for each guaranteed lease, graphed out HMC's lease exposure on a year-by-year basis into the future, and separately analyzed the amounts to be paid through end of term in connection with the 11 leases for unprofitable stores (totaling $24M) that would have already been closed but for HMC's liability as guarantor.

89.     The May 2017 Presentation also discussed and acknowledged the continuing decline of the Debtor's business, stating, "despite numerous initiatives, management changes and $50M in investment over the last 5 years, the retail business has not turned around," and "a material restructuring of the business model and of the overhead base is necessary immediately if there is any intent to operate the business past Q2 2018 . . . " – precisely what the Officer Defendants had been advised years before.  And the board of advisors also discussed the expectation that things would only get worse when the Debtor's vendors received the financial results for 2016 and began revising and reducing their credit terms.  A reduction of just 30 days' payment dating by the Debtor's largest vendor, it was noted, would have a $15M impact on the Debtor's cashflow.

### F. The Status Quo is Not an Option

90.     By the end of May 2017, Mitchell considered retaining an investment bank to explore the potential sale of the Debtor, and, on the advice of the Debtor's restructuring counsel, considered hiring another restructuring consultant to evaluate the Debtor's condition.

91.     While the Officer Defendants did not ultimately retain the investment bank, their presentation to the bank, on June 1, 2017, reiterated Mitchell's priorities and desired outcomes, including the prioritization of HMC and the M&M PropCos' interests, stating: "The shareholders own a substantial real estate portfolio, which is primarily deployed to support their retail business

(stores, distribution centers). The shareholders desire to (i) maximize the income from these properties and (ii) mitigate the risks to the real estate business from the retail business, including guarantees of 37 Modell's Sporting Goods, Inc. leases by Henry Modell & Company, Inc.," which, Defendants stated, amounted to $139M in exposure.

92.     Then, at the Officer Defendants' direction, restructuring counsel for the Debtor spoke with two managing directors of a potential restructuring consultant, and reported back to the Officer Defendants that the consultant was very interested in exploring whether a right-sized store footprint would work for the Debtor, and that the right-sizing strategy "would be coupled with the continued use of the leases guaranteed by HMC that *cannot* be exited." (emphasis added). But the reality was that Mitchell never allowed the Debtor to explore whether it would be possible to exit those leases. It simply was not an option that Mitchell permitted the Debtor's professionals – including its *restructuring* counsel – to consider because it would expose Mitchell's personal wealth.

93.     Indeed, as stated by Spiel, the Officer Defendants wanted to work with the restructuring consultant, but wanted the consultant to understand that the "number one goal remains preservation of real estate and its risk mitigation," and all other priorities were to be "guided and filtered thru that prism [sic]."

94.     The Officer Defendants then went forward and caused the Debtor to retain the restructuring consultant (the Debtor's second in three years), which issued its final report a few weeks later on June 22, 2017 (the "Second Restructuring Report").

95.     Just like the First Restructuring Report and the Project Hope analysis, the Second Restructuring Report recommended that the Debtor's store footprint be "right-sized," in this case, by eliminating anywhere from 63 to 107 of the Debtor's existing 158 stores.

96.     But the Second Restructuring Report reflected that the Debtor's situation had only become more dire: the consultant found that only 43 of the 158 stores were "keepers," with 45 stores on the "bubble" and 70 stores deemed "closers."

97.     As a result of the worsened situation, a "shrink to operate" scenario was no longer a viable option – the consultant concluded that the capital requirements and cost reductions required to reach viability were not practical or likely.

98.     Indeed, the restructuring consultant found that the Debtor needed to be able to sustainably achieve $20M per year in EBITDA in order to be a viable, financeable entity, but all of the consultant's modeling showed that the Debtor would need to achieve cost reductions of at least $20M to achieve that result, which "management and [the consultant] concur[red]" was "not possible."

99.     Accordingly, the consultant determined that the Debtor's "business is not viable in the current state" and that maintaining the "status quo is not an option" because the Debtor's EBITDA levels were "not sufficient to maintain liquidity to operate through 2017 and beyond."

100.    Thus, the Debtor would need to "shrink to sell," which would involve closing all but "a subset of high-margin, geographically-focused locations," and, in order to obtain an attractive sales price, also file for Chapter 11 protection, because it would, among other things, expedite the disposal of assets with no strategic value.

101.    The consultant advised that the Debtor should *immediately* hire a real estate advisor to develop a strategy for lease mitigation and monetization and, *within two to three weeks*, refine and agree on a "shrink to sell" store footprint to pursue, engage a liquidator to evaluate store closure strategies, and evaluate the necessity for (and if necessary, appoint) a chief restructuring officer ("CRO") and independent directors.

### G. *Mitchell Declines to Hire a CRO or Independent Directors*

102.    On June 21, 2017, within two days of the consultant's presentation of its first draft
of the Second Restructuring Report, the Debtor's restructuring counsel provided the Officer
Defendants with three recommendations for well-qualified individuals that might serve as
independent directors of the Debtor, and advised the Officer Defendants that the Debtor should,
within the next two weeks, retain a CRO and appoint independent directors (with the CRO to report
to Mitchell and the to-be-expanded board of directors). A week later, in order to address concerns
raised by Spiel and the GC, counsel for the Debtor also recommended that the employment
agreement for the CRO should provide that the CRO would: i) report to the Debtor's board
(inclusive of two new independent directors) on any decision the CRO deemed necessary, and ii)
merely consult with Mitchell on such issues rather than seek Mitchell's approval.

103.    Ultimately, however, Mitchell ignored the consultant and counsel's advice, and
declined to retain either a CRO or independent directors, which would have limited his unchecked
authority over the Debtor and compromised his ability to ensure the protection of his and his
family's wealth.

104.    Indeed, notwithstanding the advice he was given and the Debtor's continued
financial decline, the fact did not change that Mitchell's personal wealth would still be
compromised if he were to close down stores with HMC-guaranteed leases or put the Debtor into
bankruptcy.

105.    ████████████████████████████████████████████████████
████████

106.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████



107.

108.

### H. Defendants Gut the Debtor to Keep it Nominally Afloat

109.    As predicted time and again, the Debtor's financial condition continued to worsen due to the Officer Defendants' steadfast refusal to take decisive action to close underperforming stores and begin the process of righting the ship.

110.    To be sure, in November of 2017, based upon an analysis by Spiel, the Officer Defendants predicted the Debtor would run out of money by either December or January and it would have to begin holding back checks from vendors and landlords in order to avoid default.

111.    Luckily for the Debtor, an exceptionally strong 4th quarter (driven largely by sales flowing from a particularly cold winter) allowed the Debtor to scrape by the end of 2017 and into the beginning of 2018.

112.    But, in January of 2018, [redacted]

[redacted] the Debtor was stripped of its most valuable asset when Mitchell caused it to agree to the early termination of the lease on its distribution center for pennies on the dollar.

113.    Indeed, the distribution center transaction was a terrible loss for the Debtor. As of 2018, the Debtor had nearly 13 years left on its lease of the distribution center, and its rent was far below the market rate – $1.8M per year, as compared with the Officer Defendants' estimate that the market rate was $6.5-7M per year. Based on that alone, the leasehold interest in the distribution center held tremendous financial value for the Debtor, but the strategic value to the Debtor was perhaps even more important, because the Debtor lacked the financial wherewithal (or a plan) to lease and build out a new distribution center.

114.    Nonetheless, because he stood to gain personally by the transaction, Mitchell caused the Debtor to accept only $15M for the early termination of the lease, which allowed Mitchell to sell the distribution center – owned by Service Center, one of the M&M PropCos – [redacted]

[redacted] to a third party. [redacted]

[redacted] Mitchell causing the Debtor to terminate its lease was necessary for Service Center to accomplish the sale – and to realize such a high sale price (the price of which was $40M greater than the Officer Defendants' estimated value of the property only one year before).

115.    While the transaction provided for the Debtor to enter into a new, 30-month lease of the distribution center from the buyer, the ballooning rent under the new lease effectively established an outside limit for the Debtor's continued operation. Indeed, the lease provided that the Debtor's rent would continue at $1.8M per year for the first 24 months, but would then increase to more than $1M per month for the next six months. Due to the Debtor's continuously

00680888.DOCX 30                                     28

deteriorating financial condition, however, there was no reasonable likelihood that the Debtor would be able to either i) pay the dramatically increased rent owed in months 25-30 of the new lease or ii) fund the $15-20M in capital investment required to lease and build out a new distribution center.

116.    Moreover, the fee for the early termination was neither negotiated at arms-length nor fair to or in the best interests of the Debtor. As an initial matter, the Debtor's rent was so far below market rates that the benefit which would accrue to Service Center by the early termination far exceeded the $15M fee paid. Indeed, Service Center stood to receive $19.5M from the Debtor over the course of the next 13 years under the terms of the terminated lease, but could expect to receive as much as $91M over that same period if it was able to re-let the property at the Officer Defendants' estimated prevailing market rate. But instead of paying the Debtor a reasonable amount for the early termination, Mitchell caused Service Center to pay, and the Debtor to accept, just enough to keep the Debtor nominally afloat so that it could continue burning down HMC's lease obligations and paying rent to the M&M PropCos, thereby maximizing the benefit to himself. Furthermore, the early termination created, as noted, a pressing need for a capital investment in a new distribution center that the Debtor had no ability to fund itself, and the early termination fee was entirely insufficient to provide such funding.

117.    Thus, even in causing a $15M payment to the Debtor from Service Center, Mitchell did nothing more than continue placing his own interests over the interests of the Debtor and its creditors. ██████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████

118.    While Mitchell was enriching himself, the Debtor's financial condition continued to deteriorate through 2018. Indeed, as set forth in the September 2018 presentation to the Debtor's board of advisors, Defendants anticipated that, by the end of the month, the Debtor would be unable to meet the liquidity requirements of its credit agreement with its primary lender.

119.    In order to avoid triggering the credit agreement's cash dominion provision due to insufficient liquidity, the Officer Defendants caused the Debtor to borrow yet another $10M pursuant to a term note in October of 2018. The impact of the note on liquidity, however, was almost immediately wiped out by lackluster sales in December of 2018, and the Debtor again expected to be in breach of its liquidity requirements by February.

120.    Indeed, the $10M loan was yet another in a long line of actions that no reasonable officer could have expected to cure the problem of the Debtor's inability to generate sufficient operating income or profit due to the Officer Defendants' long-standing refusal to close underperforming stores or reorganize the Debtor.

121.    In January of 2019, the ineffectiveness of the actions taken at the Officer Defendants' direction over the preceding years was expressly acknowledged in a presentation to the board of advisors. In that presentation, it was acknowledged that the Officer Defendants' failure to develop or implement a business model that generated sufficient free cash flow to sustain the Debtor's retail business had left the Debtor "materially worse." Indeed, pre-tax losses for the preceding three years were noted to be $23M, while EBITDA was a paltry 0.4% of sales and debt had multiplied by more than 1.5x over the same period.

122.    It was further calculated that, without cash infusions of $15M in 2019 ($9M in February and $6M in June), the Debtor would violate the liquidity requirement in its primary credit facility. Making matters worse, it was noted, Mitchell's termination of the distribution center lease created a capital expenditure requirement of $17-20M for the build out of a new distribution center, which the Debtor had no ability to fund.

123.    Given the dire circumstances, reason briefly prevailed and the Officer Defendants re-engaged the second restructuring consultant at the end of January of 2019, for the purpose of, among other things, advising the Debtor concerning potential opportunities to generate liquidity and to work with the Debtor on contingency planning, including the evaluation, planning, and execution of a potential restructuring. But the Officer Defendants' actions were far too little and far too late.

### I. Burning Down HMC's Lease Obligations

124.    Indeed, despite receiving the same advice again and again, Mitchell persisted for too long in maintaining the status quo, failing to right-size the Debtor, and allowing the Debtor to limp along while its creditor claims continued to proliferate.

125.    The silver lining, from Defendants' perspective, is that their breach of fiduciary duties bore fruit. Indeed, in a presentation to the Debtor's advisory board in February 2018, on a slide titled "Continuing To Burn Down the HMC Obligation," the Officer Defendants touted the elimination of $32M of HMC's lease obligations through the Debtor's continued operations during 2017 (via the payment of rent on guaranteed leases). And the Officer Defendants further noted that HMC's exposure from the riskier of the guaranteed leases (those that might be most difficult to mitigate) would decline to just $27M if the Debtor continued operating and paying rent through the end of 2020.

126. The Officer Defendants' success in this regard was noted at each subsequent advisory board meeting in 2018 and into 2019. To be sure, at the June and September meetings, it was highlighted that "we continue to burn off lease obligations of HMC as a guarantor and work deals to release HMC as we renegotiate, the liability as of [fiscal year end] 2018 is estimated to be $52-$155M depending on the ability to release certain properties. This works down to $38-107M by the end of 2020 [sic]."

127. And continue to burn off HMC's liability they did, as the Officer Defendants would point out in other advisory board presentation materials in early 2019: HMC had obtained another "$29M relief by operating during FY18."

### J. The "Perfect Storm"

128. On March 11, 2019, the *Wall Street Journal* ran an article announcing that the Debtor had recently retained a restructuring consultant and speculating about the likelihood that the Debtor would file for bankruptcy in the near term. As a result, the Debtor's vendors stopped shipping goods immediately, which prompted Mitchell to go on a campaign to assuage the concerns of the Debtor's vendors and landlords in a desperate attempt to keep the Debtor even nominally afloat.



129.

130.

32

131. With his ego and his personal wealth at risk, Mitchell went on a full court press with the Debtor's vendors and landlords. For instance, Mitchell hosted carefully-scripted conference calls with the Debtor's landlords and vendors on April 4 and 15, 2019.

132. During his call with the Debtor's landlords, Mitchell acknowledged that the Debtor had "never seen more turbulent times than we have in the past 18-36 months," but blamed the challenging period on "the Amazon impact on retailers today," and claimed that, "during this retail disruption, Modell's has continued to change and pivot to adjust to these challenges," but "the 'perfect storm' of a challenged retail [sic] coupled with the impact of the [*Wall Street Journal*] article last week negatively affected us." Ironically, Mitchell further claimed that the Debtor would "continue to review every cost item every minute of every day" and be "closing under-performing stores and bring[ing] occupancy costs more in line with [the Debtor's] sales performance." Mitchell stated that the Debtor needed a 4-month rent deferral from every landlord in order "to manage through our liquidity crisis."

133. But the truth was that the *Wall Street Journal* article was simply the straw that broke the camel's back after years of actions (or inaction, as it were) by the Officer Defendants directly contrary to: i) the advice of the Debtor's professionals and ii) the Debtor and its creditors' interests.

134. The preparation of the script for Mitchell's call with the vendors is also telling. On April 11, 2019, a draft script was sent to Mitchell. The draft script set out, among other things, that either Mitchell or the Debtor's EVP of merchandising had already personally spoken with every vendor, and invited every vendor to call Mitchell directly if they had any questions or concerns, because Mitchell "wanted to be totally transparent, forthright, and upfront" and let the vendors know "how sensitive" he was to their situations. The script initially called for Mitchell to then point out "positive updates on other fronts," including that "[o]n Friday, April 5th, after 11

years of litigation, my sister in law Abby Modell finally settled our lawsuit as well as the transfer of the business. **That means that I now own 100% of Modells Sporting Goods, & I have the freedom & authority to do what is needed to get the company back on solid financial footing** [sic]." (emphasis added).

135.    However, as the sole director and CEO of the company, Mitchell had near-plenary authority over the management of the Debtor for nearly twenty years, but had failed to act in accordance with the sound advice and analysis of professionals in recent years in order to protect his own interests and those of HMC and the M&M PropCos (which he did not even cause to grant rent deferrals matching those he requested and received from the Debtor's non-affiliated landlords). Thus, likely recognizing the absurdity of this statement, that part of the script was revised to state, "On Friday, April 5th, after 11 years of litigation, my sister in law Abby Modell finally settled our lawsuit as well as the transfer of the business. **That means that without the distraction and overhang of the shareholder litigation, I can now focus 100% and do what is needed to get the company back on solid financial footing**." (emphasis added).

136.    But Mitchell continued to fail to do what needed to be done to satisfy his duties to the Debtor and its creditors, such as working to create a plan to steer the Debtor out of insolvency, and instead continued focusing on preserving his own wealth (i.e., the value of HMC and the M&M PropCos).

137.

138.



139.    Coming full circle in January of 2020, the second restructuring consultant issued yet another report (the "Third Restructuring Report") repeating what it had said before: the Debtor needed to close its underperforming stores, which had dragged the Debtor into insolvency years before. The numbers changed slightly, but the story was the same. The Debtor was operating 141 stores as of January of 2020. Seven of those stores generated less than $50,000 per year in profit, and 28 stores were entirely unprofitable. Altogether, those 35 stores caused a $6.3M loss in EBITDA in 2019, and they needed to be closed immediately.

140.    In the end, however, the Debtor's fate had been sealed by years of inaction by Defendants, and neither the concessions wrangled from vendors and landlords nor the loan provided by Mitchell cured the underlying problems that had been known to the Officer Defendants for years.

141.    Finally, in March of 2020, the Debtor filed for a long-overdue bankruptcy, after Defendants caused the debts of the Debtor and the claims of its creditors to proliferate by nearly $200M over the preceding three years. And while Mitchell did briefly employ an independent director to help oversee the Debtor's operations, Mitchell paid him little to no heed, did what he had always done, and bears responsibility for the Debtor's worsened state.

## K. Mitchell Merely Paid Lip Service to Appointing an Independent Director

142.    On October 18, 2018, more than a year after being urged by the Debtor's restructuring counsel to retain a CRO and appoint independent directors, Mitchell finally caused the Debtor to hire and appoint an independent director with extensive restructuring and bankruptcy experience (the "Independent Director").

143.    However, rather than appoint two directors, as urged by his counsel, Mitchell hired only one, which meant that he could not be overruled by the Debtor's board, and the board would

00680888.DOCX 30                                    36

not be able to truly exercise its duty of oversight of the Officer Defendants. Additionally, neither

Mitchell's resolution appointing the Independent Director nor the Debtor's employment agreement

with the Independent Director provided for the Independent Director to have exclusive authority

when Mitchell, the Debtor, or the board was faced with issues that raised conflicts of interest for

Mitchell, and Mitchell never voluntarily recused himself from any board decision despite his well-

known and -documented conflicts of interest.

144.    Indeed, rather than creating a true board of directors responsible for overseeing the

Debtor's officers, Mitchell hired the Independent Director to merely check a box, then folded the

Independent Director into his board of advisors, and treated him as one more advisor. As a result,

the Debtor continued to suffer at Mitchell's hands.

145.



███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

146.    Rather than accept the counsel or oversight of the Independent Director, however, Mitchell requested his resignation on or about April 7, 2019. Perhaps less than enthused with his treatment as a director and concerned with the decisions being made by Mitchell in the wake of the *Wall Street Journal* article, the Independent Director resigned his directorship only seven months after his appointment, in May of 2019, while Mitchell was negotiating a renewal of the Debtor's credit facility with its primary lender and the terms of the $6.8M subordinated loan from ███ himself to the Debtor.

147.    The Independent Director would later rejoin the Debtor in January of 2020, but he ensured that he would have a voice in the running of the company. To wit, the Independent Director's second employment agreement explicitly provided that he would be solely responsible for addressing any matter submitted to the board for approval which involved Mitchell, HMC, the M&M PropCos, or any other Modell family member or entity, if the interests of the Debtor and such person or entity were not fully aligned.

148.    But even then, Mitchell couldn't resist putting his thumb on the scale when he saw an opportunity to favor his personal interests over those of the Debtor and its creditors. For instance, shortly after the Independent Director rejoined the Debtor, HMC directed its chief operating officer (the "COO") to collect records from the Debtor and change the authorization of HMC bank accounts that had long been controlled by the Debtor. Rather than recuse himself from a situation in which the Debtor and HMC's interests were not fully aligned, Mitchell directed the Debtor's GC to cooperate – and to do so quickly – with all requests made by HMC's COO.

149.    Additionally, in March of 2020, following the Debtor's delivery of a demand upon

HMC for the payment of millions of dollars owed pursuant to the Debtor's provision of various

services and inventory to HMC, ███████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████

██████████████████████████ HMC refused to pay the Debtor for $5.3M worth of inventory and

millions of dollars' worth of services and reimbursements owed to the Debtor, to the detriment of

the Debtor and its creditors.

### L. The Debtor Has Been Insolvent Since At Least 2014

150.    The Debtor's liabilities have significantly exceeded the Debtor's assets since at

least 2014, and the Officer Defendants and the Debtor never had any plan or ability to repay: i) a

debt to HMC totaling tens of millions of dollars and ii) tens of millions of dollars in unfunded

pension benefits for which the Debtor was liable pursuant to the Debtor's defined benefit pension

plan (the "Pension").

151.    In 2011, the Debtor and HMC entered into a Services Agreement which

memorialized the long-standing arrangement between the parties whereby HMC funded the

Debtor, the Debtor provided various services to HMC – including, among other things providing

home office services and the staff to operate certain Modell's Sporting Goods stores owned by

HMC and furnishing the same with inventory to be sold, and HMC reimbursed the Debtor for

services and inventory provided. A true and correct copy of the Services Agreement is attached

hereto as **Exhibit "A."** Nonetheless, the Services Agreement did not require the Debtor to make

any payments in satisfaction of the principal during the term of the Services Agreement. Instead,

it provided for interest-only payments by the Debtor which took the form of credits in HMC's favor against amounts owed by HMC to the Debtor, for the intercompany debt to be adjusted in favor of the Debtor if HMC were to fail to pay any amounts due, and that, in the event of termination of the Services Agreement, any debt owed by one party to the other would be reduced to a 15-year note bearing simple interest. And, as expressly represented to the Debtor's auditors by Spiel, "this intercompany liability has no stated payment terms no due date nor history of ever being paid [sic]."

152.    Indeed, as of February 1, 2014, the Debtor owed in excess of $11M in unfunded pension benefits under the Pension, which it had no plan or ability to repay, and the Debtor had accumulated in excess of $35.5M in debt to HMC, which (i) represented the net value of funded capital, goods, and services provided by HMC to the Debtor since 1987, (ii) the Debtor had no plan or ability to repay, and (iii) would increase significantly by the Petition Date.

153.    Furthermore, for the year ended February 1, 2014 ("Fiscal Year 2013"), the Debtor's liabilities exceeded the Debtor's assets by nearly $18.5M, and the composition of the Debtor's assets (largely inventory, fixtures, and equipment) was such that they were recorded at or near fair market value.

154.    For the year ended January 31, 2015 ("Fiscal Year 2014"), the Debtor's liabilities exceeded the Debtor's assets by nearly $23M, the composition of the Debtor's assets (largely inventory, fixtures, and equipment) was such that they were recorded at or near fair market value, the Debtor owed in excess of $25.5M in unfunded benefits under the Pension, which it had no plan or ability to repay, and the Debtor had accumulated nearly $37M in debt to HMC, which it also had no plan or ability to repay.

155.    For the year ended January 30, 2016 ("Fiscal Year 2015"), the Debtor's liabilities exceeded the Debtor's assets by over \$25M, the composition of the Debtor's assets (largely inventory, fixtures, and equipment) was such that they were recorded at or near fair market value, the Debtor owed in excess of \$15.5M in unfunded benefits under the Pension, which it had no plan or ability to repay, and the Debtor had accumulated in excess of \$36M in debt to HMC, which it also had no plan or ability to repay.

156.    For the year ended January 28, 2017 ("Fiscal Year 2016"), the Debtor's liabilities exceeded the Debtor's assets by over \$38M, the composition of the Debtor's assets (largely inventory, fixtures, and equipment) was such that they were recorded at or near fair market value, the Debtor owed nearly \$18M in unfunded benefits under the Pension, which it had no plan or ability to repay, and the Debtor had accumulated in excess of \$37.5M in debt to HMC, which it also had no plan or ability to repay.

157.    For the year ended February 3, 2018 ("Fiscal Year 2017"), the Debtor's liabilities exceeded the Debtor's assets by nearly \$32M, the composition of the Debtor's assets (largely inventory, fixtures, and equipment) was such that they were recorded at or near fair market value, the Debtor owed in excess of \$20.5M in unfunded benefits under the Pension, which it had no plan or ability to repay, and the Debtor had accumulated nearly \$38M in debt to HMC, which it also had no plan or ability to repay.

158.    For the year ended February 2, 2019 ("Fiscal Year 2018"), the Debtor's liabilities exceeded the Debtor's assets by over \$48.5M, the composition of the Debtor's assets (largely inventory, fixtures, and equipment) was such that they were recorded at or near fair market value, the Debtor owed nearly \$20M in unfunded benefits under the Pension, which it had no plan or

ability to repay, and the Debtor had accumulated nearly $39M in debt to HMC, which it also had no plan or ability to repay.

159.    While audited financial statements for the Debtor for Fiscal Years 2019 and 2020 were never prepared due to the Debtor filing for bankruptcy protection on March, 11, 2020, the Debtor's insolvency continued through the Petition Date, as the Debtor's assets only declined while its liabilities dramatically increased over that period. Indeed, as of February 2, 2019, the Debtor's assets amounted to only $123M, while its total liabilities amounted to $172M, and, as of the Petition Date, the Debtor's liabilities had dramatically increased to include unpaid creditor claims in excess of $350M asserted against the Estate.

### M. Defendants Benefitted From Officer Defendants' Breaches of Duties

160.    Between 2014 and the Petition Date, while the Debtor was insolvent, the Officer Defendants placed Mitchell's personal and familial financial interests ahead of the interests of the Debtor and its creditors in violation of their fiduciary duties owed to the Debtor and its creditors, and caused the Debtor to continue operating to protect Mitchell's interests, as set forth above.

161.    Due to Defendants' actions, the Debtor amassed nearly $200M in additional liability between the beginning of 2017, when its liabilities totaled approximately $175M, and the Petition Date, when its unsecured creditor claims exceeded $350M.

162.    During that same period, Mitchell and HMC benefited from the Officer Defendants' breaches of fiduciary duties via the elimination of over $80M worth of liability on the part of HMC (of which he is the 50% owner) as guarantor of leases of the Debtor's stores.

163.    During that same period, Mitchell and the M&M PropCos benefited from the Officer Defendants' breaches of fiduciary duties via the Debtor's and HMC's continued payment of rents to the M&M PropCos (of which he is a 50% owner) totaling approximately $14.5M.

164.    In 2018, Mitchell caused the Debtor to terminate its long-term, below-market lease
of its distribution center (leased from Service Center) 13 years early. By the Officer Defendants'
calculations, the Debtor's annual rent was less than one third of the $6.5-7M going market rate for
the property. Causing the early termination of the lease for inadequate consideration to the Debtor
permitted Mitchell to cause Service Center (of which Mitchell is a 50% owner and the managing
member) to sell the distribution center ███████████████████████████████████████

████████████████████████████████████████████████████████████████████████

and harmed the Debtor by grossly underpaying it for an extremely valuable leasehold interest.

165.    Additionally, while actively in breach of their fiduciary duties and while the Debtor
was insolvent, the Officer Defendants caused the Debtor to make the following payments and
transfers to or for their benefit:

> a. from 2014 through 2018, the Debtor paid Mitchell unlawful dividends in the
> amount of $6,164,000 – $1,635,000 in 2014, $1,739,000 in 2015, $1,040,000 in
> 2016, $400,000 in 2017, and $1,350,000 in 2018;
>
> b. from 2017 through 2020, the Debtor paid Mitchell $5,676,923 in salary – $2.4M in
> 2017, $1.8M in 2018, $1.2M in 2019, and $276,923 in 2020;
>
> c. from February 2019 through December 2019, the Debtor paid $527,175 to satisfy
> personal charges on Mitchell's American Express Centurion Card, including
> charges for flights for friends and family, luxury hotel stays, tickets to sporting
> events, and meals; and
>
> d. from March 2017 through March 2019, the Debtor paid Spiel nearly $1.1M in
> salary.

## COUNT I
## BREACH OF FIDUCIARY DUTY
### *(against Mitchell B. Modell)*

166.   Plaintiff re-alleges paragraphs 1 through 165 as if fully set forth herein.

167.   At all times material hereto, Mitchell was the CEO of the Debtor.

168.   When a corporation is insolvent, its officers and directors owe fiduciary duties to the corporation and its creditors. The Debtor was insolvent at all times material hereto.

169.   As such, in his capacity as an officer of the Debtor, Mitchell owed the Debtor and its creditors fiduciary duties, including the duty of care and the duty of loyalty.

170.   As an officer, Mitchell had an obligation to discharge his duties in good faith with the care an ordinarily prudent officer in a like position would exercise and in a manner reasonably believed to be in the best interests of the Debtor and its creditors, and to consider all material information reasonably available in making business decisions.

171.   In his capacity as CEO of the Debtor, Mitchell exhibited a conscious, grossly negligent, and/or reckless disregard for the best interests of the Debtor and its creditors.

172.   In his capacity as CEO of the Debtor, Mitchell breached his fiduciary duties owed to the Debtor and its creditors by, among other acts or omissions, the following:

   a. Prioritizing the preservation of his personal and familial wealth over the best interests of the Debtor and its creditors to whom he owed fiduciary duties;

   b. Failing to act in the best interests of the Debtor and its creditors by ignoring repeated advice of professionals hired by the Debtor that recommended a restructuring of the Debtor, including the immediate closure of underperforming stores;