FILED
April 14, 2023
Jeanne A. Naughton, CLERK
United States Bankruptcy Court
Newark, NJ
By: Juan Filgueiras, Courtroom Deputy

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY | |
| In Re:<br><br>MODELL'S SPORTING GOODS, INC. *et al.*,<br><br>Liquidating Debtors. | Case No.: 20-14179 (VFP) |
| MSGI LIQUIDATION TRUST, by and through its Liquidation Trustee, Steven Balasiano,<br><br>Plaintiff,<br><br>v.<br><br>MITCHELL B. MODELL, individually, ERIC SPIEL, individually, HENRY MODELL AND CO., INC., M&M SERVICE CENTER, LLC, M&M OF BRUCKNER, LLC; M&M OF JAMAICA, LLC, M&M FLUSHING, LLC, and M&M MT. KISCO, LLC,<br><br>Defendants. | Chapter: 11<br><br>Adv. Pro. No.: 22-1076 (VFP)<br><br>Judge: Vincent F. Papalia<br><br>Hearing Date: February 8, 2023 |

**OPINION**

**APPEARANCES**

Michael A. Kaplan, Esq.
Michael Papandrea, Esq.
Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07068
*Counsel for MSGI Liquidation Trust*

Paul S. Hollander, Esq.
Margreta Morgulas, Esq.
Okin Hollander LLC
Glenpointe Centre West, 2nd Floor
500 Frank W. Burr Blvd., Suite 40
Teaneck, NJ 07666
*Counsel for Mitchell B. Modell*

Carlos Luis De Zayas, Esq.
Erin M. Hoskins, Esq.
Lydecker LLP
1221 Brickell Avenue, Suite 19th Floor
Miami, FL 33131
*Counsel for Eric Spiel*

Eric R. Perkins
Bercker LC
354 Eisenhower Parkway
Livingston, NJ 07039
*Counsel for Henry Modell & Co., Inc.*

Henry Longmire, Esq.
James H. Burbage, Esq.
787 Seventh Avenue
New York, NY 10019
*Counsel to Henry Modell & Co., Inc.*

Joseph L. Schwartz, Esq.
Tod S. Chasin, Esq.
Ryan M. Dunn, Esq.
Riker, Danzig LLP
Headquarter Plaza, One Speedwell Avenue
Morristown, NJ 07962-1981
*Counsel for M&M Service Center, LLC; M&M of Bruckner, LLC; M&M Mt. Kisco, LLC*

Andrew H. Sherman, Esq.
Lucas F. Hammonds, Esq.
Sills Cummis & Gross P.C.
One Riverfront Plaza
Newark, N 07102
*Counsel for M&M of Jamaica, LLC and M&M Flushing, LLC*

**VINCENT F. PAPALIA, U.S.B.J.**

## I. INTRODUCTION

These matters are before the Court on six (6) motions filed by all eight named (8) Defendants (collectively, the "Defendants") to dismiss all (or the applicable Counts) of the twelve-count Complaint filed by Steven Balasiano, Liquidation Trustee to the MSGI Liquidation Trust (the "Trustee" or "Plaintiff"). The Trustee's Complaint against the Defendants includes claims for avoidance of transfers, business torts, including particularly breach of fiduciary duty and aiding and abetting that breach, as well as breach of contract. Several Defendants have moved for a more definite statement as alternative relief. The Trustee has filed two (2) separate objections to the Defendants' motions. The first is as to the two (2) individual Defendants, Mitchell B. Modell and Eric Spiel. The second is as to the six (6) Entity Defendants (as defined below). Every Defendant has filed a reply according to the schedule set by the parties' November 9, 2022 *Order Establishing Briefing and Hearing Schedule*.[1] Oral argument on these motions was conducted at a hearing held on February 8, 2023.

On February 1, 2023, one week prior to the February 8, 2023 hearing, the Trustee filed a motion to approve his compromise with Defendant Eric Spiel ("Mr. Spiel").[2] On February 3, 2023, Mr. Spiel withdrew his Motion to Dismiss.[3] Accordingly, the Court is not directly addressing Mr. Spiel's Motion.

## II. JURISDICTIONAL STATEMENT

The Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and the Standing Orders of Reference entered by the United States District Court on July 10, 1984 and amended on September 18, 2012. Certain aspects of Plaintiff's claims are core proceedings,

[1] Nov. 9, 2022 Order, Dkt. No. 41.
[2] Feb. 1, 2023 Mot. to Approve Settlement, Dkt. No. 65.
[3] Feb. 3, 2023 Status Change Form, Dkt. No. 66.

particularly as they relate to avoidance actions under the Bankruptcy Code, under 28 U.S.C. § 157(b)(2)(A), (F), (H), (O), while others are non-core, related to proceedings to the extent they are based on prepetition causes of action under state law, under 28 U.S.C. § 157(b) and (c). Venue is proper in this Court under 28 U.S.C. § 1408. The Court issues the following findings of fact (based on the allegations of the Complaint for purposes of these Motions only) and conclusions of law pursuant to Fed. R. Bankr. P. 7052. To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

Defendants (i) Mitchell B. Modell; (ii) M&M Service Center, LLC; (iii) M&M of Jamaica, LLC; (iv) M&M Flushing, LLC; (v) M&M Mt. Kisco, LLC; and (vi) M&M of Bruckner, LLC; state in the Conclusion of their Briefs that they do not consent to entry of final judgment by the Bankruptcy Court and reserve their rights as to whether the Bankruptcy Court may conduct a jury trial. The Court acknowledges those reservations of rights, but also confirms its authority to determine these Motions.[4]

## III. STATEMENT OF RELEVANT FACTS

This Statement of Relevant Facts is taken mostly from the Trustee's Complaint. Certain other alleged facts and information are taken from the parties' submissions on these Motions and the record of the Debtors' bankruptcy cases. On these Motions to Dismiss, the Court is required to accept the well-pleaded allegations of the Complaint as true, with proof of the allegations left to a later date.

[4] Mitchell B. Modell Br., at 38, Dkt. No. 35-1; Service Center Br., at 6 n.2, Dkt. No. 30-1; Jamaica/Flushing Br. ¶¶ 23-24, Dkt. No. 31-1; Kisco/Bruckner Br., at 6 n.2, Dkt. No. 29-1. Notwithstanding 28 U.S.C. § 157(b) and (c), the Bankruptcy Court has authority to enter Orders that dispose of less than this entire proceeding**.** *See e.g., In re Trinsum Grp., Inc*., 467 B.R. 734, 739 (Bankr. S.D.N.Y. 2012) ("After *Stern v. Marshall*, the ability of bankruptcy judges to enter interlocutory orders in non-core proceedings, or in core proceedings as to which the bankruptcy court may not enter final orders or judgments consistent with Article III absent consent, has been reaffirmed by the courts that have had occasion to address the issue."); *In re DSI Renal Holdings, LLC*, 2020 WL 550987, at *1 n.4 (Bankr. D. Del. Feb. 4, 2020) (same; citing cases).

A. The Bankruptcy Case

The fourteen (14) liquidating debtors (collectively, the "Debtors") filed voluntary Chapter 11 petitions on March 11, 2020.[5] Because the Debtors filed at the onset of the global pandemic in 2020, the Debtors barely operated postpetition except under the authority of a March 13, 2020 Interim Order that approved procedures for store closing sales and a subsequent March 27, 2020 Order that temporarily suspended the Debtors' cases under 11 U.S.C. §§ 105(a) and 305 due to the Debtors' limited ability to operate during the pandemic.[6] The March 27, 2020 Order was amended and extended by Orders of April 30, 2020 and June 5, 2020 with a Final Order entered on June 24, 2020.[7] The Debtors filed an October 8, 2020 First Modified Disclosure Statement and Joint Plan of Liquidation, which the Court confirmed by Order entered on November 13, 2020.[8] The Effective Date of the First Modified Plan was December 1, 2020.[9] The Confirmed Plan established a Liquidation Trust to which the Debtors assigned their retained causes of action.[10] The November 13, 2020 Confirmation Order also approved the Liquidation Trust Agreement and Steven Balasiano's appointment as Liquidation Trustee.[11]

B. The Adversary Proceeding

On March 10, 2022, the Trustee filed the instant twelve-count Complaint for avoidance of certain transfers as preferences and/or constructive fraudulent conveyances under the laws of

---

[5] The fourteen (14) Debtors, identified by case number are: Modell's Sporting Goods, Inc. (20-14179); Modell's II, Inc. (20-14195), Modell's NY II, Inc. (20-14208), Modell's NJ II, Inc. (20-14178), Modell's PA II, Inc. (20-14211), Modell's Maryland II, Inc. (20-14197), Modell's VA II, Inc. (20-14212), Modell's DE II, Inc. (20-14194), Modell's DC II, Inc. 20-14193), Modell's CT II, Inc. (20-14182), MSG Licensing, Inc. (20-14213), Modell's NH, Inc. (20-14206), Modell's Massachusetts, Inc. (20-14202) and Modell's Online, Inc. (20-14209). MSGI's thirteen wholly-owned subsidiaries are defined as the "Debtor-Subsidiaries."
[6] Mar. 13, 2020 Order, Main Dkt. No. 63; Mar. 27, 2020 Order, Main Dkt. No. 166.
[7] Apr. 30, 2020 Order, Main Dkt. No. 294; June 5, 2020 Order, Main Dkt. No. 371; June 24, 2020 Final Order, Main Dkt. No. 438.
[8] Sept. 18, 2020 Plan and DS, Main Dkt. Nos. 720, 721; Oct. 8, 2020 1st Modified Plan and DS, Main Dkt. Nos. 758, 759; Nov. 13, 2020 Order Confirming Plan, Main Dkt. No. 827.
[9] Dec. 1, 2020 Notice of Effective Date, Main Dkt. No. 853.
[10] Oct. 8, 2020 1st Modified Plan, Arts. IV.C and IV.K, at 19, 27, Main Dkt, No. 758-1.
[11] Nov. 13, 2020 Order Confirming Plan ¶ 7, at 30, Main Dkt. No. 827.

various states and the Bankruptcy Code; business torts (breach of fiduciary duty; aiding and abetting that breach; unlawful dividends); and breach of contract. The Defendants filed the instant Motions in lieu of Answer on October 7, 2022. The Court held an October 27, 2022 scheduling conference that generated the November 9, 2022 Scheduling Order referenced above.[12]

The Complaint characterizes the Debtors, the Defendants and their relationships among themselves in the following manner. In 1889, Morris Modell, great-grandfather of Defendant Mitchell B. Modell, began the retail business formerly operated by Debtors, Henry Modell & Company, Inc. (now Defendant "HMC").[13] In 1986, the common stock of HMC was passed to Defendant Mitchell B. Modell ("Mitchell") and to his brother, the now-deceased Michael S. Modell ("Michael"). Mitchell and Michael also formed the Debtor, Modell's Sporting Goods, Inc. ("MSGI"), and its thirteen wholly-owned Debtor-Subsidiaries (collectively and previously defined as the "Debtors"), in 1986 (or later).[14] Mitchell and Michael shared in MSGI's ownership equally until Michael died in 2001.[15]

None of the affected parties seems to dispute that a December 24, 1999 document entitled Certificate of Incorporation of Modell's Holding Corp., Inc. (the "Certificate of Incorporation"), filed with the Delaware Secretary of State on December 27, 1999, is actually MSGI's controlling Certificate of Incorporation.[16] The three-page Certificate includes a one-paragraph liability-exculpation clause that states in full:

> SEVENTH: No director shall be liable to the corporation or any of its stockholders for monetary damages for breach of fiduciary duty as a director, except with respect to
>
> (1) a breach of the director's duty of loyalty to the corporation or its stockholders,

[12] Nov. 9, 2022 Scheduling Order, Dkt. No. 41.
[13] Compl. ¶ 22, Dkt. No. 1.
[14] Compl. ¶ 24, Dkt. No. 1.
[15] Compl. ¶ 23-24, Dkt. No. 1.
[16] Mitchell Reply, Dec. 27, 1999 Certif. of Incorporation, Ex. A, Dkt. No. 47.

> (2) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law,
> (3) liability under Section 174 of the Delaware General Corporation Law or
> (4) a transaction from which the director derived an improper personal benefit,
>
> it being the intention of the foregoing provision to eliminate the liability of the corporation's directors to the corporation or its stockholders to the fullest extent permitted by Section 102(b)(7) of the Delaware General Corporation Law, as amended from time to time. The corporation shall indemnify to the fullest extent permitted by Sections 102(b)(7) and 145 of the Delaware General Corporation Law, as amended from time to time, each person that such Sections grant the corporation the power to indemnify (paragraphing added).[17]

After formation of the Debtors and at a date or dates unstated, Mitchell and Michael also formed the following five (5) entities which are defendants here (collectively, the "M&M PropCos"):

M&M Service Center, LLC ("Service Center")
M&M of Bruckner, LLC ("Bruckner")
M&M of Jamaica, LLC ("Jamaica")
M&M Flushing, LLC ("Flushing")
M&M Mt. Kisco, LLC ("Mt. Kisco").[18]

The Complaint describes each of the M&M PropCos as a New York limited liability company having its principal place of business at the Debtor's former corporate headquarters, 498 Seventh Avenue, 20th Floor, New York, New York 10018. The Complaint also identifies these five (5) defendants as "special purpose real estate-owning entities" and refers to them collectively as the M&M PropCos, as will this Opinion.[19] Service Center owned the Debtors' distribution center (the "Distribution Center" or the "Distribution Center Property") (which it sold and the buyer leased back to the Debtors in or about 2018).[20] HMC, a New York corporation formed many years earlier,

---

[17] Mitchell Reply, Dec. 27, 1999 Certif. of Incorporation, Ex. A, Dkt No. 47. That Exhibit includes a Certificate of Merger of Modell's Sporting Goods Co., Inc. into Modell's Holding Corp., Inc., with the latter being the surviving entity and changing its name to Modell's Sporting Goods, Inc. (the lead Debtor). Mitchell Reply, Dec. 29, 2004 Certif. of Merger, Ex. A, Dkt. No. 47.
[18] Compl. ¶¶ 15-19, 24, Dkt. No. 1.
[19] Compl, ¶ 24, Dkt. No. 1.
[20] Compl. ¶¶ 41, 114, 116-17, 164, Dkt. No. 1.

also listed its principal place of business at the Debtors' corporate headquarters.[21] The five (5) M&M PropCos and HMC are sometimes collectively referred to as the "Entity Defendants."

From 1986 through 2001, when Michael Modell died, Mitchell and Michael each held 50% ownership interests in HMC and the M&M PropCos.[22] At Michael's death, his 50% interest in those Defendants passed into a *Trust Under the Will of Michael S. Modell* (the "Trust") for the benefit of his wife, Abby Modell.[23] At that time, Mitchell maintained his 50% ownership interest in each of these six (6) Defendants; became CEO of Debtors (through the petition date); CEO of HMC; and managing member of the remaining five (5) M&M PropsCos.[24] Mitchell was also chairman of the board of HMC and, "at nearly all relevant times," the sole director of Debtor[s].[25] Mr. Spiel served as CFO of HMC and as CFO of Debtor from 2009 until March 2019.[26] By 2017, the Debtors operated their businesses and the businesses of HMC and the five (5) M&M PropCos with only the Debtors' employees."[27]

The Complaint describes HMC as a real estate holding company, the source of Modell family wealth, the guarantor of "dozens" of Debtors' store leases, and Debtors' "deep pocket backing," the assets of which were included on at least some of Debtors' consolidated financial statements.[28] However, as of 2017, HMC owned only 7 of Debtors' 158 stores and operated them with Debtor's employees, with the Debtors owning and operating the remaining stores.[29] HMC obtained inventory and employees from the Debtors for the seven (7) stores that it owned through "a complex Services Agreement" entered on April 3, 2011 among Debtor, HMC and co-debtor

[21] Compl. ¶ 14, Dkt. No. 1.
[22] Compl. ¶¶ 15-19, 24, 25, Dkt. No. 1.
[23] Compl. ¶ 25, Dkt. No. 1. Abby Modell and Mitchell were co-trustees of the Trust through April 2019, when Mitchell resigned as co-trustee under the settlement of their litigation described below. Compl. ¶ 39, Dkt. No. 1.
[24] Compl. ¶ 15-19, 25, Dkt. No. 1.
[25] Compl. ¶ 29, Dkt. No. 1.
[26] Compl. ¶¶ 13, 29, Dkt. No. 1.
[27] Compl. ¶¶ 28, 30, Dkt. No. 1.
[28] Compl. ¶¶ 26, 29, 77, 84, Dkt. No. 1
[29] Compl. ¶¶ 28, 29, 30, Dkt. No. 1.

Modell's II, Inc. ("MII").[30] According to the Complaint, HMC did not pay dividends to shareholders but reinvested profits "into the family business."[31] The Complaint also asserts that HMC was jointly and severally liable with Debtors on Debtors' pension liabilities.[32]

The Complaint alleges that Debtor was insolvent by 2014 and that Mitchell, aided in part by the other Defendants, made business decisions and deployed assets deliberately to enhance his own wealth, his family's wealth and the value of HMC at the expense of Debtor; ignored the advice of restructuring experts hired by Debtor on three (3) separate occasions; and finally filed for "long-overdue" bankruptcy protection on March 11, 2020.[33]

The twelve counts of the Complaint and the Defendants against which they are directed follow (with liquidated damages identified to the extent available):

| **Ct.** | **Claim** | **Defendants** |
|---|---|---|
| 1 | Breach of fiduciary duty under 8 Del. C. § 174[34] | Mitchell Modell |
| 2 | Breach of fiduciary duty | Eric Spiel |
| 3 | Constructive fraud under:<br>● 11 U.S.C. § 544(b)(1) and 550<br>● N.Y. Debt. & Cred. Law §§ 273, 274, 278<br>**Damages:**<br>**$6,164,000** in shareholder dividends, consisting of:<br>1,635,000 in 2014<br>1,739,000 in 2015<br>1,040,000 in 2016 | Mitchell Modell |

[30] Compl. ¶ 28; Services Agreement, Ex. A, Dkt. No. 1. The year of 2011 appears to have been a watershed one for Debtors, the Trust and Mitchell. The Plaintiff avers that Abby sued Mitchell in or about 2011 for overpaying himself from the Trust and for his removal as trustee of the Trust. The Complaint alleges that Abby and Mitchell reached an April 2019 settlement under which Mitchell paid a substantial sum to Abby; resigned as trustee of Michael's Trust; became sole shareholder of Debtor MSGI, which wholly-owned all the Debtor-Subsidiaries; and was still a 50% shareholder and director of HMC. Compl. ¶ 39, Dkt. No. 1. HMC asserts in its Motion to Dismiss that it entered the April 3, 2011 Services Agreement to formalize its relationship with Debtors when HMC refused to continue to guarantee Debtors' secured loan. HMC Br. ¶¶ 9-10, Dkt. No. 34-1. HMC also disputes that Mitchell was a 50% owner after a certain undefined date. HMC Br. ¶ 6 n.4, Dkt. No. 34-1; Feb. 8, 2023 Hr'g Tr. 106:1-6. Neither of these latter two assertions appears in the Complaint.

[31] Compl. ¶ 26, Dkt. No. 1.

[32] Compl. ¶ 138a, Dkt. No. 1.

[33] Compl. ¶ 43, Dkt. No. 1.

[34] Trustee presumably elected Delaware law in Counts 1 and 8 because he describes "Debtor" (undifferentiated) as a "Delaware corporation." Compl. ¶ 11, Dkt. No. 1. But the reference must be to MSGI only, as that is the only Delaware corporation described in the Complaint and is also the owner of each of the Debtor-Subsidiaries. Mitchell did not dispute Trustee's use of Delaware law in these Counts.

| | | |
|---|---|---|
| | 400,000 in 2017<br>1,350,000 in 2018<br><br>**$5,676,923** in salary, consisting of:<br>2,400,000 in 2017<br>1,800,000 in 2018<br>1,200,000 in 2019<br>276,923 in 2020<br><br>**$ 527,175** in Amex payments, Feb. through Dec. 2019 | |
| 4 | Constructive fraud under 11 U.S.C. § 548(a)(1)(B)<br>**Damages:** $5,154,098 (two-year period) | Mitchell Modell |
| 5 | Constructive fraud under:<br>● 11 U.S.C. § 544(b)(1) and 550<br>● N.J.S.A. §§ 25:2-25a(2)(a) and (b) and 25:2-29(1)<br>**Damages:** $6,594,098 (four-year period) | Mitchell Modell |
| 6 | Constructive fraud under:<br>● 11 U.S.C. § 544(b)(1) and 550<br>● N.J.S.A. §§ 25:2-27a and 25:2-29(1)<br>**Damages:** $6,594,098 (four-year perid) | Mitchell Modell |
| 7 | Unlawful dividends 8 Del. C. §§ 154, 170, 173, 174 when Debtor was insolvent<br>**Damages**: FY 2014: $1.635 million paid to Mitchell<br>FY 2015: $1.739 million paid to Mitchell<br>FY 2016: $1.04 million paid to Mitchell<br>FY 2017: $ 400,000 paid to Mitchell<br>FY 2018: $1.35 million paid to Mitchell<br>**Total: $6.164 million paid to Mitchell**[35] | Mitchell Modell |
| 8 | Aiding and Abetting Breach of Fiduciary Duty<br>**Damages**:<br>● $80 million extinguishment of HMC lease guaranty<br>● $200 million "proliferation" of debt to Debtors' creditors | HMC |
| 9 | Aiding and Abetting Breach of Fiduciary Duty<br>**Damages**:<br>● $ 14.5 million additional rent payments to M&M PropCos<br>● $200 million "proliferation" of debt to Debtors' creditors | Service Center<br>Bruckner<br>Jamaica<br>Flushing<br>Mt. Kisco |
| 10 | Aiding and Abetting Breach of Fiduciary Duty<br>**Damages**: "tens of millions" in lost value for underpayment of $15 million for lease termination | Service Center |

[35] For each of these fiscal years, the Complaint asserts an equal amount was paid to the Trust, which is the Defendant in Adv. Pro. No. 22-1077 (VFP) and subject to the Trustee's avoidance claims in that action; however, the amount of dividends allegedly paid to the Trust is slightly different in that Adversary Proceeding ($420,000 lower than in this Adversary Proceeding). The Court assumes that this difference can and will be reconciled as this case progresses.

| | | |
|---|---|---|
| 11 | Breach of Contract (Services Agreement with Debtor)<br>**Damages**:<br>● $4.3 million unpaid inventory<br>● $2.5 million for services rendered<br>● $4.2 million for real estate taxes advanced (total $11 M) | HMC |
| 12 | Preference under 11 U.S.C. § 547(b) (as the following advances were booked as an intercompany loan; no time period stated).<br>**Damages**:<br>● $4.3 million unpaid inventory<br>● $2.5 million for services rendered<br>● $4.2 million for real estate taxes advanced (total $11 M) | HMC |

The Trustee has cited statutory law from three different jurisdictions (Delaware, New Jersey and New York) in his Complaint. The Complaint alleges that Debtor MSGI is a Delaware corporation with its principal place of business at 498 Seventh Avenue, 20th Floor, New York, New York 10018 (the "New York City Address").[36] As noted above, the six (6) Entity Defendants are, respectively, a New York corporation ("HMC") and New York limited liability companies (M&M PropCos) with the same New York City Address.[37] Also, these bankruptcy cases were filed in New Jersey, and the Debtors operated a significant number of stores in New York, New Jersey and, to a lesser extent, certain other states. No party in interest seeks dismissal on the grounds that the Trustee has made an incorrect choice of law or asserted any particular law must apply. Mr. Spiel argued most strenuously for the Court to make a choice-of-law determination at this juncture, but he recently entered into a Settlement Agreement with the Liquidation Trust, which this Court approve at a hearing held on March 15, 2023 and as to which the parties are attempting to settle a form of Order.[38]

---

[36] Compl. ¶ 11, Dkt. No. 1.
[37] Compl. ¶¶ 14-19, Dkt. No. 1.
[38] Spiel Mot. at 7-17, Dkt. No. 33; Feb. 1, 2023 Mot. to Approve Settlement, Dkt. No. 65; Mar. 15, 2023 Hr'g Tr., Dkt. No. 79.

Mitchell and the Entity Defendants appear to be willing to await further factual development before asserting which substantive law applies in areas other than the "internal affairs" of MSGI, if that becomes necessary. Consistent with that position, certain of the Entity Defendants argue for dismissal of the Trustee's aiding-and-abetting claims under the substantive law of all three jurisdictions.

C. The Factual Allegations in the Complaint by Category

The Trustee recites 145 paragraphs of factual allegations (¶¶ 21-165) divided into thirteen subsections (A through M). For purposes of brevity, the Court will summarize the conduct and facts alleged into four (4) broad categories:

(i) Debtors were balance-sheet insolvent and showed declining profits (or losses) from and after FY 2013;

(ii) Mitchell and Mr. Spiel (whom the Trustee collectively calls the "Officer Defendants") breached their fiduciary duties to the Debtors by devising deliberate programs over time and especially from and after 2013 to protect Mitchell's personal wealth, Modell family wealth and HMC at the expense of Debtors;

(iii) Mitchell and Mr. Spiel retained restructuring consultants in 2014, 2017 and 2019; ignored their recommendations for operational changes to preserve the Debtors' assets and viability; and persisted in a contrary course to protect Mitchell's personal wealth, Modell family wealth and HMC; and

(iv) In 2018, Mitchell caused Debtors to terminate a favorable lease (the "Lease") with Service Center, which owned the Distribution Center that Debtors leased in the Bronx, New York in order to reduce the liability of HMC, which had guaranteed the Lease, and simultaneously to sell the Distribution Center to a third party at a substantial profit to HMC and thus at least concomitant detriment to the Debtors.

(i) Debtors' Insolvency and Declining Profitability

The Trustee's allegations of insolvency are fundamental to his maintaining his avoidance claims in Counts 3 through 6 of the Complaint and his claims for unlawful payment of dividends in Count 7, and are also relevant to certain of his other claims. Debtors' fiscal year ended approximately at the end of January of the year following (e.g., FY 2013 ended on February 1,

2014).[39] For the six (6) fiscal years for which the Trustee has received audited financial statements (which included HMC for at least certain periods), the Debtors reported the following:[40]

FY 2013 (ending February 1, 2014)
- liabilities = $175.2 million; assets = $156.7 million
- liabilities exceeded assets by nearly $18.5 million
- significant debt included $35.5 due HMC (accumulating since 1987)
- $11 million in unfunded pension benefits
- net loss = $4.7 million.

FY 2014 (ending January 31, 2015)
- liabilities = $166 million; assets = $143.1 million
- liabilities exceeded assets by nearly $23 million
- significant debt included nearly $37 due HMC
- $25.5 million in unfunded pension benefits
- net loss = $1.2 million
- dividends = $1.635 million to Mitchell; $1.635 million to Michael's Trust.

FY 2015 (ending January 30, 2016)
- liabilities = $154.3 million; assets = $129.1 million
- liabilities exceeded assets by over $25 million
- significant debt included over $36 million due HMC
- $15.5 million in unfunded pension benefits
- net profits = $1.2 million
- dividends = $1.739 million to Mitchell; $1.739 million to Michael's Trust.

FY 2016 (ending January 28, 2017)
- liabilities = $175.3 million; assets = $137.1 million
- liabilities exceeded assets by over $38 million
- significant debt included over $37.5 million due HMC
- nearly $18 million in unfunded pension benefits
- net loss = $11.1 million
- dividends = $1.04 million to Mitchell; $1.04 million to Michael's Trust.

FY 2017 (ending February 3, 2018)
- liabilities = $177.4 million; assets = $145.5 million
- liabilities exceeded assets by nearly $32 million
- significant debt included nearly $38 million due HMC
- nearly $20.5 million in unfunded pension benefits
- net loss = $7.9 million
- dividends = $400,000 to Mitchell; $400,000 to Michael's Trust.

---

[39] The audited financial statements relate to the fiscal years ended 2013 (ending February 1, 2014) through 2018 (ending February 2, 2019). Compl. ¶ 152, Dkt. No. 1. The fiscal year end dates cited by Trustee range from January 28 through February 3, Compl. ¶¶ 152-159, Dkt. No. 1.

[40] Asset and liability data are at Compl. ¶¶ 152-59 and ¶¶ 227-32, Dkt. No. 1; profit, loss and dividends data are at Compl. ¶¶ 227-32, Dkt. No. 1; salary figures are at Compl. ¶ 165, Dkt. No. 1.

FY 2018 (ending February 2, 2019)

- liabilities = $171.5 million; assets = $123.1 million
- liabilities exceeded assets by over $48.5 million
- significant debt included nearly $39 million due HMC
- nearly $20 million in unfunded pension benefits
- net loss = $13.9 million
- dividends = $1.35 million to Mitchell; $1.35 million to Michael's Trust.[41]

The Trustee states that audited financial statements were never prepared for FY 2019 and FY 2020 because Debtors filed their voluntary petitions in March 2020. However, Trustee argues that Debtors were insolvent in the intervening period from February 2, 2019 for FY 2018 to the March 11, 2020 petition date, reckoning that Debtors' assets, reported at $123.1 on February 2, 2019, would only have declined to the March 11, 2020 petition date, when Debtors scheduled more than $350 million in "unpaid creditor claims . . . against the Estate."[42]

(ii) Mitchell's and Mr. Spiel's Alleged Breaches of Fiduciary Duty to the Debtor

As alleged in the Complaint, Mitchell had: (i) a 50% interest in MSGI (and therefore indirectly in each of the Debtor-Subsidiaries) from their inception in 1986; (ii) a 50% interest in HMC from and after 1986; and (iii) a 50% interest in the other five (5) M&M PropCos from and after their inception in or about 1986 (with Michael Modell or Michael's Trust holding the other 50% interest).[43] According to the Complaint, rather than a board of directors, the Debtor had a "board of advisors," who were paid hundreds of thousands of dollars but had no authority over Mitchell (and whom the Trustee does not otherwise identify by name or by number).[44] Mitchell was the Debtors' CEO and often sole director during the last decade prepetition and thus operated the Debtors without the supervision, direction or oversight of a Board of Directors.[45] Mitchell

[41] Compl. ¶¶ 152-59; ¶¶ 227-32, Dkt. No. 1
[42] Compl. ¶ 159, Dkt. No. 1.
[43] Compl. ¶¶ 22-25, Dkt. No. 1.
[44] Compl. ¶ 31, Dkt. No. 1.
[45] Compl. ¶ 31, Dkt. No. 1.

was also the managing partner of the M&M PropCos and the CEO of HMC.[46] Mr. Spiel served as the Debtors' and HMC's CFO from 2009 until he resigned in March 2019.[47] As noted, HMC more formally documented and restated its relationship with Debtors under the April 3, 2011 Services Agreement.[48]

At a date unstated, Service Center as lessor and Debtor as lessee undertook a lease, which HMC guaranteed, for real property that Debtor used as its Distribution Center.[49] By 2018, there were 13 years remaining on this lease at $1.8 million per year, a rate which Trustee describes as significantly under the market rate of $6.5-$7 million per year.[50] After settling the litigation with Abby Modell (Michael's spouse and widow) that had been ongoing for about a decade, Mitchell became 100% shareholder of Debtor MSGI (and therefore indirectly of the Debtor-Subsidiaries) in April 2019, while maintaining his 50% ownership interest and manager role in the other Entity Defendants, i.e., HMC and M&M PropCos.[51]

The Trustee characterizes Debtors' history under Mitchell's leadership as one of rapid expansion from 86 stores in 2000 (recalling that Michael died in 2001) to 154 stores by the end of 2013 along with a significant decline in "operating income" from $20 million in 2000 to $3 million in 2013.[52] According to the Complaint, that decline was accompanied and caused at least in part

---

[46] Compl. ¶ 3, 15-19, Dkt. No. 1. As noted, HMC disputes whether Mitchell was its CEO for at least a portion of the relevant time period.
[47] Compl. ¶¶ 13, 37, Dkt. No. 1.
[48] Compl. ¶ 151; Apr. 3, 2011 Services Agreement, Ex. A, Dkt. No. 1.
[49] Compl. ¶¶ 41, 113, Dkt. No. 1. The Complaint does not state the address of the Distribution Center, which, according to the petition, appears to have been 1780 Eastchester Road, Bronx, New York 10461-2330. Petition, at 5, Dkt. No. 1.
[50] Compl. ¶ 113, Dkt. No. 1.
[51] Compl. ¶ 39, Dkt. No. 1. The Trustee alleges that, in 2011, Abby sued Mitchell "for paying himself an exorbitant salary from the Debtor[s] upon his promotion to CEO following her husband's death, causing the Debtor[s] to make improper payments to fund his lavish personal lifestyle, and allowing other Modell family members to draw salaries from the Debtor[s] despite providing no services to the Debtor[s]" and sued to have him removed as co-trustee of Michael's Trust. Compl. ¶ 39, Dkt. No. 1. After Mitchell made "a substantial payment" to Abby, he stepped down as co-trustee of Michael's Trust and became Debtors' 100% owner. Compl. ¶ 39, Dkt. No. 1.
[52] Compl. ¶ 48, Dkt. No. 1.

by a significant increase in administrative and occupancy expenses, as well as an increase in the number of employees in the corporate office from 130 to nearly 240 during that period.[53]

(a) Project Silver Octopus and the First Restructuring Report

In late 2014, apparently based on the above data, Mitchell and Mr. Spiel, under the moniker "Project Silver Octopus" and at a cost of $125,000, engaged a restructuring consultant, who recommended: (i) closing 28 unprofitable stores; (ii) reducing expenses in the home office; (iii) retaining a real estate expert to negotiate early lease terminations; (iv) selling or refinancing certain real estate assets of the Defendant-entities ($77 million attributed to HMC and $92 million attributed to the M&M PropCos); and (v) retaining an investment banker "to evaluate strategic alternatives" (the "First Restructuring Report").[54] Mitchell and Mr. Spiel did not follow or implement any of the First Restructuring Report's recommendations.[55] Instead, Debtors expanded to 158 stores by 2016.[56]

(b) Project Hope and the World of Mitchell

In February 2017, after the $11.1 million net loss reported above for FY 2016 (notwithstanding Debtor's expansion to 158 stores), Mitchell allegedly asked Mr. Spiel to analyze the effect of restructuring through bankruptcy or through store closings to make Debtor profitable again.[57] The Trustee alleges that Mr. Spiel both "recirculated" the First Restructuring Report and, by the end of February 2017, prepared a new, forty-page report called "Project Hope," which the Trustee distinguishes from the outside consultant's First Restructuring Report as explicitly favoring the protection of Mitchell and the Modell family's wealth over the Debtor's well-being and/or need for bankruptcy protection. Project Hope focused on (quoting the Complaint):

[53] Compl. ¶¶ 48-51, 54, Dkt. No. 1.
[54] Compl. ¶¶ 45-46, 53-58, Dkt. No. 1.
[55] Compl. ¶ 60, Dkt. No. 1.
[56] Compl. ¶ 60, Dkt. No. 1.
[57] Compl. ¶ 61, Dkt. No. 1.

(1) Mitchell's risk of personal liability,

(2) the likelihood that Mitchell would be able to maintain majority control of the Debtor[s] and his position as CEO,

(3) the impact on Mitchell's business and personal reputation,

(4) the impact on Mitchell's ability to obtain trade and personal credit post-filing,

(5) the professional and social impact on Mitchell's sons,

(6) the risk of a substantive consolidation of HMC with the Debtor[s],

(7) the implications of HMC's joint liability for the then-$18M dollars' worth of unfunded pension liability of the Debtor[s], and

(8) the cash flow impact on Mitchell and the Trust if the Debtor[s] and HMC were to suddenly stop paying rent to the M&M PropCos (which were using cash flow from rent payments to service approximately $35M worth of mortgage debt on their respective holdings).[58]

The "Project Hope" report also discouraged the closing of unprofitable stores for which HMC had guaranteed the lease, as such action would increase HMC's liability on its guarantees.[59]

In preparation for a March 23, 2017 meeting with outside counsel, Mitchell asked Mr. Spiel to prepare a further report to address the impact of Debtor's business failure on Mitchell's various roles (as CEO and board member of Debtors and of HMC; as an individual; as an investor; and as trustee of Michael's Trust) and any conflicts arising therefrom.[60] Mr. Spiel called this report "World of Mitchell," which proposed analyzing all recommendations through two filters: (1) "Wealth Preservation (Protect HMC Real Estate Assets)"; and (2) "Keep[ing] My Operating Platform."[61]

[58] Compl. ¶ 64, Dkt. No. 1 (paragraphing added).
[59] Compl. ¶ 67, Dkt. No. 1.
[60] Compl. ¶ 73, Dkt. No. 1.
[61] Compl. ¶ 74, Dkt. No. 1.

The real estate assets of HMC and of the M&M PropCos then had an estimated market value of $145 million and $150 million, respectively.[62] HMC was then guaranteeing $22 million in annual rent obligations on 37 of Debtors' stores for an additional ten (10) years; and the M&M PropCos were encumbered with $35 million in mortgage debt serviced with rental income from [Debtors'] retail stores.[63] The Trustee asserts that the "World of Mitchell" reported that Mitchell and Abby (who had not yet settled their dispute) "'have a common goal – preservation of wealth and maximizing value, just different visions on how to achieve that.'"[64]

(c) Project Compromise

In April 2017, Spiel generated a presentation called "Project Compromise" for the attorney serving as mediator in the litigation between Abby and Mitchell.[65] "Project Compromise," as quoted by the Liquidation Trustee, generally recommended potentially sacrificing the Debtor to protect HMC and the M&M PropCos.[66] The Shareholders referenced below are Michael's Trust (with Abby as beneficiary) and Mitchell, with the Trust and Mitchell each owning 50% of the Debtor, HMC and the M&M PropCos at this time:

> "Over the last two decades of operation HMC has guaranteed 37 MSG leases. These guarantees would survive both a bankruptcy and potentially a sale, pending negotiations with a buyer and the landlord. **Abby and Mitchell's HMC real estate interests are equally exposed and hence the Shareholders have a common unifying interest; preservation of (real estate) wealth at (potentially) the sacrifice of the Retail business**. A sale with the assumption of the HMC leases by a tenant with a stronger balance sheet and greater likelihood to make all payments due through their tenure is desired. For 2018 through 2033, **under worse case scenario there could be as much as $140M due under the guarantees** [sic]."[67]

---

[62] Compl. ¶ 76, Dkt. No. 1.
[63] Compl. ¶¶ 77-78, Dkt. No. 1.
[64] Compl. ¶ 78, Dkt. No. 1.
[65] Compl. ¶ 80, Dkt. No. 1.
[66] Compl. ¶ 83, Dkt. No. 1.
[67] Compl. ¶ 81, Dkt. No. 1 (Trustee quoting "Project Compromise"; bold emphases in Complaint) (underscore, other bold emphases supplied).

Mr. Spiel recommended that the Shareholders avoid Debtors' bankruptcy, as it would place at risk the real estate owned by HMC and by the M&M PropCos.[68]

At the May 2017 meeting of Debtors' board of advisors, Mr. Spiel stated in the CEO's report that Mitchell and he had identified "Preservation of Wealth" (the Modell family real estate investments) as Mitchell's primary goal and that threats to that goal included:

(1) Mitchell's litigation with Abby;
(2) credit facility extension with JP Morgan;
(3) HMC lease guarantees;
(4) retail business performance;
(5) fiscal year 2016 audited financial statements; and
(6) fiscal year 2018 liquidity.[69]

According to the Trustee, Mr. Spiel emphasized that Debtors' bankruptcy "would trigger up to" $139 million in lease liability for HMC.[70] The Trustee alleges that Mitchell and Mr. Spiel made the focus of the May 2017 board of advisors meeting the preservation of Mitchell's and Modell family wealth rather than the preservation of the Debtors, even though Mitchell and Abby (as beneficiary of Michael's Trust, Debtors' 50% owner) understood that the Debtors had no value at that point except to a purchaser.[71]

(d) The Second Restructuring Report and Consultant

On June 1, 2017, Debtors, through their restructuring counsel,[72] pitched an investment banker with a proposal that reiterated the above themes: that the Shareholders wished to maximize income from the properties held by HMC and by the M&M PropCos and to "mitigate the risks to the real estate business from the retail business."[73] Debtors did not retain the investment banker but did retain a second restructuring consultant, to whom Mitchell reported that Debtors could not

---

[68] Compl. ¶ 82, Dkt. No. 1.
[69] Compl. ¶ 84, Dkt. No. 1.
[70] Compl. ¶¶ 85-88, Dkt. No. 1.
[71] Compl. ¶¶ 85-88, Dkt. No. 1.
[72] The term "restructuring counsel" appears first in Trustee's Complaint in May 2017. Compl. ¶ 90, Dkt. No. 1.
[73] Compl. ¶ 91, Dkt. No. 1.

withdraw from the leases guaranteed by HMC, without exploring whether such exits were possible.[74]

On June 22, 2017, the second restructuring consultant issued the "Second Restructuring Report," which recommended eliminating 63 to 107 of Debtors' 158 stores (as only 43 stores were "keepers"; 45 were on the "bubble"; and 70 were "closers") and calculated that Debtors had no ability to operate in their current state after 2017.[75] The second restructuring consultant also: (i) opined that Debtors must make these reductions just to sell Debtors' assets as a going concern; (ii) recommended filing for bankruptcy protection; (iii) advised the Debtors, within two to three weeks, to hire a real estate advisor and liquidator in order to formulate a "shrink to sell" plan; and (iv) advised the Debtors to consider hiring a Chief Restructuring Officer ("CRO") and appointing independent directors.[76] Within days, Debtors' restructuring counsel and general counsel recommended individuals to fill both roles.[77] Instead, the Complaint alleges that Mitchell ignored their recommendations and did not pursue those appointments.[78] Although Mitchell and Mr. Spiel expected Debtors to run out of money at the end of 2017, a strong fourth quarter that year allowed them to operate into 2018.[79]

In January 2018, the Trustee alleges that Mitchell stripped the Debtors of their most valuable remaining asset by causing the Debtors to terminate their below-market lease (the "Lease") with Service Center. Service Center (which is one of the M&M PropCos) then owned the property that served as Debtors' Distribution Center in the Bronx, New York.[80] Debtors had thirteen years left on the Lease at $1.8 million per year, whereas Mitchell and Mr. Spiel estimated

[74] Compl. ¶ 92, Dkt. No. 1.
[75] Compl. ¶¶ 94-96, 99, Dkt. No. 1.
[76] Compl. ¶ 100-01, Dkt. No. 1.
[77] Compl. ¶ 102.
[78] Compl. ¶¶ 102-03, Dkt. No. 1.
[79] Compl. ¶ 110-11, Dkt. No. 1.
[80] Compl. ¶ 112, Dkt. No. 1.

that a market-rate lease for the Distribution Center Property would cost $6.5-$7 million per year.[81] Mitchell caused Debtors to accept $15 million for this early termination (a figure that Trustee deems unreasonably low, as Service Center could have allegedly earned $91 million by re-letting the Property for thirteen (13) years at $7 million per year).[82] Mitchell then caused Service Center to sell the Distribution Center Property to a third-party buyer (the "Buyer"), who required delivery free of the Lease, for $115 million, which was $40 million more than Mitchell and Mr. Spiel's valuation of the Property one year earlier.[83]

In furtherance of this plan, the Complaint alleges that, to preserve personal wealth at the expense of the Debtors, Mitchell thereafter caused the Debtor(s) as lessee and Buyer as lessor to enter a new lease (the "New Lease") for only thirty (30) months at an initial cost of $1.8 million per year for the first two years (the same last rate as under the old Lease) and $1 million per month for a remaining six (6) months, an increase that Debtors had no realistic prospect of paying.[84] The alternative was for Debtors to invest $15-$20 million in leasing new space and building out a new distribution center, also amounts that Debtor also had no realistic prospect of paying.[85]

(e) Continuing to Burn Down the HMC Obligation

In February 2018, Mitchell's and Mr. Spiel's presentation to the board of advisors included a slide titled "Continuing To Burn Down the HMC Obligation," a graphic that touted HMC's ability to reduce its liability on its guarantee of Debtors' store leases so long as Debtors continued to operate and to pay rent (HMC's liability declining by $32 million through 2017 and projected

[81] Compl. ¶ 113, Dkt. No. 1.
[82] Compl. ¶ 114, 116, Dkt. No. 1.
[83] Compl. ¶ 114, Dkt. No. 1. The Trustee alleges that Mitchell did not invest the sale proceeds, which the Trustee characterizes as a "windfall," into Debtors, but instead sheltered the proceeds for investment in another property immediately subject to a cash-out refinancing that provided "tens of millions of dollars each" to Mitchell and to Michael's Trust. Compl. ¶ 117, Dkt. No. 1.
[84] Compl. ¶ 115, Dkt. No. 1.
[85] Compl. ¶ 115, Dkt. No. 1.

to decline to $27 million if Debtors operated through 2020).[86] The Trustee alleges that, throughout Debtors' 2018 and 2019 board meetings, Mitchell and Spiel continued to report the "burning off" of HMC's liability on its lease guarantees as Debtors continued to operate.[87]

In October 2018, Mitchell and Mr. Spiel caused Debtors to borrow $10 million to avoid defaulting on their liquidity covenant with their primary secured lender.[88] But Debtors had poor sales in December 2018 and expected to default in February and in June 2019 without cash infusions of $15 million and $9 million, respectively.[89] At the end of January 2019, Mitchell and Mr. Spiel caused the Debtors to re-engage the second restructuring consultant in an effort to find additional sources of liquidity and to explore restructuring.[90]

On October 18, 2018, Mitchell caused one independent director to be appointed (but not two, as restructuring counsel had urged), insuring that Mitchell could not be overruled by the board.[91] The implementing resolution for this appointment did not provide a mechanism for resolving conflicts of interest that might arise as to Mitchell.[92] On February 12, 2019, Mr. Spiel warned the independent director in writing that Mitchell was interfering with the investment banker and was not heeding advice of Mr. Spiel or of general counsel.[93] Mr. Spiel sought to confer with the independent director out of Mitchell's presence regarding a strategy for running the company and adding a second independent director.[94]

On March 11, 2019, the *Wall Street Journal* announced that Debtors had retained a restructuring consultant and speculated whether Debtors would seek bankruptcy protection.[95] As

---

[86] Compl. ¶ 125, Dkt. No. 1.
[87] Compl. ¶ 126, Dkt. No. 1.
[88] Compl. ¶¶ 118-19, Dkt. No. 1.
[89] Compl. ¶ 122, Dkt. No. 1.
[90] Compl. ¶¶ 122-23, Dkt. No. 1.
[91] Compl. ¶¶ 142-43, Dkt. No. 1.
[92] Compl. ¶¶ 142-43, Dkt. No. 1.
[93] Compl. ¶ 145, Dkt No. 1.
[94] Compl. ¶ 145, Dkt No. 1.
[95] Compl. ¶ 128, Dkt. No. 1.

vendors stopped shipments to Debtors, Mitchell hosted conference calls with vendors on April 4 and April 15, 2019 to attempt to assuage their concerns.[96] Mitchell told the vendors in part that, as he had entered an April 5, 2019 settlement that ended eleven (11) years of litigation with Abby Modell, he was now the Debtors' 100% owner and could operate the Debtors properly.[97] On April 7, 2019, Mitchell requested the resignation of the independent director, who acceded.[98]

The Complaint alleges that, in June 2019, Mitchell caused $6.8 million to be lent to Debtors through a circuitous route on terms that Trustee asserts ultimately favored HMC:

(i) HMC lent Mitchell $6.8 million for the purpose of funding a $6.8 million loan to M&M Lending, LLC (not identified here or previously) that would lend the money to Debtors:

(ii) the terms of the loan from HMC to Mitchell:

(A) required Debtors to pay its pension obligations as they became due, as HMC had guaranteed these obligations;

(B) prohibited Mitchell from renewing any lease guaranteed by HMC;

(C) prohibited Mitchell from "discriminating" against stores owned by HMC; and

(iii) the terms of the loan from Mitchell to M&M Lending also provided that it could be repaid by Debtors' payments toward (1) leases guaranteed by HMC or (2) Debtor's pension liabilities.[99]

(f) <u>The Third Restructuring Report</u>

In January 2020, the second restructuring consultant issued the Third Restructuring Report that reiterated the recommendations of the Second Restructuring Report, including immediate closure of certain stores (Debtors were then operating 141 stores).[100] Also in January 2020, the Debtors' independent director that had resigned on Mitchell's April 7, 2019 demand rejoined the

[96] Compl. ¶¶ 131-34, Dkt. No. 1.
[97] Compl. ¶¶ 134-35, Dkt. No. 1.
[98] Compl. ¶ 146, Dkt. No. 1.
[99] Compl. ¶¶ 137-38, Dkt. No. 1. HMC disputes this characterization of this $6.8 million transaction. HMC Reply ¶ 17 n.4, Dkt. No. 51. However, determination of that factual dispute is not appropriate on this Motion to Dismiss.
[100] Compl. ¶ 139, Dkt. No. 1.

board on the condition that he would have sole responsibility to address any matter that involved Mitchell, HMC, the M&M PropCos or any other Modell family member or entity, if those interests were not fully aligned with those of the Debtors.[101] The Complaint alleges that Mitchell still sought to evade the independent director. For example, when the COO of HMC asked Debtors to remove Debtors' long-held authorization over HMC's bank accounts, Mitchell unilaterally directed Debtors' general counsel to remove the authorizations rather than bringing to the independent director this arguably conflicted request (as to whether Debtors should continue to exercise control over HMC's bank accounts).[102]

In March 2020, just before the bankruptcy filing, the Debtors demanded from HMC payment of $5.3 million for inventory and services that Debtors had provided HMC.[103] Mitchell, aware (according to the Trustee) that Debtors' filing was imminent, voted as a member of HMC to claim an offset against monies that Debtors allegedly owed HMC rather than to pay Debtors.[104]

On March 11, 2022, the fourteen (14) affiliated Debtors filed their voluntary Chapter 11 petitions. The Trustee alleges that Debtors' delay in filing caused Debtors' debts and creditors' claims to "proliferate by nearly $200 [million]" over the prior three (3) years (2017 to 2020).[105]

## IV. ARGUMENTS OF PARTIES

As set forth above, the frequency of the Defendants in the Complaint, in descending order, is as follows:

| | |
|---|---|
| Mitchell Modell | 6 Counts (Nos. 1, 3, 4, 5, 6, 7) |
| HMC | 3 Counts (Nos. 8, 11, 12) |

[101] Compl. ¶ 147, Dkt. No. 1.
[102] Compl. ¶ 148, Dkt. No. 1.
[103] Compl. ¶ 149, Dkt. No. 1.
[104] Compl. ¶ 149, Dkt. No. 1. Both HMC and the Trustee, in their Motion, reply and objection, insert more alleged facts into the description of this alleged offset, *infra*, than the Trustee describes in the Complaint, further demonstrating that the disposition of this issue (or issues) is not ripe at this stage of the proceedings. To add to the apparently unusual nature of this transaction, counsel for HMC indicated that, to his knowledge, no other offsets had been made by HMC in this manner prior to this time. It appears that resolution of these factual and/or legal issues (among others) is likely to be relevant to the ultimate determination of the issues between the Trustee and HMC in this case.
[105] Compl. ¶ 141, Dkt. No. 1.

| | | |
|---|---|---|
| Service Center | 2 Counts (Nos. 9, 10) | |
| Spiel | 1 Count (No. 2) | |
| Bruckner | 1 Count (No. 9) | |
| Jamaica | 1 Count | “ |
| Flushing | 1 Count | “ |
| Mt. Kisco | 1 Count | “ |

As noted above, the Liquidating Trustee has filed a single response to the Motions of the Entity Defendants and a single response to the Motions of Mitchell and Mr. Spiel.[106]

A. Mitchell B. Modell

Mitchell, who appears in six (6) Counts of the Complaint (Counts 1, 3, 4, 5, 6, 7) argues that:

(i) that the Court should dismiss the entire Complaint under Fed. R. Civ. P. 12(b)(6) and Fed. R. Bankr. P. 7012(b) for failure to state a claim on which relief can be granted;

(ii) in the alternative, under Fed. R. Civ. P. 12(e), that the Court should require the Trustee to make a more definite statement to which Mitchell can respond;

(iii) that the Complaint does not satisfy the general rule of pleading under Fed. R. Civ. P. 8(a)(2) and Fed. R. Bankr. P. 7008 as it makes numerous conclusory allegations and not identifying particular conduct to a particular Debtor;[107]

(iv) that the Trustee has failed to plead “fraud-like claims” with the specificity required by Fed. R. Civ. P. 9(b) and Fed. R. Bankr. P. 9 (the Court notes here that the Trustee pleads only constructive fraud and not actual fraud);[108]

(v) that Mitchell cannot complete a choice of law analysis until Trustee pleads more specifically;

(vi) that the Complaint should be dismissed as an impermissible “shotgun” pleading for failing to identify specific harm to a specific Debtor and for failing to identify the constructively fraudulent transfers and the value given (or not given) for them;

[106] On February 1, 2023, the Trustee filed a motion to approve a compromise with Mr. Spiel for $2.8 million to be paid from Debtor’s D&O policy (Dkt. No. 65). On February 3, 2023, Mr. Spiel formally withdrew his Motion to Dismiss (Status Change Form, Dkt. No. 66). Thus, the Court is not required to decide Mr. Spiel’s now-withdrawn Motion. However, his arguments were in many respects similar or identical to those made by other parties and particularly by Mitchell. Thus, they are at times indirectly addressed in this Opinion.
[107] Mitchell Br., at 17, Dkt. No. 35-1.
[108] Mitchell Br., at 18-19, Dkt. No. 35-1. Fed. R. Civ. P. 9(b) states in full:

> (b) Fraud or Mistake; Conditions of Mind. In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

(vii) that Debtor's claim in Count 1 for breach of fiduciary duty for conduct prior to March 11, 2017 (three (3) years before the bankruptcy petition) is time-barred by the three (3) year statute of limitations under 10 Del. C. § 8106(a);

(viii) that the facts alleged do not state a claim under Delaware common law for breach of fiduciary duty, but rather slip into a claim for deepening insolvency, a cause of action and theory of damages that Delaware does not recognize;

(ix) that the Certificate of Incorporation of Debtor MSGI bars claims for breach of fiduciary duty under 8 Del. C. § 102(b)(7);[109]

(x) that, as to Count 1, the Trustee has made no more than conclusory allegations in his four foundational arguments against Mitchell (i.e., controlling MSGI for benefit of HMC/M&M PropCos; placing his financial interests in HMC/M&M PropCos over MSGI's financial interests; terminating the Service Center lease; voting in favor of the HMC offset) (and that these also constitute a veiled and impermissible claim for "deepening insolvency");[110]

(xi) that the Trustee has failed adequately to plead his constructive fraud claims (Counts 3 through 6) under New York, New Jersey or bankruptcy law with respect to the three types of disbursements or distributions challenged by the Trustee: S Corp dividends; salary; credit card payments;[111] and

(xii) that the Trustee in Count 7 (pleading a claim for unlawfully paid dividends, not as a function of the avoidance claims), the Trustee has failed to state a claim under 8 Del. C. § 170, which requires a company to pay a dividend from a surplus, or, if none is available, from net profits for the present or prior fiscal year.[112]

B. <u>The Trustee's Unified Objection to the Motions of Mitchell and Mr. Spiel</u>

The Trustee generally argues that his 65-page Complaint provides sufficient detail and attribution of conduct to satisfy the pleading and notice requirements of the Federal Rules of Civil Procedure and more than sufficiently demonstrates that: (i) Mitchell acted in self-interest pursuing

---

[109] Mitchell attached a December 24, 1999 Certificate of Incorporation (filed December 27, 1999 with the Delaware Secretary of State) and December 29, 2004 Certificate of Merger (filed December 29, 2004 with the Delaware Secretary of State) as Exhibit A to his Reply Brief, Dkt. No. 47. See n.17 *supra*.

[110] Mitchell Br., at 28, Dkt. No. 35-1.

[111] Mitchell loosely defines the "S Corps" as those entities created and co-owned by Mitchell and Michael Modell when they took over the family business in the mid-1980s and "included the entity ultimately known as Debtor MSG." Mitchell Br., at 7, Dkt. No. 35-1. These entities are not identified by name, but it appears that they may possibly include other Debtors and the six (6) Entity Defendants. The specific identities of these entities is an issue not properly (or necessarily) addressed here, but appears to be another factual matter that will likely need to be developed during the course of these proceedings. Mitchell Br., at 31, Dkt. No. 35-1.

[112] Mitchell Br., at 36, Dkt. No. 35-1; Compl. ¶¶ 227-33, Dkt. No. 1.

the four types of conduct outlined above; (ii) Mitchell controlled the Debtors and the Entity Defendants; (iii) Spiel "assisted Mitchell in crafting the strategy and pursuing the preservation of Mitchell's wealth over the faithful execution of their fiduciary duties"; and (iv) the Officer Defendants (Mitchell and Mr. Spiel) sought to prolong Debtors' operation to the detriment of creditors and the estate in order to reduce HMC's liability on the lease guaranty and generate continuing revenue for the five (5) M&M PropCos.[113]

As was pointed out by Mitchell (and as is at least implicitly acknowledged by the Trustee), in the first fifteen (15) numbered paragraphs of his objection, the Trustee effectively adds factual allegations to the Complaint. Those allegations were derived from postpetition statements by the Debtors and from Court findings that were not directly referred to in the Complaint; however, the Trustee asserts they are part of the record of the case and highlight the unitary nature of the fourteen (14) Debtors.[114] The Trustee's new allegations in his objection are (as summarized):

(i) lead Debtor MSGI wholly owned the thirteen (13) Debtor-Subsidiaries (¶ 2);

(ii) after the March 16, 2020 Order for Joint Administration, Debtors filed their July 7, 2020 Schedules and Statements on a unitary basis (¶ 3, citing to Main Dkt. No. 484);

(iii) Debtors reported in their Schedules and Statements filed on July 7, 2020 that Debtors "maintain their cash on a consolidated basis at bank accounts in the name of or for the benefit of Debtor Modell's II, Inc." (¶ 4, citing Schedules and Statements, at 6, Main Dkt. No. 484);

(iv) that the November 13, 2020 Confirmation Order substantively consolidated the Debtors "for all purposes associated with confirmation and consummation of the Plan" (¶¶ 5-9, citing Nov. 13, 2020 Confirmation Order ¶ 31, Main Dkt. No. 827); and

(v) that the Debtors represented in its March 11, 2020 Cash Management Motion that deposits into any Debtors' account were swept daily into a main operating account

---

[113] Trustee Obj., at 1, 5, Dkt. No. 43.

[114] The Trustee did, however, allege in the Complaint that, although HMC and the M&M PropCos were nominally separate from the Debtors, the relationships among the entities were convoluted and that, at least until 2017, the Debtors and HMC had "always been run as one business with consolidated financial reporting." Compl. ¶ 28, Dkt. No. 1.

(¶¶ 11-15, citing to Mar. 11, 2020 Cash Management Motion ¶¶ 13-18, Main Dkt. No. 14.)[115]

Without performing a choice-of-law analysis, the Trustee presumes that the substantive law of Delaware applies (at least to the Trustee's breach of fiduciary duty claims), as the MSGI is a Delaware corporation.[116]

Trustee avers that he has provided sufficient factual allegations to withstand Mitchell's motion to dismiss the Trustee's breach of fiduciary duty claim, particularly as Mitchell stood on both sides of all transactions, as the 50% or 100% owner of Debtors and as the 50% owner of the six (6) Entity Defendants. *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) ("Classic examples of director self-interest in a business transaction involve either a director appearing on both sides of a transaction or a director receiving a personal benefit from a transaction not received by the shareholders generally.").

The Trustee further argues that the exculpation clause in the MSGI Certificate of Incorporation does not protect Mitchell (or Mr. Spiel) because it applies only to directors, and Mitchell and Mr. Spiel were both officers of the Debtors. Additionally, the Trustee argues that their conduct was not covered by that clause particularly because Mitchell was on both sides of every challenged transaction.[117] The Trustee also argues that deepening insolvency, even if not an independent cause of action under Delaware law, may be a measure of damages, as well as evidence of breach of fiduciary duty, and that the Trustee, in every event, has argued alternate grounds for damages.[118]

C. <u>HMC</u>

---

[115] Trustee Obj. ¶¶ 1-15, Dkt. No. 43.
[116] Trustee Obj., at 16, Dkt. No. 43.
[117] Trustee Obj., at 24-27, Dkt. No. 43. 8 Del. C. Ann. § 102 ("Contents of certificate of incorporation") at subsection (b)(7) was amended by 83 Del. Laws Ch. 377 effective August 1, 2022 to include officers in most of its protections.
[118] Trustee Obj., at 28-31, Dkt. No. 43.

HMC is the sole Defendant in three (3) Counts of the Complaint, Count 8 (Aiding and Abetting Breach of Fiduciary Duty); Count 11 (Breach of Contract); and Count 12 (avoiding an alleged $11 million in preferential transfers that were booked as an intercompany loan). HMC acknowledges (at least for now) that the Modell's business historically operated through HMC but shifted to Debtors over time (citing Complaint ¶¶ 22, 26).[119] HMC avers that it owned seven (7) parcels of land and operated (7) retail stores prepetition, but closed all the stores when the Debtors filed for bankruptcy protection and was forced to sell six (6) of the seven (7) parcels to meet its liability on its guaranty of Debtors' leases.[120] HMC argues that it funded Debtors' expansion for years through an intercompany loan.[121] HMC also asserts that it separately guaranteed Debtors' secured bank loan (a fact not alleged in the Complaint) and that Debtor and HMC entered the April 3, 2011 Services Agreement (the "Services Agreement") to formalize their transactions when HMC refused to keep guaranteeing Debtors' bank loans.[122]

According to HMC, the Services Agreement fixed the manner through which HMC would compensate MSGI and MII for HMC's use of Debtors' employees; HMC's share of common charges and professional charges at Debtors' central headquarters; the payment and reconciliation of the amounts due each other; and the reconciliation of HMC's purchase of inventory exclusively from Debtors.[123] In another alleged fact not appearing in the Complaint, HMC states that the Agreement was meant to insure that transactions between HMC and Debtors benefitted Debtors.[124] HMC asserts that there is no relationship between the Agreement and the intercompany loan.[125]

---

[119] HMC Br. at 2, Dkt. No. 34-1.
[120] HMC Br., at 2-3, Dkt. No. 34-1. Certain of these "facts" in the text related to this footnote and to nn.118-120 are not asserted on the face of the Complaint but are referred to here for context. They are not being relied upon by the Court in making this decision.
[121] HMC Br., at 4, Dkt. No. 34-1.
[122] HMC Br. ¶ 10, Dkt. No. 34-1.
[123] HMC Br. ¶ 10, Dkt. No. 34-1.
[124] HMC Br. ¶ 10, Dkt. No. 34-1.
[125] Feb. 8, 2023 Hr'g Tr. 100:14-101:5, Dkt. No. 68.

However, Schedule I ¶ 6 of the Services Agreement indicates that HMC would "earn an Interest Credit on the end of the month intercompany *subordinated* balance due from [Debtors] to HMC".[126] In contrast, and giving rise to another disputed issue of fact (and law), the Complaint asserts that there was a link between the Services Agreement and the intercompany debt:

> the Services Agreement did not require the Debtor to make any payments in satisfaction of the principal during the term of the Services Agreement. Instead, it provided for interest-only payments by the Debtor which took the form of credits in HMC's favor against amounts owed by HMC to the Debtor, for the intercompany debt to be adjusted in favor of the Debtor if HMC were to fail to pay any amounts due . . . .[127]

HMC admits that Debtors' books showed a balance of $39 million due HMC on the intercompany loan in 2019, but HMC asserts that the true amount of the debt was much higher, and actually over $150 million.[128] HMC admits that Debtors demanded a $9.6 million payment from HMC shortly prepetition, as well as a "true-up" accounting, in default of which Debtors would cease honoring the Services Agreement.[129]

HMC filed Claim Nos. 1715 and 1756 for $150,148,865.75 and $550,000, respectively against the principal Debtor, MSGI.[130] The second claim, an administrative priority, is included in the first. The $150,148,865.75 consists of not less than $33,699,007.13 on the intercompany loan and under the Services Agreement; $90,263,040 in lease guarantees; $8,451,818.62 in pension plan payments; $17,184,820 in storage facility fees; and $550,000 in unpaid postpetition rent.[131] HMC acknowledges that its board ultimately voted "to offset its apparent $6.8 million Services Agreement obligation against the 'Intercompany Loan Balance.'"[132] That $6.8 million (the

[126] Compl., April 3, 2011 Service Agreement, Sched. I ("Customary Billing") ¶ 6, at 21, Ex. A, Dkt. No. 1 (emphasis supplied).
[127] Compl. ¶ 151, Dkt. No. 1.
[128] HMC Br., at 4, Dkt. No. 34-1, citing Compl. ¶¶ 152-58, Dkt. No. 1.
[129] HMC Br. ¶ 13, Dkt. No. 34-1.
[130] This information is on the website of Kroll Restructuring Administration, which appears to have absorbed Prime Clerk, LLC, the Debtor's retained claims and noticing agent.
[131] Claim No. 1715.
[132] HMC Br. ¶ 13, Dkt. No. 34-1.

Trustee asserts in his objection) represents the principal of the loan from HMC to Mitchell to M&M Lending, LLC and ultimately to Debtors, as alleged in the Complaint and Trustee's Objection.[133] As was previously noted, the precise nature of the $6.8 million loan transaction is disputed by the parties. Further, it was indicated at oral argument that this type of offset was not previously made under the Services Agreement. While not deciding any of these factual issues and/or mixed issues of fact and law, their contested nature further demonstrates that they are not appropriately resolved on this Motion.

As to the aiding-and-abetting fiduciary duty claims, HMC argues that the substantive law of Delaware applies, as MSGI was a Delaware corporation, but that the result would be the same under New York Law. HMC asks the Court to dismiss Trustee's claims against it on the grounds:

(i) as to Count 8, that the Trustee has made only conclusory statements regarding HMC and therefore has not satisfied the four elements of the aiding and abetting breach of fiduciary duty claim, adopting many of the same arguments as the M&M PropCos in this regard;[134]

(ii) as to Count 11, that the Trustee has not stated a claim for breach of contract (the April 3, 2023 Services Agreement) because HMC applied a valid setoff of Debtors' claim against the monies that Debtors owed HMC and that HMC did not waive that valuable right contractually, implicitly or otherwise;[135] and

(iii) as to Count 12, that the Trustee has not stated a claim for preference under 11 U.S.C. § 547(b) because a setoff does not constitute a transfer of Debtors' interest in property, citing *In re Agriprocessors, Inc.*, 547 B.R. 292, 325 (N.D. Iowa 2016); 11 U.S.C. § 101(54) (defining transfer);[136] and

(iv) that, if the Court dismisses the Trustee's claims against Mitchell and Mr. Spiel, then the Court must dismiss the Trustee's claims against HMC as well.[137]

D. <u>Service Center</u>

[133] Trustee Obj., at 33, Dkt. No. 44.
[134] HMC Br. ¶ 17 n.7, Dkt. No. 34-1.
[135] HMC Br. ¶¶ 27-28, Dkt. No. 34-1.
[136] HMC Br. ¶ 29, Dkt. No. 34-1.
[137] HMC Br. ¶ 17 n.7, Dkt. No. 34-1.

The claims against Service Center appear in Counts 9 and 10 only. As explained above, Service Center owned the Bronx Property that it leased to Debtors for Debtors' Distribution Center under a long-term, below-market lease. Trustee alleges that, in January 2018, Service Center, acting through Mitchell, paid Debtors $15 million to buy out the remainder of the lease; sold the Distribution Center Property to a third-party Buyer at a substantial profit to Service Center and ultimately to its owners, Mitchell and the Trust; and then re-leased the Property to Debtors, for two (2) years at the same rate and then for only six (6) more months at an extravagant rate that Debtors could not afford and when the Debtors could similarly not afford to lease a different property for the same use and renovate it to Debtors' needs. Count 10 seeks damages against Service Center in "tens of million of dollars" for this disruption in Debtors' leasehold interest.[138]

Service Center states in its motion to dismiss that it appears only in Count 10 of Trustee's Complaint. However, it appears in Count 9 as well, as the Trustee consistently identifies Service Center as one of the "M&M PropCos." Service Center argues that:

(i) the Trustee's allegations against it are conclusory and "threadbare";

(ii) under the law of New York, Delaware or New Jersey (and as argued by the other M&M PropCos), the Trustee has failed to allege sufficient factual material to raise a cognizable claim for aiding and abetting breach of fiduciary duty;

(iii) even if the Trustee alleged sufficient, plausible facts to demonstrate that Mitchell and Mr. Spiel breached their fiduciary duty to the Debtors, an entity cannot aid and abet its own principals in their breach of fiduciary duty, and the Trustee failed to allege how Service Center provided any "substantial assistance" to the alleged breach; and

(iv) allowing and aiding and abetting claims against Service Center would permit the Trustee to obtain a double recovery.[139]

[138] Compl. ¶ 257, Dkt. No. 1.
[139] Service Ctr. Br., at 5, 10-13, Dkt. No. 30-1.

Service Center moves in the alternative for a more definite statement under Fed. R. Civ. P. 12(e), to compel the Trustee to demonstrate that Service Center had "actual knowledge" of and gave "substantial assistance" to the activities of Mitchell and of Spiel to support Service Center's "knowing participation," the second element of an aiding and abetting claim.[140]

E. Bruckner/Mt. Kisco and Flushing/Jamaica

Bruckner, Mt. Kisco, Flushing and Jamaica each appear in Count 9 only.[141] In Count 9, the Trustee alleges that they each aided and abetted Mitchell's alleged breach of fiduciary duty to the Debtors.[142] Mitchell at all relevant times was 50% owner of these four (4) Defendants. Count 9 alleges that these four (4) Defendants "exercised control over the Debtor[s] through Mitchell and caused the Debtor[s] to continue operating to the Debtor[s'] detriment and for the benefit of" these four (4) Defendants.[143] On this Count, the Trustee demands damages of (i) $14.5 million in rent payments that Trustee alleges Debtors paid to these Defendants while Debtors were in distress; and (ii) $200 million in "proliferation" of debt due Debtors' unpaid creditors.

The arguments of Bruckner/Mt. Kisco and Flushing/Jamaica overlap and are identified by initials ("B/K" or "F/J") only to the extent that they differ one from the other. Counsel for these four (4) Defendants challenge Trustee's claims against the New York, New Jersey and Delaware standard for the tort of aiding and abetting and argue in summary that:

(i) even if the Trustee has alleged enough facts to sustain a breach of fiduciary duty claim against Mitchell [and Mr. Spiel], an entity cannot aid and abet fiduciary breaches by its own fiduciary. The Trustee cannot hold both an entity and its agents liable for breach of fiduciary duty to a third party;[144]

---

[140] Service Ctr. Br., at 14-15, Dkt. No. 30-1.

[141] Bruckner/Mt. Kisco are represented by one Counsel (who also represents Service Center), and Flushing/Jamaica are represented by one different Counsel.

[142] All four (4) of these Defendants state that Count 9 is directed to the alleged aiding and abetting committed by both Mitchell and Mr. Spiel, but Count 9 in fact references only Mitchell and not Mr. Spiel.

[143] Compl. ¶ 245, Dkt. No. 1.

[144] K/B Br., at 11-12, 15-16, Dkt. No. 29-1.

(ii) the mere fact that these Entity Defendants received a benefit (rent) from the Debtors does not amount to "knowing participation" or the "substantial assistance" necessary to support a claim for aiding and abetting;[145]

(iii) the Complaint does not specify what conduct Defendants undertook to aid and abet the alleged breach of fiduciary duty by Mitchell and Mr. Spiel;[146]

(iv) the conduct that constitutes aiding and abetting must be wrongful itself, unless the alleged aider-and-abettor owes its own fiduciary duty to the Debtors; then inaction by the alleged aider-and-abettor does not support Trustee's claim;[147] and

(v) deepening insolvency is not a valid claim or theory of damages under Delaware law.

F. The Trustee's Unified Objection to the Entity Defendants' Motions

The Trustee begins his unified objection by reiterating at length the allegations in his Complaint. He argues against granting any Defendant's motion for a more definite statement under Fed. R. Civ. P. 12(e) to the extent that a Defendant's demand exceeds the pleading requirement of Fed. R. Civ. P. 8(a)(2).[148] The Trustee restates the standards under Delaware law for breach of fiduciary duty (and its component duties of care, loyalty and good faith).[149] The Trustee responds to the Defendants' substantive argument as follows:

(i) that the principle, cited by the Entity Defendants, that an entity cannot be held to aid and abet breach of fiduciary duty by their own directors and officers does not apply: (A) when the fiduciary has divided loyalties; or (B) when the injured party is a different entity. The Trustee characterizes the Entity Defendants as "third parties" capable of aiding and abetting Mitchell's and Mr. Spiel's breach of fiduciary duty to the Debtors;[150]

(ii) as to the argument of Bruckner, Mt. Kisco, Service Center and HMC that Trustee has not established Defendants' knowledge of Mitchell's and Mr. Spiel's breach of fiduciary duty, the Trustee argues, under general agency law, that a director's or officer's knowledge is imputed to the corporation. *In re HealthSouth Corp. S'holders*

[145] K/B Br., at 9, Dkt. No. 29-1.
[146] F/J Br. ¶ 7, Dkt. No. 31-1.
[147] F/J Br. ¶¶ 11-12, Dkt. No. 31-1.
[148] Trustee Obj., at 15, Dkt. No. 44.
[149] Trustee Obj., at 15-16, Dkt. No. 44.
[150] Trustee Obj., at 24, Dkt. No. 44.

*Litig.*, 845 A.2d 1096, 1108 n.22 (Del Ch. 2003), *aff'd*, 847 A.2d 1121 (Del. 2004); *Carlson v. Hallinan*, 925 A.2d 506, 542 (Del. Ch. 2006);[151]

(iii) that Entity Defendants' "control" of Debtors through Mitchell and his "receipt of improper benefits" are sufficient to establish the knowing participation and substantial assistance elements of an aiding and abetting claim, citing *Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.*, 1995 WL 694397, at *16 (Del. Ch. Nov. 21, 1995); *In re Advance Nanotech, Inc.*, 2014 WL 1320145, at *7 (Bankr. D. Del. Apr. 2, 2014); *Quadrant Structured Prods Co., Ltd. v. Vertin*, 102 A.3d 155, 204 (Del Ch. 2014);[152]

(iv) that the conduct of Service Center (and of Mitchell with respect to Service Center) was particularly egregious; and

(v) that Delaware law makes clear that aiders and abettors of breach of fiduciary duty are jointly and severally liable for damages, so that any alleged potential double recovery is not an issue, citing *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 172-73 (Del. 2002); *Carlson v. Hallinan*, 925 A.2d 506, 548 (Del. Ch. 2006); *In re Rural/Metro Corp. Stockholders Litig.*, 102 A.3d 205, 220-21 (Del. Ch. 2014).[153]

In response to Defendants' argument that deepening insolvency is not a measure of damages, Trustee appears to rely on the silence about damages in the Delaware opinions that hold that deepening insolvency is not a cause of action to argue that there is nevertheless room to use "deepening insolvency" as a measure of damages. *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 205 (Del. Ch. 2006), *aff'd*, 931 A.2d 438 (Del. 2007); *In re The Brown Schools*, 368 B.R. 394, 409 (Bankr. D. Del. 2007).[154] The Trustee concludes, in any event, that the Court has flexibility and broad scope in fixing damages for breach of fiduciary duty and, impliedly by extension, for aiding and abetting breach of fiduciary duty. *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939); *Thorpe v. CERBCO*, 676 A.2d 436, 445 (Del. 1996).[155]

In response to HMC's argument that the Trustee has not adequately stated a claim for breach of contract (Count 11), Trustee argues that HMC did not validly offset monies that HMC

[151] Trustee Obj., at 18-19, Dkt. No. 44.
[152] Trustee Obj., at 20, Dkt. No. 44.
[153] Trustee Obj., at 27, Dkt. No. 44.
[154] Trustee Obj., at 28, Dkt. No. 44.
[155] Trustee Obj., at 30-31, Dkt No. 44.

claimed Debtor owed it against debt due from HMC to Debtors under the April 3, 2011 Services Agreement on the grounds that the Agreement expressly allowed the Debtors a right of offset against HMC, but is silent as to any right of offset by HMC against Debtors.[156] The Trustee cites the following paragraph of the Agreement:

> Section 3.05. Benefit Billing. . . .
>
> (f) Advances; Right of Offset: . . .
>
> Notwithstanding anything contained herein or in any other agreement between the Parties to the contrary, MSG [lead Debtor Modell's Sporting Goods, Inc.] shall have the right, at MSG's option, to offset sums due to HMC under this Agreement, any other agreement between MSG and HMC, or in connection with any receivable due to HMC from MSG or any of the MSG Entities.[157]

The Trustee argues that the principle of *expressio unius est exclusio alterius* applies to contract interpretation to prohibit the Court from determining that HMC also had a right of setoff. *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 23 N.Y.3d 549, 561 (2014); *In re Ore Cargo, Inc.*, 544 F.2d 80, 82 (2d Cir. 1976) (where an assignment of rights under a commercial security agreement included certain rights not provided in U.C.C. Article 9 (setoff) but not others (security interest in tort claims), the Court could not imply such a right "on the basis of the general language of the agreement"). The Trustee further argues that HMC's $6.8 million loan to Mitchell (who transferred the funds to M&M Lending, LLC, which transferred them to Debtors) could not form the basis for a setoff as the original debt ran from Mitchell to HMC (not from Debtors to HMC).[158] As a consequence, the Trustee argues that the invalid "setoff" effected by HMC similarly is not a

[156] Trustee Obj., at 32, Dkt. No. 44.
[157] Trustee Obj., at 32, Dkt. No. 44; Compl., Apr. 3, 2011 Services Agreement, Ex. A, Dkt. No. 1. As noted above, the Parties to the April 3, 2011 Services Agreement were Debtors Modell's Sporting Goods, Inc. and Modell's II, Inc. and Defendant HMC. The Agreement defined "MSG Entities" as "MSG and its Subsidiaries and affiliates, other than HMC, and "MSG Entity" as meaning any of the MSG Entities.
[158] Trustee Obj., at 33, Dkt. No. 44.

valid defense to the Trustee's allegation in Count 12 that this credit taken by HMC less than one month prepetition is a recoverable preference under 11 U.S.C. § 547(b).[159]

G. The Replies of the Entity Defendants

HMC argues in its reply that the Trustee has ignored the impact of *Endico v. Endico*, 2022 WL 3902730, at *12 (S.D.N.Y. Aug. 30, 2022) and of *Wiatt v. Winston & Strawn LLP*, 838 F. Supp. 2d 296, 307 (D.N.J. 2012) and has understated the holdings in *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 54 (Del. Ch. 2014) and in *Buttonwood Tree Value Partners, L.P. v. R.L. Polk & Co., Inc.* 2014 WL 3954987, at *5 (Del. Ch. Aug. 7, 2014) (discussed below). HMC argues that these cases stand for the proposition that an entity cannot aid or abet its director's or officer's breach of fiduciary duty to another entity.[160] HMC further asserts that there was nothing facially improper about the benefit (rents) that HMC derived from the actions of its directors or officers.[161] HMC also argues that Delaware does not recognize "deepening insolvency" as a claim or as a measure of damages, citing *In re Troll Comms.*, 385 B.R. 110, 121 (Bankr. D. Del. 2008); *In re CitX Corp., Inc.*, 448 F.3d 672, 677 (3d Cir. 2006).[162] HMC reiterates that the setoff that it claimed in March 2018 was valid; that Trustee's *expressio unius* argument is inapplicable; and that HMC cannot be deemed to have waived its common law or statutory right of setoff unless it does so explicitly, citing *Port Distrib. Corp. v. Pflaumer*, 880 F. Supp. 204, 211-12 (S.D.N.Y.), *aff'd*, 70 F.3d 8 (2d Cir. 1995); *Quadrant Structured Prod. Co. v. Vertin*, 23 N.Y.3d 549, 559 (N.Y. 2014); *Wright v. Universal Mar. Serv. Corp.*, 525 U.S. 70, 80 (1998).

[159] Trustee Obj., at 33-34, Dkt. No. 44.
[160] HMC Reply ¶¶ 6-12, Dkt. No. 51.
[161] HMC Reply ¶¶ 13-14, Dkt. No. 51.
[162] HMC Reply ¶ 15, Dkt. No. 51. HMC also charges Trustee with improperly adding in his Objection an $80 million damage claim for reduction in HMC's liability on the Lease, citing Trustee Obj., at 31, Dkt. No. 44, but the Trustee appears to have pleaded that damage demand in his Complaint. Compl. ¶ 162; Count 8 ¶ 241, Dkt. No. 1.

Service Center, in its reply, reiterates its arguments that collecting damages from both Mitchell and Mr. Spiel would constitute a double recovery and that applicable Delaware law does not support a claim for an entity's aiding and abetting its principals' breach of fiduciary duty to the entity itself or to another entity.[163] Service Center also relies on assertedly analogous law (as does HMC) in invoking civil conspiracy principles, which are recognized in some cases as being similar to aiding and abetting law and generally provide that a corporation cannot conspire with its own officers or agents. *Amaysing Techs. Corp. v. CyberAir Commns.*, 2005 WL 578972, at*7 (Del. Ch. Mar. 3, 2005); *Largo Legacy Grp., Ltd. Liab. Co. v. Charles*, 2021 WL 2692426, at *18 n.129 (Del. Ch. June 30, 2021); *Hartsel v. Vanguard Grp.*, 2011 WL 2421003, at *10 (Del. Ch. June 30, 2021).[164]

Bruckner/Mt. Kisco in their reply also reiterate the argument that an entity cannot be held to aid and abet a breach of fiduciary duty committed by its own officer or director, citing *Buttonwood Tree Value Partners, L.P. v. R.L. Polk & Co., Inc.* 2014 WL 3954987, at *5 (Del. Ch. Aug. 7, 2014); *Endico v. Endico*, 2022 WL 3902730, at *12 (S.D.N.Y. Aug. 30, 2022); *In re Oracle Corp. Deriv. Litig.*, 2020 WL 3410745, at *12-*13 (Del. Ch. June 22, 2020); *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 54 (Del. Ch. 2014), relying heavily on *Endico*, *infra*.[165] Bruckner/Mt. Kisco purport to distinguish on their facts the cases on which the Trustee principally relies, *Carlson v. Hallinan*, 925 A.2d 506, 542 n.243 (Del. Ch. 2006); *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.*, 1995 WL 694397, at *16 (Del. Ch. Nov. 21, 1995). Jamaica/Flushing similarly reply by distinguishing the Trustee's primary cases (*Carlson* and *Carlton*) and arguing that their accepting payments from Debtors on their leases cannot "constitute knowing

[163] Service Ctr. Reply, at 4-7, Dkt. No. 49.
[164] Service Ctr. Reply, at 5-6, Dkt. No. 49.
[165] Bruckner/Mt. Kisco Reply, at 7-16, Dkt. No. 50.

participation or substantial assistance" in aiding and abetting Mitchell's alleged breach of fiduciary duty toward the Debtor.[166]

The parties appeared for oral argument on February 8, 2023. In this Opinion, the Court will first address the multiple pleading standards applicable to the Complaint and their specific application to this case; preliminarily discuss choice of law issues; and then address the substantive legal arguments on the merits.

## V. LEGAL STANDARDS AND ANALYSIS

### A. Dismissal under Fed. R. Civ. P. 12(b)(6)

Fed. R. Civ. P. 12(b)(6), incorporated into Fed. R. Bankr. P. 7012(b), allows a defendant to move to dismiss any action for failure to state a claim upon which relief can be granted by motion made before the responsive pleading is filed. Fed. R. Civ. P. 12(b)(6); Fed. R. Bankr. P. 7012(b). To decide a Rule 12(b)(6) motion, the Court accepts all well-pleaded allegations in the complaint as true, views them in the light most favorable to the plaintiff, and determines whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

To survive a motion to dismiss, a complaint must allege sufficient factual matter which, if accepted as true, "state[s] a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 652, 678 (2009) (citing *Twombly*, 550 U.S. at 556). The pleadings must raise the possibility, though not the probability, of the conduct complained of and show "'enough facts to

[166] Jamaica/Flushing Reply ¶¶ 5-7, Dkt. No. 46.

raise a reasonable expectation that discovery will reveal evidence of' the necessary element." *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556).

Under these standards, the Court undertakes a two-part analysis which requires it: (1) to identify and reject labels, conclusory allegations, and formulaic recitation of the elements of a cause of action; and then (2) to draw upon its judicial experience and common sense to determine whether the factual content of a complaint plausibly gives rise to an entitlement to relief. *Iqbal*, 556 U.S. at 678-79. The Court "generally consider[s] only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record" along with authenticated documents which form the basis of the claim. *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir 1993), *cert. denied*, 51 U.S. 1042 (1996). A court may also take judicial notice of a prior judicial opinion. *McTernan v. City of York, Pa.*, 577 F.3d 521, 526 (3d Cir. 2009); *see Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

Finally, and significantly for the purpose of these Motions, the Court is not required to resolve factual disputes or defenses that are not apparent from the face of the Complaint on a motion to dismiss. *Flora v. Cty. of Luzerne*, 776 F.3d 169, 175-76 (3d Cir. 2015); *Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651, 657-58 (3d Cir. 2003); *Kalan v. Farmers & Merchants Trust Co. of Chambersburg*, 2015 WL 13874054, at *1 n.1 (E.D. Pa. Nov. 25, 2015). *See also Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 412 (S.D.N.Y.), *recons. denied*, 431 F. Supp. 2d 425, (S.D.N.Y. 2006) ("fact-intensive analysis . . . ordinarily does not lend itself to a motion to dismiss"); *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998) ("The task of the court in ruling on a Rule 12(b)(6) motion is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'"); *Lombardo v. Town of Hempstead*, 2020 WL 7021603, at *2 (E.D.N.Y. Nov. 30, 2020) ("Accepting

Defendants' version of the facts as stated in their objections . . . would require the Court to make factual findings that may not be made upon a motion to dismiss.").

B. Motion for a More Definite Statement under Fed. R. Civ. P. 12(e)

Fed. R. Civ. P. 12(e), incorporated into Fed. R. Bankr. P. 7012(b), provides that a defendant may move "for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." The moving party "must point out the defects complained of and the details desired." *Id.* The prevailing standard used by the Third Circuit is to grant a Rule 12(e) motion "when the pleading is so vague or ambiguous that the opposing party cannot respond, even with a simple denial, in good faith, without prejudice to [itself]." *Clark v. McDonald's Corp.*, 213 F.R.D. 198, 232-33 (D.N.J. 2003).

As a general matter, "Rule 12(e) motions are disfavored in light of the liberal pleading standards established by Fed. R. Civ. P. 8(a)." *Mut. Indus., Inc. v. Am. Int'l Indus.,* 2011 WL 4836195, at *2 (E.D. Pa. Oct. 11, 2011). Specifically, Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Moreover, the standard for granting a motion for a more definite statement is based on "unintelligibility, not lack of detail." *MK Strategies, LLC v. Ann Taylor Stores Corp.,* 567 F. Supp. 2d 729, 737 (D.N.J. 2008); *see also Frazier v. Se. Pa. Transp. Auth.,* 868 F. Supp. 757, 763 (E.D. Pa. 1994) (noting that a Rule 12(e) motion "is used to provide a remedy for an unintelligible pleading rather than as a correction for lack of detail"). "It is not the function of 12(e) to provide greater particularization of information alleged in the complaint or which presents a proper subject for discovery." *MK Strategies,* 567 F. Supp. 2d at 737.

In this case, the Complaint is not at all unintelligible and is generally more than sufficient to put Defendants on notice of the claims against them. In fact, the Complaint is atypical in certain

respects because it is based in large part on written statements made by or on behalf of the Debtors and/or the Individual Defendants. That said, there are certain details that the Court believes will hopefully help streamline these proceedings, provide some assistance to the Defendants in framing their responses to the Complaint and assist all parties in pursuing discovery, as will be described in more detail below.

C. Fed. R. Civ. P. 9(b) Heightened Pleading Standard

Fed. R. Civ. P. 9(b) requires a party alleging fraud or mistake to "state with particularity the circumstances constituting fraud of mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Rule 9(b) may apply to certain claims brought under § 548 of the Bankruptcy Code. However, as is noted by the Trustee, when the claim is constructive fraud, "the great majority of cases hold that since a cause of action based on constructive fraud does not require proof of fraud, the heightened pleading requirements of Rule 9(b) are not applicable." *In re Actrade Fin. Techs., Ltd.*, 337 B.R. 791, 801 (Bankr. S.D.N.Y. 2000) (citations omitted); *see also In re M. Fabrikant & Sons, Inc.*, 394 B.R. 721, 735 (Bankr. S.D.N.Y. 2008) ("Rule 9(b) does not apply to claims sounding in constructive fraudulent transfer . . . , and allegations of a constructive fraudulent transfer are subject to less rigorous pleading requirements").

In response, Mitchell cites to *OHC Liquidation Trust v. Nucor Corp. (In Re Oakwood Homes Corp.)*, 325 B.R 696, 698 (Bankr. D. Del. 2005), which states "[t]here is no question that Rule 9(b) applies to adversary proceedings in bankruptcy which include a claim for relief under §§ 544 or 548, whether it is based upon actual or constructive fraud." Nonetheless, the *Oakwood* Court, while adopting the minority view, also recognized that the pleading standard under Rule 9(b) is relaxed where a bankruptcy trustee is pleading a fraudulent transfer claim. *Id.* at 698-99.

In deciding this issue, the Court will follow the majority rule, which it believes is the better reasoned and supported view, principally because a constructive fraud claim does not require proof of actual fraud, and find that Rule 9(b) does not apply to constructive fraudulent transfer claims. And even if it did apply, the Court finds that, in these circumstances, the Trustee's detailed Complaint satisfies the 9(b) standards, except in certain limited circumstances that will be described in more detail in the following sections of this Opinion.

D. The Complaint Is Not a "Shotgun" Pleading

Related to these pleading matters, Mitchell in particular asserts that the Trustee's Complaint is a defective "shotgun pleading." In *Nash v. New Jersey*, 2022 WL 411169, at *2 (D.N.J. Sept. 8, 2022), the Court cited *Weiland v. Palm Beach City Sheriff's Office*, 792 F.3d 1313, 1321-23 (11th Cir. 2015) for the following definition of a shotgun pleading:

> A shotgun pleading can arise in any of the following circumstances:
>
> (i) 'a complaint containing multiple counts where each count adopts the allegations of all preceding counts,'
>
> (ii) a complaint that is 'replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action,'
>
> (iii) a complaint that does not separate 'into a different count each cause of action or claim for relief,' or
>
> (iv) a complaint that 'assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.'

*Nash*, 2022 WL 411169, at *2, quoting *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1321-23 (11th Cir. 2015) (paragraphing added). The Court in *Nash* concluded: "Such pleadings impose on courts and defendants the onerous task of sifting out irrelevancies." *Nash*, 2022 WL 411169, at *2, citing *Weiland*, 792 F.3d at 1323.

Mitchell contends that the Complaint's failure to identify the specific Debtors harmed as a result of the alleged breach, and its failure to identify the specific transfers that were constructively fraudulent or constituted illegal dividends, renders the Complaint a shotgun pleading. Mitchell relies on *In re The Brown Schools*, 368 B.R. 394, 404 (Bankr. D. Del. 2007), in support of this position. However, the *Brown Schools* court did not use the term "shotgun pleading" and did not state that the complaint in that case demonstrated the gross failure represented by the four (4) categories cited above. Instead, the *Brown Schools* court dismissed certain claims and allowed amendment of certain others in a fairly traditional Rule 12(b)(6) analysis.

In response, the Trustee argues that where multiple entities operate as a single unified enterprise, the approach taken in the Complaint -- which treats the Debtors as a single entity -- is appropriate. However, as the Trustee effectively acknowledged in his Opposition, the explanation and amplification of the "unitary operation" claim contained in the Opposition was helpful, if not necessary to understand the bases of allegations that were not directly asserted in the Complaint. And, as Mitchell correctly argued in reply, the Trustee effectively amended his Complaint in his Opposition by doing so.

In support of his "unitary operation" allegation, the Trustee refers to (among other things) the Debtors' Disclosure Statement where MSGI and each of its Subsidiaries requested substantive consolidation, stating in part as follows:

> The Debtors believe that substantive consolidation is warranted because the Debtors historically operated on a consolidated basis as is demonstrated by, among other things, the following: (i) substantially all of the Debtors' employees were employed and paid by Modell's II, Inc. ("**Modell's II**"), (ii) the Debtors operated a consolidated cash management system, with substantially all of the Debtors' disbursements being made from Modell's II's operating accounts, and (iii) the Debtors' clients,

> vendors, and industry participants identified the Debtors as "Modell's" as opposed to their separate corporate entities.[167]

On that basis (and others), this Court granted the requested relief without objection from any party, including any of these Defendants. The Trustee also points to (among other things) the facts that: (i) the Debtors and at least at times HMC prepared consolidated audited financial statements; (ii) the Debtors filed their Schedules and Statements on behalf of MSGI and the Subsidiaries on a consolidated basis; and (iii) MSGI and the Subsidiaries "maintain[ed] their cash on a consolidated basis at bank accounts in the name of or for the benefit of Debtor Modell's II, Inc."[168] In response, Mitchell argues that the substantive consolidation of the Debtors by this Court was prospective only and that no findings were made that the Debtors were substantively consolidated for all time, noting that the Trustee's Complaint does not plead such a cause of action.

The Court agrees that its substantive consolidation finding was prospective and also notes that the Trustee has not sought retroactive substantive consolidation. However, that is not controlling here. No definitive or final proof of retroactive substantive consolidation is required for the Trustee to sufficiently allege the unitary operation of the Debtors. Nor was the Trustee required to plead that alleged cause of action as part of his claims. Instead, the Trustee included his "unitary operation" allegations in his Opposition to explain why, for example, he was unable to provide more specifics as to his particular claims to particular Debtors.

It is also true that this explanation required the Trustee to effectively amend his Complaint in his Opposition by: (i) including the "unitary operations" allegations in his Opposition; and (ii) agreeing to include details regarding the challenged transfers in the same manner as was specified in the Trustee's Amended Complaint in Adv. Pro. No. 22-1077 (VFP) (the "1077 Amended

[167] Trustee Obj. ¶ 7 and page 19, Dkt. No. 43; First Modified DS, at 48, Main Dkt. No. 759-1 (emphasis in original; Trustee's elisions removed).
[168] Compl. ¶ 28, Dkt. No. 1; Schedules and Statements, at 6, Main Dkt. No. 484.

Complaint"). The Court will require the Trustee to actually do so now by directing him to amend the Complaint to include: (i) the same (or similar) allegations regarding the Debtors' unitary operations, as he did in his opposition and in the 1077 Amended Complaint; and (ii) the same (or similar) information and details as to the specific, challenged transfers that were included in the 1077 Amended Complaint. The Court will further require the Trustee to amend his Complaint to identify the specific Debtor involved and/or the Debtor account from which each challenged transfer was made, to the extent that information is readily available to the Trustee, with further details, such as intercompany attribution, left to discovery.

Although these relatively minor and easily correctible (or already corrected) alleged deficiencies may have rendered the original Complaint somewhat confusing (or less than crystal clear) in certain limited respects, that confusion is understandable based on the Debtors' admitted method of operating. For that reason, and with these amendments, the Trustee's failure to originally plead the Debtors' unitary operation in detail or to identify the specific Debtors and transfers does not render the Complaint a shotgun pleading and certainly does not serve as grounds for dismissal.

E. Choice of Law Analysis

As noted, the Trustee has cited statutory law from three different jurisdictions (Delaware, New Jersey and New York) in his opposition, without specifying which particular law should apply. At oral argument, Trustee's counsel acknowledged that Delaware law applies to the claims relating to the "internal affairs" of a Delaware corporation, such as MSGI, and that Delaware law therefore governs the asserted breach of fiduciary duty and aiding and abetting claims.[169] No party

[169] Feb. 8, 2023 Hr'g Tr. 5:18-6:9; 18:10-19:10, Dkt. No. 68.

seems to disagree with that position, and the Court will adopt it here as the Court also finds that the state of incorporation governs the internal affairs of a corporate entity.

New Jersey's choice of law rules provide that the laws of the state of incorporation govern conflicts regarding internal corporate affairs. *See In re Allserve Sys. Corp.*, 379 B.R. 69, 79 (Bankr. D.N.J. 2007). Internal affairs include matters which "'are peculiar to the relationship among or between the corporation and its current officers, directors, and shareholders.'" *Id.* (quoting *McDermott Inc. v. Lewis*, 531 A.2d 206, 216-17 (Del. 1987)). Here, there is no dispute that the MSGI Debtor, which was the parent and sole owner of each of the Debtor-Subsidiaries, is a Delaware corporation (with its principal place of business in New York). Thus, there is no conflict here, and so, even absent the parties' agreement, the Court would find that Delaware law applies to the breach of fiduciary duty and aiding and abetting claims asserted by the Trustee to the extent they are based on the Debtor MSGI's Certificate of Incorporation or other organizational documents governing its corporate affairs.

Relatedly, in bankruptcy cases, courts apply the choice of law rules of the forum state, which here is New Jersey. *See Zydus Worldwide DMCC v. Teva API Inc.*, 461 F. Supp. 3d 119, 131 (D.N.J. 2020) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). New Jersey courts have adopted the "most significant relationship" test to resolve conflict of law issues. *Snyder v. Farnam Cos., Inc.*, 792 F. Supp. 2d 712, 717 (D.N.J. 2011). This two-step analysis first requires the court to determine whether a conflict of law exists; if no such conflict exists, the law of the forum state applies. Then, if a conflict exists, the court must determine which state has the "'most significant relationship' to the claim." *Id.* "[A]t the motion to dismiss stage, when little to no discovery has taken place," it may be "inappropriate or impossible" for a court to conduct a choice of law analysis. *Id.* at 718. However, "[s]ome choice of law issues may not require a full

factual record and may be amenable to resolution on a motion to dismiss." *Id.*, *citing Harper v. LG Elecs. USA, Inc.*, 595 F. Supp. 2d 486, 491 (D.N.J. 2009).

The Court notes that, under the "most significant relationship" test, it is not at all clear that Delaware law would govern as to matters other than MSGI's "internal affairs." In those situations, the Court must determine which state has the most significant relationship to the relevant claim. In the present matter, all the Debtors, HMC and the M&M PropCos were domiciled in New York, had many employees and stores in that State and appeared to have conducted their businesses and likewise suffered the harm principally, though not exclusively, in New York. For these reasons, in the event there is a conflict of law as to further issues, it may be that New York law will govern. However, the Court will await further proceedings in this case to determine which law applies to the Trustee's claims that are not based on MSGI's internal affairs, if and to the extent that becomes necessary.

F. Debtors' Claims for Breach of Fiduciary Duty and Aiding and Abetting Those Breaches Are Partially Time-Barred under 8 Del. C. § 174 and 10 Del. C. § 8106(a)

Under Delaware law, which all parties agree governs the "internal affairs" of these Debtors, a three-year statute of limitations applies to breach of fiduciary duty claims. 10 Del. C. § 8106(a). New York is the only other law that could even arguably seem to apply here. New York law does not, however, provide a single statute of limitations for breach of fiduciary duty claims; instead, the limitations period depends on the substantive remedy sought by the plaintiff. *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 139 (2009). Where the plaintiff seeks a purely monetary remedy, or the equitable relief sought is merely incidental to the monetary relief, the courts view the action as alleging "injury to property" and apply a three-year limitations period. *IDT Corp*, 12 N.Y.3d at 139. However, "where the relief sought is equitable in nature, the six-year limitations period of CPLR 213 (1) applies." *Id.*; *see* N.Y. CPLR § 213(1).

Here, only damages are sought, so under either Delaware or New York law, the three-year statute of limitations applies, and the Trustee has not argued to the contrary. In fact, as noted, the Trustee's counsel acknowledged at oral argument that the three-year statute under Delaware law applies to the breach of fiduciary duty and aiding and abetting claims.[170] Therefore, all alleged damages arising from any breach of fiduciary duty by Mitchell or aiding and abetting that breach by the other Defendants that occurred prior to March 11, 2017 -- three (3) years prior to the filing of the petition -- are time-barred under 10 Del. C. § 8106(a), and the Motion is granted to that limited extent.

The grant of this relief does not, however, prevent the Trustee from seeking to offer evidence that pre-dates March 11, 2017 to support his breach of fiduciary duty and other claims against the Defendants. *See e.g.*, *In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 563 (Bankr. D. Del. 2009) (finding two challenged actions that occurred prior to the limitations period are time barred but not "irrelevant . . . [as the] conduct may serve as a background" with respect to actions that occurred after the limitations period); *In re EnviroSolutions of NY, LLC*, 476 B.R. 88, 105 (Bankr. S.D.N.Y 2012) (collecting cases) ("Furthermore, the fact that claims are time-barred does not affect their admissibility if they are relevant. In this regard, evidence of time-barred claims may be admissible as background evidence."); *Magnello v. TJX Cos., Inc.*, 556 F. Supp. 2d 114, 120 (D. Conn. 2008) ("Nevertheless, plaintiff may still offer evidence regarding the time-barred conduct as 'relevant background evidence' in support of her timely claim.").

G. <u>The Trustee Has Sufficiently Pleaded the Breach of Fiduciary Claims Against Mitchell</u>

[170] Feb. 8, 2023 Hr'g Tr., 18:10-19:10, Dkt. No. 68 (Trustee's acknowledgement); Mitchell Br., at 22-23, Dkt. No. 35-1; Mitchell Reply, at 15, Dkt. No. 47; Spiel Br., at 3, 17-18, Dkt. No. 33.

It is well-settled that "[t]he directors of Delaware corporations have a triad of primary fiduciary duties: due care, loyalty, and good faith."[171] *Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001). To bring a claim for breach of fiduciary duty under Delaware law, the plaintiff must allege (1) the existence of a fiduciary duty and (2) a breach by the fiduciary of that duty. *In re Tropicana Ent., LLC*, 520 B.R. 455, 469 (Bankr. D. Del. 2014); *In re BH S & B Holdings LLC*, 420 B.R. 112, 143 (Bankr. S.D.N.Y. 2009), *aff'd*, 807 F. Supp. 2 199 (S.D.N.Y. 2011).

The Trustee alleges, in considerable detail, that Mitchell breached his fiduciary duties to the Debtors by (among other things):

> (a) exercising control over MSGI and the other Debtors for his and his family's personal benefit and for the benefit of HMC and M&M PropCos, all to the detriment of MSGI and the other Debtors;
>
> (b) placing [his] financial interests in HMC and M&M PropCos above the financial interests of the Debtors;
>
> (c) causing the termination of MSGI's below-market Lease of the Distribution Center so that Service Center could sell the Distribution Center Property at a great ultimate profit to Mitchell and other insiders, to the detriment of the Debtors;
>
> (d) on the eve of the bankruptcy filing, "vot[ing] in favor of HMC's decision to offset payments owed by HMC to MSGI for inventory and services"; and
>
> (e) ignoring the advice of professionals hired by the Debtors to restructure or file for Chapter 11 protection. [172]

Far from being conclusory, as argued by Mitchell and other Defendants, these specific and detailed allegations, which are often based on written statements made by or on behalf of the Debtors, are more than sufficient to put Mitchell on notice of the claims against him, as further explained in the following sections.

---

[171] Of note, the relevant case law addresses the duties of good faith and loyalty in the same context. Thus, it appears the duty of good faith may be subsumed within the duty of loyalty, rather than acting as a separate standalone duty.

[172] Compl. ¶¶ 5, 40, 73-89, 93-101, Dkt. No. 1.

i. Duty of Loyalty

To sufficiently plead a breach of the duty of loyalty, the plaintiff must demonstrate that the defendant was "interested and/or lacked independence" in approving any given transaction. *Continuing Creditors' Comm. of Star Telecomms., Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 460 (D. Del. 2004). "[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).

"[I]t is usually necessary to show that the director was on both sides of a transaction or received a benefit not received by the shareholders" in demonstrating that the director had a self-interest. *Edgecombs*, 385 F. Supp. 2d at 460 (citing *Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002)). "[A]ppearing on both sides of a transaction" or "receiving a personal benefit from a transaction not received by the other shareholders generally" is the "classic example" of director self-interest. *Cede*, 634 A.2d at 362; *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993) (to the same effect); *In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 563–64 (Bankr. D. Del. 2008) ("To show that a director was interested, it is usually necessary to show that the director was on both sides of a transaction or received a benefit not received by the shareholders."). *See also Matter of Seidman*, 37 F.3d 911, 934 (3d Cir. 994) ("Directors are considered to be 'interested' if they either 'appear on both sides of a transaction [ ] or expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally.'"); *In re D'Amore*, 472 B.R. 679, 690 (Bankr. D.N.J. 2012) (same).

The Trustee has sufficiently pleaded that Mitchell was on both sides of the challenged transactions and was therefore interested and/or lacked independence in approving the various actions (or not taking recommendations) in manners that benefitted him, his family and the Entity

Defendants to the detriment of the Debtors and resulted in breaches of his duty of loyalty. The Trustee makes numerous detailed allegations regarding Mitchell's "primary goal" to preserve his and his family's real estate wealth, even if it meant potentially "sacrificing" the Debtors, and also alleges that discussions took place "characterizing the Debtor's business as a 'threat' to the preservation of Mitchell's wealth, rather than an asset."[173] In addition, the Trustee claims that Mitchell terminated MSGI's below-market lease of the Distribution Center so that Service Center could sell the Distribution Center Property at a great profit to Mitchell and his family. The Trustee further alleges that Mitchell ignored the advice of his restructuring professionals, while not only standing on both sides of the challenged transactions but also controlling and orchestrating them for his and his family's benefit and the benefit of the Entity Defendants. These allegations amply plead valid claims for breaches of the duty of loyalty, as well as potential violations of the duty of due care and of good faith.

ii. <u>Due Care</u>

As to the duty of care, Delaware law requires that:

> directors of a Delaware corporation 'use that amount of care which ordinarily careful and prudent men would use in similar circumstances,' and 'consider all material information reasonably available' in making business decisions, and that deficiencies in the directors' process are actionable only if the directors' actions are grossly negligent."

*In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).

Here, the Trustee alleges that Mitchell "ignor[ed] repeated advice of professionals hired by the Debtor that recommended a restructuring of the Debtor" and placed his personal interests and business interests in the M&M PropCos ahead of his interests in and duties to the Debtors, all as

[173] Compl. at ¶¶ 40, 73-89, 93-101, Dkt. No. 1.

more particularly described above and in even more detail in the Complaint.[174] These allegations sufficiently put Mitchell on notice that he is alleged to have breached the duty of due care to the Debtors, by, among other things, ignoring or disregarding on more than one occasion the advice of the restructuring professionals he retained and planning and executing various transactions and strategies that were designed to benefit him, his family and the Entity Defendants at the expense of the Debtors.

iii. Duty of Good Faith

For many of the same reasons and based on many of the same actions, the Trustee has sufficiently pleaded breach of the duty of good faith Mitchell owed to the Debtors. Delaware Courts have described the fiduciary's duty of good faith as "not . . . an independent fiduciary duty that stands on the same footing as the duties of care and loyalty" but one that may indirectly result in liability. *Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 370 (Del. 2006). At the same time, "failure to act in good faith requires conduct that is qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care (i.e., gross negligence)." *Stone*, 911 A.2d at 369. In *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 66-67 (Del. 2006), the Delaware Supreme Court approved the non-exclusive list of factors collected by the Chancery Court in the case below to articulate a good-faith standard:

> The good faith required of a corporate fiduciary includes not simply the duties of care and loyalty . . . but all actions required by a true faithfulness and devotion to the interests of the corporation and its shareholders. A failure to act in good faith may be shown, for instance,
>
> (i) where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation,
>
> (ii) where the fiduciary acts with the intent to violate applicable positive law, or

[174] Compl. ¶ 172b, Dkt. No. 1.

> (iii) where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.
>
> There may be other examples of bad faith yet to be proven or alleged, but these three are the most salient.

*Walt Disney*, 906 A.2d at 67 (paragraphing added); *In re Fedders N. Am., Inc.*, 405 B.R. 527, 540 (Bankr. D. Del. 2009).

In this case, the Trustee easily alleges adequate facts to state a claim that Mitchell breached his duty of good faith by repeatedly supporting business plans that placed his and his family's interests and those of HMC and the M&M PropCos over the interests of Debtors; causing Debtors to alienate their last significant asset (the Distribution Center Lease) for the benefit of many of the same entities and interests; delaying the recommended filing of Debtors' petitions to shield HMC from liability on its guarantees of Debtors' leases; ignoring the advice of restructuring professionals; and allowing HMC to exercise an offset right immediately prior to the Debtor's bankruptcy filing.[175] These acts or omissions by Mitchell, as alleged by the Trustee, also meet the third exemplar above, as well. Finally, because this Court's ruling also preserves the Trustee's claim that Debtors paid Mitchell (and Michael's Trust) unauthorized dividends or distributions (as will be described in more detail in the next section), the Trustee also stated (but has not yet proven) a claim for breach of good faith under the second exemplar as well.

H. <u>The Exculpation Clause of MSGI's Certificate of Incorporation Does Not Bar as a Matter of Law the Trustee's Claims for Breach of Fiduciary Duty under 8 Del. C. § 102(b)(7)</u>

Mitchell also relies on a section 102(b)(7) exculpation provision in the Debtor's Certificate of Incorporation in seeking to dismiss Count 1 of the Complaint. The provision provides, in relevant part, that "No director shall be liable to the corporation or any of its stockholders for

[175] Compl. ¶¶ 54-126, Dkt. No. 1.

monetary damages for breach of fiduciary duty as a director . . . ."[176] As a preliminary matter, Mitchell was an officer as well as a director of the Debtors, so this exculpation clause does not apply to him in his actions taken in his capacity as an officer of the Debtors. But even if it did, Plaintiff's Complaint states claims for breach of fiduciary duty against Mitchell based on the express exclusionary language contained in the exculpation clause, which excepts out from Mitchell's potentially limited liability as a director: (i) breaches of the duty of loyalty; (ii) acts or omissions not in good faith, intentional bad conduct, or a knowing violation of the law; (iii) liability under 8 Del. C. § 174; or (iv) transactions from which the director derives improper benefit. As noted above, facts alleging conduct within each of these exclusions are alleged by the Trustee.

Further, section 102(b)(7) does not eliminate or limit the liability of a director for a breach of the duty of loyalty or care in these circumstances, as the Trustee has not exclusively alleged a breach of the duty of care. Under Delaware law, "'[w]hen a duty of care breach is not the exclusive claim, a court may not dismiss [the duty of care claim] based upon an exculpatory provision.'" *In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 568 (Bankr. D. Del. 2008) (quoting *Alidina v. Internet.com Corp.*, 2002 WL 31584292, at *8 (Del. Ch. Nov. 6, 2002)).

In sum, the Trustee's claims under Count 1 sufficiently allege a breach of the duty of loyalty, as well as breaches of the duties of care and good faith, as was also described in detail above.[177] Thus, on various grounds, the exculpation clause of MSGI's Certification of Incorporation does not limit Mitchell's potential liability if the Trustee's well-pleaded allegations are proven.

I. Deepening Insolvency Generally as a Claim or as a Measure of Damages

[176] Mitchell Reply, Certif. of Incorporation, Art. 7, Ex. A, Dkt. No. 47.
[177] Compl. ¶¶ 172-183, Dkt. No. 1.

Although the Trustee does not expressly plead a claim for "deepening insolvency" in any Count of his Complaint, Mitchell in particular argues that the Trustee's Count 1 claim against him for breach of fiduciary duty through self-dealing is a "thinly-veiled 'deepening insolvency' claim," which he states is not recognized as a cause of action or measure of damages under Delaware law.[178] Mr. Spiel (who has withdrawn his Motion to Dismiss) and certain of the Entity Defendants also make reference to this argument in their Briefs.

Mitchell correctly argues -- and the Trustee does not dispute -- that Delaware law does not recognize an independent cause of action for "deepening insolvency." *Quadrant Structured Prod. Co., Ltd. v. Vertin*, 115 A.3d 535, 547 (Del. Ch. 2015), *clarification denied*, 2015 WL 2256327 (Del. Ch. May 13, 2015); *Trenwick Am. Lit. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 174 (Del. Ch. 2006), *aff'd*, 931 A.2d 438 (Del. 2007). "Even when a firm is insolvent, its directors may, in the appropriate exercise of their business judgment, take action that might, if it does not pan out, result in the firm being painted in a deeper hue of red." *Trenwick*, 906 A.2d at 174. The Court in *Trenwick* rejected "deepening insolvency" as a cause of action on numerous grounds (that such injury is already cognizable and compensable as breach of fiduciary duty or as another tort; that simply prolonging an insolvent entity's life is not a tort; that "[r]ecognizing that a condition is harmful and calling it a tort are two different things"). *In re Trenwick*, 906 A.2d at 206 n.105 (collecting cases) (internal citations omitted). The Court in *Quadrant* explained that a corporation is either solvent or insolvent and that recognizing an intermediate zone would confuse the principal's fiduciary duty:

> There is no legally recognized "zone of insolvency" with implications for fiduciary duty claims. The only transition point that affects fiduciary duty analysis is insolvency itself.

[178] Mitchell Br., at 24, Dkt. No. 35-1.

> Regardless of whether a corporation is solvent or insolvent, creditors cannot bring direct claims for breach of fiduciary duty. After a corporation becomes insolvent, creditors gain standing to assert claims derivatively for breach of fiduciary duty.

*Quadrant*, 115 A.3d at 546 (footnotes omitted).

In *In re CitX Corp., Inc.*, 448 F.3d 672, 677, 681 (3d Cir. 2006) (under Pennsylvania law of professional malpractice, below, *In re CitX Corp., Inc.*, 2005 WL 1388963, at *4 (E.D. Pa. June 7, 2005)), the Third Circuit, having previously predicted that the law of Pennsylvania would recognize a claim for "deepening insolvency" (citing *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 344, 347, 340 (3d Cir. 2001)), held that "deepening insolvency" could not provide a measure of damages in a negligence action.[179] The Third Circuit quoted Sabin Willett, *The Shallows of Deepening Insolvency,* 60 Bus. Law. 549, 575 (2005) for the conclusion:

> [T]he deepening of a firm's insolvency is not an independent form of corporate damage. Where an independent cause of action gives a firm a remedy for the increase in its liabilities, the decrease in fair asset value, or its lost profits, then the firm may recover, without reference to the incidental impact upon the solvency calculation.

*In re CitX*, 448 F.3d at 678, quoting Sabin Willet, 60 Bus. Law. at 575. *Accord In re Troll Comm., LLC*, 385 B.R. 110, 121 (Del. 2008) (citing *In re CitX* for the proposition that deepening insolvency is neither a cause of action or a measure of damages under Delaware law, even though *In re CitX* appears to have been decided under Pennsylvania law); *In re Radnor Holdings Corp.*, 353 B.R. 820, 842, 849 (Bankr. D. Del. 2006) (recognizing that the Third Circuit in *In re CitX* rejected deepening insolvency as a theory of damages).

This Court agrees that deepening insolvency is not a viable cause of action or theory of damages under Delaware law and the Third Circuit cases construing it. Accordingly, to the extent such a claim is made as a theory of damages in the Complaint and is based on Delaware law, the

---

[179] The Third Circuit in *In re CitX*, 448 F.3d at 677 n.8, noted that it "[d]id not mean to imply that deepening insolvency would be a valid theory of damages for any other cause of action, such as fraud, and *Lafferty* did not so hold."

Motion to Dismiss is granted. No deepening insolvency claim was asserted as an independent cause of action, so there is no need to dismiss such a claim. However, that does not mean that the Trustee cannot seek to demonstrate how the Debtors were directly damaged by Mitchell's alleged breach of fiduciary duty on grounds other than deepening insolvency, nor does it prevent the Trustee from pointing to the Debtors' alleged deepening insolvency as evidence of probable breach of fiduciary duties. *See e.g.*, *In re Bridgeport Holdings,* 388 B.R. at 563, *supra.*

The Court also acknowledges and accepts the Trustee's argument that this Court has flexibility in establishing damages for alleged breaches of fiduciary duty and to prevent a wrongdoer from benefitting from that breach. *See Guth v. Loft*, 5 A.2d 503, 510 (Del. 1934), *Thorpe v. CERBCO*, 676 A.2d 436, 445 (Del. 1996). On a breach of fiduciary claim, the Court "may fashion any form of equitable and monetary relief as may be appropriate." *Ryan v. Tad's Enters., Inc.*, 709 A.2d 682, 698 (Del. Ch.), *rearg. denied*, 709 A.2d 675 (Del. Ch. 1996), *j. aff'd*, 693 A.2d 1082 (Del. 1997) (damages may be based upon appraised value of company or rescissory damages.) (internal citations omitted); *In re Dole Food Co., Inc. Stockholder Litig.*, 2015 WL 5052214, at *42, *46 (Del. Ch. Aug. 27, 2015) (basing damages on diminished stock value after fiduciaries manipulated the sale of the company); *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 859 (Del. Ch. 2022) ("A proven breach of fiduciary duty also causes the remedial aperture to widen to encompass remedies other than the standard legal solution of compensatory damages"); *In re Emerging Comms., Inc. S'holders Litig.*, 2004 WL 1305745, at *39 (Del. Ch. May 3, 2004) (basing damages on improper personal benefits received by chief executive officer who had voting control of both parties to the transaction). Thus, depending on how the facts of this case develop, the Court will have various methods of determining the available and appropriate relief as to any breach of fiduciary duty claims that may be proven by the Trustee.

In short, Mitchell is plainly on notice of the breach of fiduciary claims being asserted against him, and the damages sought are in no way limited to the Debtors' deepening insolvency. Accordingly, Mitchell's Motion to Dismiss the breach of fiduciary claim against him is denied on all grounds, other than: (i) the three-year statute of limitations; and (ii) to the extent the Trustee seeks damages based exclusively on the Debtors' deepening insolvency. In this regard, the Trustee has alleged millions of dollars of damages not based on deepening insolvency, but instead based on numerous alleged breaches of fiduciary duty and on various avoidable transfers, improper dividends, improvident termination of the Service Center Lease and ongoing lease payments on leases that should have been terminated. Whether the Trustee will be able to prove any such damages and whether they were caused by Mitchell's alleged breaches are all questions left for another day.

J. As to Trustee's Constructive Fraud Claims (Counts 3 through 6), the Trustee Has Sufficiently Pleaded the Causes of Action under New York, New Jersey and Federal Bankruptcy Law

i. Bankruptcy Law

11 U.S.C. § 548(a)(1)(B) allows the Trustee to avoid a transfer of an estate asset within two years of the petition under the following circumstances:

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--
>
> (B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
>
> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; *or*
>
> (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B).

11 U.S.C. § 544(b) expands these powers by enabling the Trustee to also bring avoidance actions pursuant to state law and provides in relevant part:

> (b)(1) Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

ii. New York Law

The New York Debtor and Creditor Law §§ 273-75 ("N.Y. Debt. & Cred. Law §§ 273-75") is similarly formulated to Section 548(a)(1)(B) of the Bankruptcy Code and provides that:

> a conveyance by a debtor is deemed constructively fraudulent if it is made without 'fair consideration,' and if one of the following conditions is met (i) the transferor is insolvent or will be rendered insolvent by the transfer in question . . . (iii) the transferor is engaged or is about to engage in a business or transaction for which its remaining property constitutes unreasonably small capital; or (iv) the transferor believes that it will incur debts beyond its ability to pay.

*In re Sharp Intern. Corp.*, 403 F.3d 43, 53 (2d Cir. 2005).

Unlike Section 548(c) of the Bankruptcy Code, which "designates the transferee's good faith as an affirmative defense which may be raised and proved by the transferee at trial," under New York law, the party seeking to set aside the transfer "has the burden of proof on the element

of fair consideration and, since it is essential to a finding of fair consideration, good faith." *In re Actrade Fin. Techs. Ltd.*, 337 B.R. 791, 802 (Bankr. S.D.N.Y. 2005).

iii. New Jersey Law

The relevant provision of New Jersey's fraudulent conveyance statute essentially provides that a transfer is fraudulent:

> a. If the debtor made the transfer or incurred the obligation: . . .
>
> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> (a) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

N.J.S.A. § 25:2-25a(2)(a). In short, federal bankruptcy law and New York and New Jersey fraudulent transfer law all have similar standards.

iv. Application to Facts Alleged in the Complaint

Although a choice-of-law analysis as to these claims has not yet been fully completed or decided by the Court, it appears likely New York law will apply to the Trustee's fraudulent conveyance claims in light of the "most significant relationship" test discussed above. *See Snyder v. Farnam Cos., Inc.*, 792 F. Supp. 2d 712, 717 (D.N.J. 2011). In any event, there is considerable overlap between the Bankruptcy Code and New York law (as well as New Jersey law), and the Court would likely reach the same result regardless of which applies.

As to the merits, the Trustee challenges three groups of transfers made by or to Mitchell: S Corp dividends, salary payments, and credit card payments, each of which will be discussed below. Before addressing those individual items, the Court will discuss Mitchell's more general arguments in support of dismissal of all these claims that are based on the asserted lack of detail as to the challenged transfers, insolvency and reasonably equivalent value.

As was discussed above, any alleged deficiencies as to the specifics of the alleged transfers will be remedied by providing the detail included in the 1077 Amended Complaint.[180] The alleged deficiency regarding the identity of the specific Debtor-transferor was similarly addressed and resolved, as set forth above.[181]

Next, Mitchell argues that the Trustee simply concluded and did not demonstrate that the Debtors did not receive reasonably equivalent value for these transfers or that the Debtors were insolvent at the time of the challenged transfers. Mitchell cites to cases such as *Zazzali v. Hirschler Fleischer, P.C.*, 482 B.R. 495, 520-21 (Bankr. D. Del. 2012) in support of the proposition that a claim should be dismissed where it "merely recites the statutory elements of this claim, pleading no facts to support this claim or that give rise to an inference that [supports the claim]." As is discussed in more detail below, and elsewhere in this Opinion, the Court disagrees and finds that the Trustee has sufficiently pleaded the insolvency and lack of reasonably equivalent value elements of his avoidance claims.

(a) Insolvency

As to insolvency, which is an element of all the Trustee's avoidance claims against Mitchell, the Court finds that the Trustee has sufficiently alleged that the Debtors were insolvent at the time the challenged transfers were made. As was noted above, the Trustee based his claims as to the Debtors' alleged insolvency for fiscal years 2013 through 2018 (ending February 2, 2019) on consolidated, audited financial statements prepared for the Debtors (which included HMC at times) that showed the Debtors' assets were in excess of their liabilities during the entire period and that the Debtors suffered losses every year, except one (FY 2015). *See* Section III.C(i), *supra*. The Trustee also alleged that Debtors' declining assets, increasing liabilities and continuing losses

[180] Amended Compl., Ledger, Ex. A, Dkt. No. 12, Adv. Pro. No. 22-1077 (VFP).
[181] Amended Compl., Ledger, Ex. A, Dkt. No. 12, Adv. Pro. No. 22-1077 (VFP).

persisted from February 3, 2019 to the Debtors' bankruptcy filing in March 2020. At this early stage of the case, these detailed allegations of insolvency, based mostly on the Debtors' own audited financial statements, are plainly sufficient to defeat a motion to dismiss.[182]

(b) Reasonably Equivalent Value

Analysis of this element of the Trustee's claims against Mitchell requires the Court to separately review each category of the challenged transfers. That discussion follows.

(i) Salary

The Court will first address Mitchell's salary in the context of reasonably equivalent value. As a general rule, "payments for salary are presumed to be made for fair consideration." *In re TC Liquidation LLC*, 463 B.R. 257, 268 (Bankr. E.D.N.Y. 2011). In addition, "the general rule that treats a preferential payment to an insider of an insolvent corporation as a fraudulent transfer" does not apply to compensation, as it is considered a "roughly contemporaneous exchange" and is deemed necessary to encourage people to work for distressed corporations. *In re Wonderwork, Inc.*, 611 B.R. 169, 208-209 (Bankr. S.D.N.Y. 2020). Thus, to sufficiently state an avoidance claim with respect to salary, the plaintiff must allege that "the salary payments were in bad faith or that the payments were excessive in light of the Defendants' employment responsibilities." *In re TC Liquidation*, 463 B.R. at 268. As pointed out by Mitchell, the Trustee has not alleged that the Debtors' salary payments to him were in bad faith or excessive. Thus, this aspect of Mitchell's motion is granted, without prejudice to the Trustee's right to seek to amend the Complaint in this regard within thirty (30) days of the entry of the Order addressing this motion, as the Trustee as not yet alleged sufficient facts to support his avoidance claims as to Mitchell's compensation.

(ii) Credit Card Payments

[182] Compl. ¶¶ 152-59, 227-32, Dkt. No. 1.

Next, the Trustee challenges the credit card payments to or on behalf of Mitchell in the amount of $527,175 to pay (as Trustee alleges) "personal charges on Mitchell's American Express Centurion Card, including charges for flights for friends and family, luxury hotel stays, tickets to sporting events, and meals" (emphases supplied).[183] In this regard, Mitchell argues that these are conclusory allegations that lack the required specificity and also makes arguments based on alleged facts, including that "some of the sporting event tickets and related travel and meals were used to entertain third parties with business relationships."[184]

In these respects, Mitchell at least implicitly seems to rely on the presumption of fair consideration that applies to salaries.[185] However, no case has been cited that applies that presumption to expenses. Further, Mitchell's defense that "some" of the expenses were business-related raises factual issues that are not appropriately raised on a motion to dismiss, as noted above. Instead, these alleged facts may constitute a defense to the Trustee's claims that Mitchell will have ample opportunity to prove as this case proceeds.

In sum, based on the notice pleading standard applicable here, the Trustee has sufficiently alleged (but certainly not yet proven) that the charges on Mitchell's personal credit card for personal expenses, such as trips, hotel stays and meals, that were reimbursed by the Debtors were for less than reasonably equivalent value. Mitchell is properly on notice of the basis of the Trustee's claim, as evidenced (at least in part) by his already-asserted defense to that claim. Accordingly, this aspect of Mitchell's motion is denied.

(iii) Dividends or Distributions

Lastly, as to the S Corporation dividends (or distributions, as Mitchell sometimes characterizes them), Mitchell again argues facts that are not asserted in the Complaint (and are

---

[183] Compl. ¶ 165c, Dkt. No. 1.
[184] Mitchell Br., at 33, Dkt. No. 35-1.
[185] Compl. ¶ 165c, Dkt. No. 1; Mitchell Br., at 33, Dkt. No. 35-1.

really a defense); i.e., that the "S Corps" (which would appear to include at least the Debtor MSGI, the Debtor-Subsidiaries and possibly the M&M PropCos by his definition)[186] paid the dividends to enable Mitchell and the Trust to pay their pass-through tax obligations "in keeping with the requirements of the relevant corporate governance documents and, at certain times, also expressly permitted by the Debtors' credit agreement."[187] Once again, these are alleged facts that contradict the Trustee's claims and that may ultimately be used to defend against those claims. These alleged facts are not, however, addressed in the body of the Complaint, nor are they properly asserted or capable of being resolved on this Motion to Dismiss. *See e.g. Mabry v. Neighborhood Defender Serv.*, 769 F. Supp. 2d 381, 395 (S.D.N.Y. 2011) (quoting *United States v. Space Hunters, Inc.*, 429 F.3d 416, 426 (2d Cir. 2005)) ("A court may dismiss a claim on the basis of an affirmative defense raised in the motion to dismiss, 'only if the facts supporting the defense appear on the face of the complaint,' and 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.'"). *See also* cases cited at Section V.A above.

Further, and as noted above, it is well-established that "fact-intensive analysis . . . ordinarily does not lend itself to a motion to dismiss." *Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 412 (2d Cir.), *recons. denied*, 431 F. Supp. 2d 425 (S.D.N.Y. 2006); *see also Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998) ("The task of the court in ruling on a Rule 12(b)(6) motion is 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'"); *Lombardo v. Town of Hempstead*, 2020 WL 7021603, at *2 (E.D.N.Y. Nov. 30, 2020) ("Accepting Defendants' version of the facts as stated in their objections . . . would require the Court to make factual findings that may not be

---

[186] *See* n.111 *supra* as to the identification (or lack of identification) of the S Corps.
[187] Mitchell Br., at 31, Dkt. No. 35-1.

made upon a motion to dismiss."). For all these reasons, this aspect of Mitchell's motion is also denied.

Although not required, the Court will also address the principal case that Mitchell cites in support of his "pass-through" argument. As noted, Mitchell claims that the "S Corps" paid these distributions rather than dividends to Mitchell and the Trust so that they could pay their pass-through tax obligations "in keeping with the requirements of the relevant corporate governance documents and, at certain times, also expressly permitted by the Debtors' credit agreement."[188] Mitchell cites *In re F-Squared Invest. Mgmt., LLC*, 633 B.R. 663, 669-71 (Bankr. D. Del. 2021) for the proposition that such dividends to pay taxes are not avoidable provided that the debtor's creditors are "no worse off" than they would be without the transfers (but "no worse off" includes the recognition that, if the corporate structure had not compelled the transferee to pay taxes as a pass-through obligation, then the debtor-transferor would have been compelled to pay them directly to the taxing authority. *Id.*)

The Trustee argues that the facts in *F-Squared* are substantively and procedurally different from this case, as the court in *F-Squared* found on a motion for summary judgment that the tax distributions were made for reasonably equivalent value based on the by then established facts that the debtor had previously converted from a C-Corp to an LLC, and its shareholders were induced to vote in favor of the LLC conversion by debtor's promise to "make them whole for any tax obligations that passed through." *F-Squared,* 633 B.R. at 670-71. Had the shareholders not voted to permit the debtor to convert to an LLC, the debtor would have had to pay income tax on its revenue, thus paying its tax obligations to the United States Treasury rather than making its tax

[188] Mitchell Br., at 31, Dkt. No. 35-1.

distributions to the shareholders. *Id.* As such, the debtor and its creditors were not made worse off.

No such factual findings have been (or, at this stage of the case, could be) made here. Moreover, as noted by the Trustee, there is nothing properly in the record on this motion to dismiss to establish that the dividends or distributions were tax reimbursement transfers to begin with. In fact, if the Debtors were suffering continuing losses (in all years except one) and were balance-sheet insolvent every applicable year, it is difficult to see how or why there would be any taxable income to pass through to shareholders. In any event, the substance of these alleged factual defenses may be further developed through discovery, but are not properly asserted or determined on a Motion to Dismiss. Accordingly, this aspect of Mitchell's motion is also denied.

K. As to Count VII, the Trustee Has Sufficiently Plead That the Challenged Dividends Were Improper

Mitchell also challenges the Trustee's illegal dividends claims under Delaware law. In this regard, 8 Del. C. § 170 ("Dividends; payment; wasting of asset corporations") states in most relevant part:

> (a) The directors of every corporation, subject to any restrictions contained in its certificate of incorporation, may declare and pay dividends upon the shares of its capital stock either:
>
> (1) Out of its surplus, as defined in and computed in accordance with 154 and 244 of this title; or
>
> (2) In case there shall be no such surplus, out of its net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year.

8 Del. C. 170(a).

Under applicable Delaware case law, the corporation may use one of two insolvency tests to determine whether it has a surplus:

(i) the balance-sheet insolvency test. *See SV Inv. Partners, LLC v. ThoughtWorks, Inc.*, 7 A.3d 973, 982, 987 (Del. Ch. 2010), *aff'd*, 37 A.3d 205 (Del. 2011); *see also In re Tribune Co. Fraudulent Conveyance Litig.*, 2018 WL 6329139, at *12 (S.D.N.Y. Nov. 30, 2018); and

(ii) the "inability to pay debts when due" test. *In re Tribune Co. Fraudulent Conveyance Litig.*, 2018 WL 6329139, at *8-*10.[189]

Under Delaware law, a stock dividend that issues when a corporation is insolvent or the issuance of which renders the corporation insolvent is illegal and constitutes a voidable transfer under 11 U.S.C. §§ 544(b) or 548(a). *EBS Litig. LLC v. Barclays Global Invs., N.A.*, 304 F.3d 302, 305-06 (3d Cir. 2002). The Trustee must allege facts showing that the Debtor was insolvent under either the balance sheet test or the inability to pay debts when due test when the dividends were paid. In doing so, the Trustee must do more than "offer[] labels and conclusions or a formulaic recitation of the elements of a cause of action." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).

Here, as previously noted, the Trustee affirmatively alleges that the Debtors were insolvent between Fiscal Years 2013 and 2018 under the balance sheet test, based on audited financial statements prepared for the Debtors and thereafter based on the Debtors' bankruptcy disclosures. The Trustee makes specific allegations regarding Debtor's insolvency, namely by providing its total assets, total liabilities, and net losses during Fiscal Years 2013 and 2018, based on audited financial statements. For example, the Complaint alleges that:

> During Fiscal Year 2018, the Debtor suffered a net loss of $13.9M, its total assets amounted to $123.1M, and its total liability amounted to $171.5M. . . . Mitchell, as the sole director of the Debtor, unlawfully caused the Debtor to pay dividends totaling $2,700,000 during Fiscal Year 2018 ($1,350,000 to Mitchell and $1,350,000 to the Trust.).[190]

---

[189] *SV Inv. Partners*, cited by the Trustee, was a stock-redemption case under 8 Del. C. § 160, not a dividend-payment case under 8 Del. C. § 170(a). *SV Inv. Partners*, 7 A.3d at 982; Trustee Obj., at 39-40, Dkt. No. 43. In *In re Tribune*, the Court expressly rejected the application of the third insolvency test (unreasonably small capital) in this context as veering too close to the "zone of insolvency." *In re Tribune Co.*, 2018 WL 6329139, at *8.
[190] Compl. ¶ 232, Dkt. No. 1.

Similarly, allegations are made as to prior years (2013-2017) based on audited financial statements and in FY 2019 to the Debtors' bankruptcy filing based on the Debtors' assets and increased liabilities at the time of the bankruptcy filing.[191] Accordingly, the Trustee has demonstrated that the Debtors were insolvent, had no available surplus or net income (except perhaps partially for one year) to pay the dividends and thus has sufficiently pleaded that the Debtors unlawfully paid dividends within the meaning of 8 Del. C. § 170.

Mitchell also claims that, by not identifying precisely which entity paid the dividends, when each dividend was paid, or the means by which the Debtors effectuated the dividend transfers, the Trustee has not met his burden under 8 Del. C. § 170.[192] Mitchell does not provide legal support for this proposition, and this issue is not directly addressed by the Trustee in his response, other than by the assertion that the Debtors essentially operated as one or on a consolidated basis during Mitchell's tenure and the allegations put Mitchell on sufficient notice of the claims against him, particularly with the additional detail being required here.

As noted previously, with respect to the transfers subject to the avoidance claims, additional details as to the date and amounts of the individual dividends or distributions paid by the Debtors (using the Amended 1077 Complaint as a guide) would be helpful and would, in this Court's view, cure any asserted deficiency in the pleadings at this stage of the case. Also, the Court will request, but not require, that the Trustee identify which Debtor actually paid the dividend or made the distribution, if practicable, by alleging that, for example, the payment came from the MII account being sufficient (if that was the case), but without necessarily including intercompany attribution for the payment. Further details as to this issue, including how the dividend or distribution was reflected in the Debtors internal books and records can be addressed

[191] Compl. ¶¶ 227-32; see also ¶¶ 152-59, Dkt. No. 1.
[192] Mitchell Br., at 36-37, Dkt. No. 35-1.

through discovery. For now, Mitchell has sufficient notice of the claims against him, particularly with the additional detail being required here.

Accordingly, this aspect of Mitchell's motion is denied, except that the Trustee shall have thirty (30) days to amend his Complaint to identify the date and amount of each challenged dividend or distribution (to the extent he has not already done so), as well as the specific Debtor account from which the transfer of funds was made, to the extent practicable, with further details (such as intercompany attribution) left to discovery. Where the specific identification of a Debtor or Debtors cannot be made by a basic, preliminary review of the Debtors' books and records, use of the word "Debtors" will suffice. However, none of these minor amendments will be grounds for a renewed motion to dismiss, unless specifically permitted by the Court after letter application explaining why and in what particular respects the Amended Complaint is not sufficiently pleaded.

L. As to Counts 8, 9 and 10, Entity Defendants Can Be Held to Have Aided and Abetted Mitchell Modell's Alleged Breach of Fiduciary Duty to the Debtors

The parties rely generally on Delaware law to address whether the six (6) Entity Defendants may be deemed to have aided and abetted any breach of fiduciary duty that the Court finds was breached by Mitchell (at the pleading stage). The Entity Defendants concur that the elements of a claim for aiding and abetting are roughly congruent in Delaware, New Jersey and New York.[193]

Under Delaware law, to sustain a claim for aiding and abetting breach of fiduciary duty, the plaintiff must show:

> (1) the existence of a fiduciary relationship,
> (2) a breach of the fiduciary's duty, ...
> (3) knowing participation in that breach by the defendants"; and
> (4) damages proximately caused by the breach.

[193] HMC Br. ¶ 17 n.6, Dkt. No. 34-1; Service Ctr. Br., at 10 n.4, Dkt. No. 30-1; Service Ctr. Reply, at 4 n.2, Dkt. No. 49; Bruckner/Mt. Kisco Br., at 10 n.4, Dkt. No. 29-1; Bruckner/Mt. Kisco Reply, at 5 n.2, Dkt. No. 50; Jamaica/Flushing Br., at 3 n.7, Dkt. No. 31-1; Jamaica/Flushing Reply ¶ 4 n.3, Dkt. No. 46.

*Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (paragraphing added) (footnote and internal citations omitted) (ellipsis in original). For purposes of this Motion, the Entity Defendants appear to assume as they must that a fiduciary duty existed between Mitchell and the Debtors and that Mitchell at least allegedly breached that duty. The Entity Defendants argue that the knowing participation and substantial assistance prongs are not satisfied here. The Court will address those arguments now.

i. Knowing Participation

"Knowing participation" requires that the defendant have acted "with the knowledge that the conduct advocated or assisted constitutes" a breach of the fiduciary's duty. *Malpiede*, 780 A.2d at 1097. The Court has no trouble finding that the allegations of the Complaint demonstrate that the Entity Defendants "knowingly participated" in Mitchell's (and Mr. Spiel's) plan to protect and preserve the wealth of Mitchell, his family, HMC and the M&M PropCos at the expense of the Debtors. As noted, Mitchell was the CEO and 50% (or, in later years, sole) owner of the Debtors; 50% owner and managing member of all the M&M PropCos; and a director, CEO and 50% owner of HMC.[194] Mr. Spiel was the CFO of the Debtor(s) and the M&M PropCos.[195] It is a basic principle of law that the knowledge of Mitchell and Mr. Spiel in their capacities as director, managing member and/or officers of each of the Entity Defendants is imputed to each of those entities. *In re HealthSouth Corp. S'holders Litig.*, 845 A.2d 1096, 1108 n.22 (Del Ch. 2003); *Carlson v. Hallinan*, 925 A.2d 506, 542 (Del. Ch. 2006). This imputed knowledge easily satisfies the knowing participation requirement as to the Entity Defendants, which Mitchell allegedly owned equally with Michael (or his estate) and controlled.

ii. Substantial Assistance

[194] Compl. ¶¶ 3, 14, Dkt. No. 1.
[195] Compl. ¶ 13, Dkt. No. 1.

The Entity Defendants cite to cases such as *Kaufman v. Cohen*, 760 N.Y.S. 2d 157, 170 (N.Y. App. Div. 2003), which holds that the "knowing participation" element of an aiding and abetting claim also requires that the alleged aider and abettor provided "substantial assistance" in the breach by the fiduciary. *Id*. at 170 ("substantial assistance" means affirmative assistance; knowing concealment of facts; or "fail[ure] to act when required to do so"); *Firefighters' Pension Sys. v. Presidio, Inc.*, 251 A.3d 212, 275 (Del. Ch. 2021) (providing misleading information to or withholding information from the fiduciary may constitute substantial assistance). Further to this principle, various cases hold that mere silence or inaction may not be enough to satisfy this requirement, unless the alleged aider and abettor owes a fiduciary duty to the injured party. *In re Oracle Corp. Dev. Litig.*, 2020 WL 3410745, at *12-*13 (Del. Ch. June 20, 2020). *See also Endico v. Endico*, 2022 WL 3902730, at *12 (S.D.N.Y. Aug. 30, 2022).

Defendants also rely on *Wiatt v. Winston & Strawn LLP*, 838 F. Supp. 2d 296, 304, 307 (D.N.J. 2012) in particular in support of their argument that aiding and abetting requires plaintiff to show that the defendant did something more than passively receive payments. In *Wiatt*, plaintiffs alleged that their lawyer, a partner at a major law firm, and his law firm aided and abetted plaintiffs' financial advisor (who was their fiduciary) in misdirecting (and laundering) money, including two payments from plaintiffs, through the attorney trust account. The partner was ultimately indicted. *Wiatt*, 838 F. Supp. 2d at 304-05, 307. The law firm moved to dismiss the plaintiffs' aiding and abetting count for failure to state a claim. *Id.* at 307. The court deemed plaintiffs' allegation that the equity partner was acting within the scope of his employment insufficient to support plaintiffs' claim for aiding and abetting against the law firm. *Id.* at 307. Applying either New York or New Jersey law, the court found that the plaintiffs must establish "a strong inference that the alleged aider and abettor had 'actual knowledge' of the breach" (New

York and New Jersey law) or that the "defendant 'knowingly' aid[ed] and abet[ted] a breach of fiduciary duty" (New Jersey law), standards that the court deemed congruent. *Id.* at 307.

In the *Wiatt* case, the Court held that even the passage of two (2) checks related to plaintiffs through the law firm escrow account was deemed insufficient to alert the law firm to the financial advisor's scheme. *Id.* at 308. The court thus granted the law firm's motion and dismissed the aiding and abetting claim without prejudice. *Wiatt*, 838 F. Supp. 2d at 309. On the basis of *Wiatt*, Defendants HMC and M&M PropCos argue that mere passive receipt of Lease payments cannot sustain an aiding and abetting claim.

The Court finds *Wiatt* and other cases cited by the Entity Defendants distinguishable in that Mitchell and Mr. Spiel are alleged to have controlled and directed the M&M PropCos and HMC as well as the Debtors, as part of the scheme or plan to potentially sacrifice the Debtors for the benefit of HMC and the M&M PropCos, so as to preserve the wealth of Mitchell Modell and his family, as alleged in the Complaint. The knowing involvement of the two principal actors, Mitchell and Mr. Spiel, who were in control of each of the closely-held Entity Defendants, constitutes far more knowledge and substantial assistance than the receipt of two checks by a large law firm and the imputation of the knowledge of a rogue partner to that firm, which has hundreds of partners. According to the Complaint, HMC and the M&M PropCos were knowing participants (through the imputed knowledge of Mitchell and Mr. Spiel), the direct beneficiaries, and the instrumentalities through which Mitchell implemented and executed his plan to preserve his personal wealth and that of his family. Further, because the M&M PropCos had no employees, officers or facilities of their own, the plan was allegedly developed and executed at the direction of Mitchell (and Mr. Spiel) through the Debtors' own employees. This is far more than the passive receipt of payments. It is the active and necessary participation of the Entity Defendants in the alleged plan, without whom the plan could not have been implemented.

Thus, at this stage of the proceedings, this Court finds that Plaintiff has sufficiently alleged (but certainly has not yet proven) that HMC and the M&M PropCos knowingly participated and provided substantial assistance to Mitchell, as the Debtors' fiduciary, in developing and implementing that plan. Without the separate legal existence of HMC and the M&M PropCos, the common control of the Debtors, HMC and the M&M PropCos by Mitchell, and the use of Debtors' employees, officers and facilities, the plan could not have been executed. In this Court's view, these allegations -- which assert far more than mere inaction by HMC and the M&M PropCos -- are sufficient to state a claim against the Entity Defendants for aiding and abetting Mitchell's breach of fiduciary duty to the Debtors under applicable law, as they were the means by which Mitchell's alleged plan was implemented and its direct beneficiaries. If HMC and PropCos' argument is accepted, it would allow the entities that participated in and were integral parts of Mitchell's plan -- and without whom the plan could not be accomplished -- to escape potential liability because they were separate entities that Mitchell and Michael created and that Mitchell controlled. That does not make sense. Instead, it would sanction and perhaps even encourage this kind of alleged behavior.

In sum, in this Court's view, the allegations against HMC and the M&M PropCos satisfy the requirements of knowing participation and substantial assistance at this stage of the case. In this regard, certain M&M PropCos also argued that this Court's ruling that the substantial assistance requirement has been satisfied would impermissibly and broadly expand this element of the Trustee's claim as interpreted under existing law. The Court disagrees. Instead, the Court believes an interpretation of the substantial assistance requirement -- which is itself an outgrowth or corollary to the knowing participation requirement -- that allows entities to escape aiding and abetting liability simply because they are separate entities controlled by the same individual (or individuals) would improperly limit the scope of an aiding and abetting claim by allowing a

breaching fiduciary to insulate the other entities he controls from liability for his bad acts -- even though those entities (and he) directly benefited from those bad acts, and he directed them. Further proceedings in this case, including discovery relating to these affirmative claims and the defenses to them, will decide whether those allegations can be sufficiently proven to sustain these claims on the merits. These claims are not, however, ripe for dismissal at this stage.

M. A Separate Legal Entity Controlled by the Same Breaching Fiduciary May Be Liable for Aiding and Abetting That Breach

The Entity Defendants cite as a foundation to their objections the principle that an entity cannot aid and abet a breach by its own fiduciary against that same entity on the grounds that an entity acts only through its directors and officers, citing, for example, *Endico v. Endico*, 2022 WL 3902730, at *12 (S.D.N.Y. Aug. 30, 2022); *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 54 (Del. Ch. 2014); *Buttonwood Tree Value Partners, L.P. v R.L. Polk & Co., Inc.* 2014 WL 3954987, at *5 (Del. Ch. Aug. 7, 2014).[196] That principle recognizes that an entity cannot be held to aid and abet its own injury. However, contrary to the Entity Defendants' arguments, a "third party," whether an entity or an individual, can aid and abet an individual's breach of fiduciary duty to another entity. *Malpiede v. Townson*, 780 A.2d 1075, 1096-97 (Del. 2001) (finding that a bidder suspected of colluding with the board of a target company that the bidder sought to acquire in order to chill bidding could be held liable for aiding and abetting the board's breach of its duty of care to the target but ultimately finding that the complaint did not allege sufficient facts to meet the third prong, "knowing participation," to withstand the bidder's motion to dismiss).

Similarly, in *Carlton Invests. v. TLC Beatrice Int'l Holdings, Inc.*, 1995 WL 694397, at *1-*2 (Del. Ch. Nov. 21, 1995), the plaintiff filed a derivative action against defendant for excessive

[196] Interestingly, this principle is a direct corollary to another basic principle; i.e., that the knowledge of an officer or director may be imputed to the corporation, which can act only through its officers and directors, that is applicable here, as the Court has found with respect to the knowledge of Mitchell and Mr. Spiel being imputed to HMC and the M&M PropCos.

payments to or on behalf of defendant's late CEO and allegedly controlling shareholder, Reginald Lewis, including payments to or through an affiliate owned and controlled by Mr. Lewis and its general partner. Plaintiff charged the Lewis-controlled affiliate and its general partner with aiding and abetting the directors' breach of their fiduciary duty to defendant corporation. *Carlton*, 1995 WL 694397, at *15. The Court denied the motion to dismiss filed by the affiliate and its general partner and allowed the plaintiff's claim to proceed against them with the observation:

> The actions of [the affiliate] and its general partner . . . , as set forth in the complaint, clearly reveal a knowing participation in the alleged acts that are said to constitute breaches of fiduciary duties. The complaint sets forth a melange of payments made by [the affiliate] to Lewis, his friends and family, his companies, and its own employees which were later reimbursed by [defendant corporation]. This participation as middleman for and beneficiary of improper disbursements by [defendant corporation] inextricably intertwines [the affiliate and its general partner] with the defendant directors in this action for breach of fiduciary duties.

*Carlton Invests.*, 1995 WL 694397, at *15.

The case of *Carlson v. Hallinan*, 925 A.2d 506, 513-14, 542 (Del. Ch. 2006), an opinion after trial, also addresses the capacity of an entity to aid and abet its principal in breaching its fiduciary duty to another entity. There, the Court noted the controlling fiduciary relationship is not between the aider/abettor and its principal but between that principal in its relationship to another entity. *Carlson*, 925 A.2d at 542 n.243.[197]

Defendants argue that these cases were wrongly decided and are distinguishable essentially because the nature of the excessive payments and benefits was more egregious -- or wrongful -- than in this case. The Court acknowledges that the specific nature of some of the payments or

[197] In support of their Motions, Service Center and HMC also cite to civil conspiracy law, which has been held to be analogous in certain respects to the law regarding aiding and abetting breach of fiduciary duty (see Section IV.G, p. 36, *supra*). However, the Court sees no reason to resort to assertedly analogous law when there is the specific law cited above that addresses the issue in the directly applicable context of aiding and abetting a breach of fiduciary duty. Further, like the aiding and abetting cases, those civil conspiracy cases similarly recognize that a corporation cannot conspire with its <u>own</u> officers. They do not address whether separate entities can conspire through their respective officers.

benefits may be different (and, in some cases, perhaps arguably even more egregious), but that does not render the general principles underlying these cases distinguishable or non-controlling, nor does it mean that the payments cannot be found to be wrongful. In fact, the payments and benefits at issue here (to HMC and the M&M PropCos, as well as the Modell family) are quite substantial (in the millions of dollars) and are also alleged to be improper and/or excessive, as they benefitted these entities, Mitchell and his family at the expense of the Debtors, which (for example) continued to pay for leases that allegedly should have been terminated and allegedly received inadequate consideration for the termination of the Service Center Lease.

The Entity Defendants also rely heavily on the *Endico* case, which was not directly addressed by the Trustee in his Opposition, but will be discussed here. In *Endico v. Endico,* 2022 WL 3902730, at *12 (S.D.N.Y. Aug. 30, 2022), two brothers, plaintiff Felix and defendant William, had interests in separate food service businesses. *Endico*, 2022 WL 3902730, at *1. William held majority interest in Company A (with a partner), and William and Felix each held 50% interest in Company B, which had been founded by the brothers' late father and where Felix once worked. *Id.* at *2. Company A had a longstanding contract to purchase products from Company B at a 10% discount (later reduced to 6%). *Id.* at *2-*3. William stepped into management of Company B after a non-family CEO was fired, and Felix, apparently unhappy with his lesser role in Company B, sued William and Company A individually and derivatively for various business torts, including aiding and abetting breach of fiduciary duty as to Company B (Felix alleging in part that Company B and he suffered a loss every time Company A received that discount). *Id*. at *1, *9.[198] Defendants William and Company A moved for summary judgment, which the court granted mostly in their favor. *Id.* at *13. In most relevant part, the court granted

[198] It is not clear that Company B did so suffer, but Felix lost the ability on summary judgment to pursue this claim because he failed to show sufficient preliminary evidence of damages. *Id.* at *9.

summary judgment in favor of Company A on Felix's claim that Company A had aided and abetted William in breaching his fiduciary duty to Company B by maintaining the discount against Company B (while at the same time finding a triable question of fact as to whether William breached his fiduciary duty to Company B). *Id.* at *11. The court found:

> [T]here are genuine issues of material fact regarding whether William breached his fiduciary duty [to Company B]. However, nothing in the record suggests that [Company A] had actual knowledge of William's alleged breach and knowingly participated in it. Plaintiff provides no evidence to suggest that [Company A] provided substantial assistance to William in maintaining the discount arrangement, such as affirmatively aiding the arrangement or failing to change the discount. Further, 'the mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff.' *Kaufman v. Cohen*, [760 N.Y.S.2d 157, 170 (N.Y. App. Div. 2003)]. Here, [Company A] did not owe a fiduciary duty directly to Plaintiff. Plaintiff 'cites to no evidence supporting any inference' that [Company A] owed a fiduciary duty to him and 'does not argue in its brief' that [Company A] owed him a fiduciary duty. . . .
>
> Even assuming that Plaintiff could prove [Company A's] knowing participation in the alleged breach, Plaintiff's claim against [Company A] separately fails because 'a corporation cannot aid and abet violations by the fiduciaries who serve it' [citing *Buttonwood Tree Value Partners, L.P. v R.L. Polk & Co., Inc.* 2014 WL 3954987, at *5 (Ch. Del. Aug. 7, 2014)].

*Endico*, 2022 WL 3902730, at *11-*12 (emphasis supplied) (other internal citations omitted).

As noted, the Entity Defendants rely heavily rely on *Endico* and correctly argue that Plaintiff failed to address *Endico* directly in his objections to the motions to dismiss. At oral argument, Plaintiff asserted that *Endico* was not specifically addressed because it is not controlling and was not correctly decided in any event.

The Court will directly address this issue and find that the cases relied upon by the Plaintiff (such as *Carlton*, *Carlson* and *Quadrant*) are more factually analogous and legally applicable than those cited by the Entity Defendants and therefore controlling on this Motion. This is so principally because, other than *Endico*, the cases relied upon by the Entity Defendants did not involve the circumstances we have here of one or two individuals controlling the actions of various

affiliated entities to further the principal fiduciary's goal of preserving the wealth of the fiduciary, his other entities and his family over the interests of the Debtors. Additionally, the Court finds the cases relied upon by Defendants to be distinguishable because they merely held that an entity cannot be held liable for aiding and abetting a breach of fiduciary duty of its own officers and directors. As was acknowledged during oral argument, those cases (other than *Endico*) did not involve a situation in which a different entity, also controlled by the same principal actor, is alleged to have aided in the principal's breach of fiduciary duty.[199]

In the instant case, the Entity Defendants repeatedly cite to *Endico* for the proposition that having an individual (such as William) on both sides of the transaction does not detract from the principle that an entity cannot aid and abet a breach of fiduciary duty by its own principal. But that is an over-simplification of the rule and not the case here, where Mitchell was allegedly using other non-Debtor entities (the Entity Defendants) to implement (i.e., aid and abet) the plan that breached his fiduciary duty to the Debtors -- not to HMC or the M&M PropCos --which are distinct legal entities in any event. In contrast, the cases cited by the Trustee, such as *Carlson* and *Carlton* and *Quadrant*, all acknowledge that a third-party entity or individua -- as a distinct legal entity -- an be liable for aiding and abetting the breach of fiduciary duty owed by its officers or directors to another entity. The Court finds this rationale and holding of these cases to be better reasoned and supported than *Endico* and therefore controlling here. Thus, the Entity Defendants, as distinct legal entities, can be held liable for aiding and abetting Mitchell's breach of fiduciary duty to other entities, such as the Debtors, even though Mitchell was an officer, owner and/or in control of all those entities. In fact, that common ownership and control, as proven, may make for an even stronger aiding and abetting case.

[199] Feb. 8, 2023 Hr'g Tr. 89:9-92:14, Dkt. No. 68.

Further, in this Court's view, the Entity Defendants' reliance on the concluding paragraphs of *Endico* cited above is based on the misapplication (and over-extension) of the principle that an entity cannot aid and abet its own fiduciary. In *Endico*, William was charged with breach of his fiduciary duty to Company B (Sally Sherman) and/or Felix (his brother), not Company A (Ace Endico), which received the alleged benefit of the discount and which William also controlled. But the *Endico* court held only that William, as an officer of Company A, could not aid and abet a breach of fiduciary duty to that same company (Company A). *Endico*, 2022 WL 3902730, at *12.

In this case, and in contrast, the Entity Defendants are charged with aiding and abetting Mitchell's breach of fiduciary duty to the Debtors, rather than to the Entity Defendants. Additionally, the *Endico* case was decided on summary judgment, and the court found that, because the aiding and abetting issue had not been briefed by plaintiff, it was effectively abandoned, but went on to decide the issue nonetheless. *Endico*, 2022 WL 3902730, at *11. Thus, this aspect of the Magistrate Judge's ruling is arguably dicta. And finally, the *Endico* Court held that, even though there were genuine issues of material fact as to whether William breached his fiduciary duties to Company B, and William was a principal of both Company A and Company B, there was no evidence of knowing participation by Company A. *Id.* That finding is directly contrary to the principle of law cited above, i.e., that the knowledge of an entity's officer and director is imputed to the entity. That holding would also be *contra* to the *Carlton* line of cases cited above, to the extent it determined that an entity controlled by a common officer or director cannot aid or abet a breach of fiduciary duty by the officer or director to another commonly-controlled entity. Thus, to the extent it is not dicta and/or distinguishable, this Court disagrees with those aspects of the *Endico* decision and finds that separate legal entities, such as HMC and the M&M PropCos, that are controlled by the same principal (here, Mitchell), may be held liable

for aiding that individual's breach of fiduciary duty to other entities that he also controls (here, the Debtors).

N. There Is No Potential for Double Recovery on the Aiding and Abetting Claim

Several of the Entity Defendants argue that allowing the Trustee to recover on the aiding and abetting claims would potentially result in a double recovery. However, as was argued by the Trustee and not directly disputed by the Entity Defendants, Delaware law makes clear that aiders and abettors of breaches of fiduciary duty are jointly and severally liable for any damages caused by the breaches, so there is no possibility of a double recovery. *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 172-73 (Del. 2002); *Carlson v. Hallinan*, 925 A.2d 506, 548 (Del. Ch. 2006); *In re Rural/Metro Corp. Stockholders Litig.*, 102 A.3d 205, 220-21 (Del. Ch.), *appeal dismissed*, 105 A.3d 990 (Del 2014). Further, as the Court made clear at oral argument, such double recovery will not be permitted. Thus, this aspect of the Entity Defendants' motion is denied.

O. HMC's Motion to Dismiss Trustee's Breach of Contract and Preference Claims Based on Offset Is Denied

HMC argues that the Trustee fails to state a claim for breach of contract (Count 6), namely a breach of the Services Agreement, because HMC applied a valid setoff against money that Debtors owed HMC. HMC further argues that the Trustee's preference claim must also be dismissed because a setoff does not constitute a transfer and thus cannot create a preference.

According to the Complaint, pursuant to the Services Agreement, the Debtor delivered $4.3 million worth of inventory to HMC, provided $2.5 million in services, and paid $4.2 million in real estate taxes owed by HMC.[200] Rather than repay the Debtors, HMC claimed to setoff $6.8 million owed to it by the Debtor. The Complaint states that Mitchell borrowed $6.8 million from

[200] Compl. ¶¶ 149, 180e, 261, 267, Dkt. No. 1.

HMC, which he then provided to M&M Lending, LLC, which ultimately loaned the $6.8 million to the Debtors.[201] However, in Footnote 4 of HMC's Reply to the Trustee's response in opposition to HMC's motion to dismiss, and during oral argument, HMC argued that the March 2020 setoff amount was based on an amount HMC allegedly owed under the Services Agreement at that time, which also happened to be approximately $6.8 million, and not as a result of the above-described loan made to Mitchell.[202] As with other factual arguments made by other parties, these factual disputes are not properly resolved on a motion to dismiss. Further, the Court finds an ambiguity in the contractual language at issue, as noted above, and related issues as to HMC's alleged performance under the Services Agreement that mandates denial of HMC's Motion to Dismiss Count 6 at this stage of the case.

In this regard, Section 3.06(f) of the Services Agreement refers to offset rights and provides:

> Notwithstanding anything contained herein or in any other agreement between the Parties to the contrary, MSG shall have the right, at MSG's option, to offset sums due to HMC under this Agreement, any other agreement between MSG and HMC, or in connection with any receivable due to HMC from MSG or any of the MSG Entities.[203]

The Trustee argues that § 3.06(f)'s language providing that "MSG shall have the right" reserves the right to setoff to MSG exclusively and thereby precludes HMC's right to setoff. The Trustee relies on the maxim *expression unius est exclusio alterius*, meaning "the expression of one thing is the exclusion of the other," in arguing that the omission of express language providing for HMC's right to setoff reserves the right to setoff exclusively to MSG.[204] *Dunn Auto Parts, Inc. v. Wells*, 155 N.U.S.3d 507, 510 (N.Y. App. Div. 2021) ("Where a document describes the particular

[201] Compl. ¶ 138, Dkt. No. 1.
[202] HMC Reply ¶ 17, at 12 n.4, Dkt. No. 51; Feb. 8, 2023 Hr'g Tr. 100:14-102:23, Dkt. No. 68.
[203] Compl. Apr. 3, 2011 Services Agreement § 3.06(f), Ex. A, dkt. No. 1.
[204] Trustee Obj., at 32-33, Dkt. No. 44.

situations in which it is to apply, an irrefutable inference must be drawn that what is omitted or not included was intended to be omitted and excluded.”).

In response, HMC argues that the Trustee is attempting to transform contractual silence into a waiver of HMC’s setoff rights. HMC contends that, absent explicit language waiving the right to setoff, contractual silence does not equate to a waiver. *See Port Distrib. Corp. v. Pflaumer*, 880 F. Supp. 204, 211 (S.D.N.Y.), *aff’d*, 70 F.3d 8 (2d Cir. 1995) (“[W]aiver is the intentional relinquishment of a known right, which must be evidenced by a clear manifestation of intent.”); *Wright v. Universal Mar. Serv. Corp.*, 525 U.S. 70, 80 (1998) (“[W]e will not infer from a general contractual provision that the parties intended to waive a statutorily protected right unless the undertaking is ‘explicitly stated.’”); *Johnson v. Zerbst,* 304 U.S. 458, 464 (1938) (defining waiver as “an intentional relinquishment or abandonment of a known right or privilege”).

HMC also relies on the offset rights preserved (rather than created) by the Bankruptcy Code. 11 U.S.C. § 553:

> Although the Bankruptcy Code does not itself establish a right of setoff, section 553 of the Bankruptcy Code recognizes and preserves any right to setoff that exists under applicable non-bankruptcy law, to the extent that the conditions of section 553 have been satisfied.

*In re Lehman Bros. Holdings*, 404 B.R. 752, 757 (Bankr. S.D.N.Y. 2009). Section 553(a) provides, in relevant part:

> Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case . . . .

11 U.S.C. § 553(a). The prerequisites for a setoff under Section 553(a) of the Bankruptcy Code include that “(1) the amount owed by the debtor must be a prepetition debt; (2) the debtor's claim against the creditor must also be prepetition; and (3) the debtor's claim against the creditor and the

debt owed the creditor must be mutual." *In re Lehman Bros.*, 404 B.R. at 757 (citations and quotations omitted).

Here, it must first be determined whether, regardless of issues of waiver, HMC has a right to setoff under applicable nonbankruptcy law. Since mutuality is required for a valid setoff, if the $6.8 million was not a debt owed by the Debtors to HMC, but rather a debt resulting from a loan received from a non-HMC entity, there would be no mutuality and thus no valid setoff. *See In re Westchester Structures, Inc.*, 181 B.R. 730, 741 (Bankr. S.D.N.Y. 1995) ("New York law finds debts are mutual when they are due to and from the same persons in the same capacity."). This disputed issue requires a factual finding that cannot be properly made upon a motion to dismiss and is by itself sufficient to deny HMC's motion.

With respect to waiver, the Court first notes that the Trustee has not argued that HMC waived that right; instead, the Trustee's position is that HMC does not have that right under the Services Agreement. Here, although Section 3.06(f) of the Services Agreement is silent as to HMC's right to setoff, HMC argues that this silence may not rise to the level of an "intentional relinquishment of a known right." *Johnson*, 304 U.S. at 464. However, whether a contractual or other right was waived is typically a factual issue that is not appropriately resolved on a Motion to Dismiss. *See Optima Media Group Ltd. v. Bloomberg L.P.*, 383 F. Supp. 3d 135, 150 (S.D.N.Y. 2019) (the general rule under New York law is that questions of waiver are not to be decided on a motion to dismiss). Relatedly, the actions and course of dealings between the parties in connection with the exercise of setoff rights under the Services Agreement appear to be relevant and are inherently factual determinations that this Court cannot resolve at this stage of the proceedings. That is particularly true here, where the parties dispute the meaning and effect of the cited contractual language, and both parties argue that the silence of the Agreement as to any other offset rights is dispositive, but in opposite directions. Additionally, HMC is alleged to have exercised

the setoff right just before the Debtors' bankruptcy filing and with Mitchell's approval, even though HMC had not previously exercised any setoff right in this fashion, as was acknowledged by HMC at oral argument.[205] Thus, HMC's Motion to Dismiss is denied, pending discovery and further proceedings on what appears to be a mixed question of fact and law.

As to the Trustee's preference claim against HMC, the Trustee and HMC do not dispute the black letter bankruptcy law that prepetition setoffs cannot be avoidable preferences. *See* 5 Collier on Bankruptcy ¶ 547.03 (16th ed. 2021) (". . . a setoff does not create a preference because there is no 'transfer'"). Thus, the only issue involves whether HMC applied a valid setoff; if there was a valid setoff, then the Trustee's preference claim regarding the prepetition setoff must fail. However, if the setoff is not valid for any of the reasons HMC's alleged setoff rights under the Service Agreement were not properly exercised, then the setoff defense would similarly not apply to the preference claim. Thus, this aspect of HMC's motion is denied for the same reasons cited above as to the denial of HMC's motion on the Trustee's breach of contract claim.

## VI. CONCLUSION

For the forgoing reasons, the Motions to Dismiss filed by Mitchell, HMC and the M&M PropCos are **DENIED**, except as set forth in the following paragraphs:

A. The breach of fiduciary duty claims against Mitchell (Count 1) and the aiding and abetting breach of fiduciary claims against HMC and the M&M PropCos (Counts 8, 9, 10) are **DISMISSED**, with prejudice, to the extent they seek damages for any period prior to March 11, 2017; provided, however, that this relief shall not preclude the Trustee from seeking discovery for any period prior to March 11, 2017 to the extent permissible under other applicable law.

B. To the extent the Complaint alleges or seeks damages based on the Debtors' "deepening insolvency" or "proliferation" of debt, those damage claims are **DISMISSED**, with prejudice; provided however that the Trustee may seek other appropriate damages under the principles set forth in this Opinion.

[205] Feb. 8, 2023 Hr'g Tr. 100:14-119:1, particularly 102:24-104:17, Dkt. No. 68.

C. The Motion to Dismiss the avoidance claims against Mitchell based exclusively on his salary is **GRANTED**, without prejudice to the Trustee's right to amend his Complaint to seek to sufficiently allege such a claim as to salary within thirty (30) days of the entry of the Order implementing this Opinion; but is **DENIED** as to the Trustee's avoidance claims based on improper reimbursement of expenses and improper dividends or distributions.

D. The Motions by Mitchell and Service Center for a more definite statement are **DENIED**, except that the Trustee shall have thirty (30) days from the entry of the Order implementing this Opinion:

(i) to identify the specific transfers being challenged, by providing the same (or similar) details as to the challenged transfers as were provided in the 1077 Amended Complaint, but only to the extent that information is reasonably available to the Trustee;

(ii) to include the allegations in the Trustee's opposition brief in support of his argument that Debtors operated as a unitary by providing these same (or similar) allegations that were included in the 1077 Amended Complaint; and

(iii) to identify, to the extent reasonably practicable, the particular Debtor that allegedly made a challenged avoidable or improper transfer, based on the readily available information in the Debtors' books and records that are in the possession of the Trustee. For example, and not by way of limitation, in the case of transfers from the MII operating or cash management account(s), it is sufficient for Trustee to identify that the funds came from an MII account, with further details (such as intercompany allocations) to be obtained through discovery to the extent they are available.

E. The Trustee shall have thirty (30) days from the entry of the Order implementing this Opinion to file an Amended Complaint, and the Defendants shall have thirty (30) days from the date of that filing to answer. No further motions to dismiss shall be permitted, except with the Court's prior written approval upon application made by a letter of 2-4 pages, to which the Trustee shall have five (5) business days to respond in a similar fashion. The Court may decide the application on the papers or may conduct a hearing. Discovery shall immediately proceed in the normal course, notwithstanding any application to file a further motion to dismiss.

F. Except to the limited extent set forth in the preceding paragraphs, the Motions to Dismiss and for a More Definite Statement are **DENIED**.

An Order consistent with this Opinion is contemporaneously being entered.

Dated: April 14, 2023

*Vincent F. Papalia*

Vincent F. Papalia
United States Bankruptcy Judge